**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOON GROUP, INC., et al.,[1] | ) Case No. 21-11140 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION OF JOHN PURSELL, JR.**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, John Pursell, Jr., declare that the following is true to the best of my knowledge,

information and belief:

1.      I am the chief executive officer of the Moon Group, Inc.. ("Moon Group" or the

"Debtor"), as well of each of its debtor affiliates, Moon Landscaping, Inc. ("MLI"), Moon

Nurseries, Inc. ("MNI"), Moon Site Management, Inc. ("MSM"), Moon Wholesale, Inc.

("MWI"), and Rickert Landscaping, Inc. ("Rickert" and collectively, with Moon Group, MLI,

MNI, MSM, and MWI, the "Debtors" or the "Moon Entities").

2.      In such capacities, I am familiar with the Debtors' day to day operations and

business and financial affairs.

3.      As the Debtors' chief executive officer, I am responsible for overseeing all

aspects of the Debtors' business, including finance, marketing, sales and the administration of

the Debtors' Chapter 11 case.

4.      I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the Debtor's

first day motions and applications filed contemporaneously herewith (collectively, the "First Day

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Moon Group, Inc. (7484); Moon Landscaping, Inc. (3442); Moon Nurseries, Inc. (8411); Moon Site Management, Inc. (0250); Moon Wholesale, Inc. (3232); and Rickert Landscaping, Inc. (3988).  The Debtors' headquarters and mailing address is 145 Moon Road, Chesapeake City, MD 21915. A description of the Debtors and their respective businesses is set forth in the Declaration of Joh Pursell, Jr. in support of First Day Pleadings (the "First Day Declaration") filed on the petition date.

Motions"). I have reviewed the First Day Motions or have otherwise had their contents explained to me by the Debtors' proposed counsel, and I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in Chapter 11 with a minimum of disruption to its business or diminution in the value of its assets.

5. Except as otherwise indicated herein, all of the facts set forth herein are based on my personal knowledge or upon information provided by Debtor's management or professionals. If called as a witness, I would testify to the facts set forth in this declaration.

## **BACKGROUND**

6. On August 12, 2021 (the "Petition Date"), the Debtors each filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors continues to operate their businesses and manage their properties as debtors-in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. Moon Group was formed as a Delaware corporation on December 30, 2002 as a holding company that would and does wholly own each of the other Moon Entities (i.e. MLI, MNI, MSM, MWI and Rickert), which are its pre-existing operating subsidiaries, through which they operate several distinct businesses from a single principal place of business located in Chesapeake City, Maryland.

8. One hundred percent of the capital stock in the Moon Group is owned by the Moon Entities' employees by and through Moon Group's Employee Stock Ownership Plan.

9. The Debtors operate as an integrated business under the common ownership and control of the Moon Group, and share management, financial and operational systems.

10.     MNI is a Maryland corporation formed on December 26, 1989, and is the present iteration of a nursery business operating under the Moon Nurseries name which has been in operation since 1767 and is widely accepted as America's oldest surviving plant nursery.

11.     MNI grows, markets and sells numerous varieties of field grown or container trees, shrubs and perennial plants from two farms comprising nearly 900 acres near Chesapeake City, Maryland.

12.     MSM is a Pennsylvania corporation formed on January 4, 1974, that provides complete grounds management for commercial, institutional or industrial sites and residential communities. Services include turf management (mowing, trimming, edging, fertilization, weed and insect control, aerating or re-seeding); landscape maintenance (mulching, bed maintenance, plant trimming or pruning, plant care and fertilizing and spring and fall clean up); mature tree care; irrigation systems; nightscaping (adding outdoor lighting for appearance and safety); and snow removal. MSM provides these ground management services to clients throughout the mid-Atlantic region of the United States.

13.     While MSM has many large customers throughout its service region, one entity, StoneMor, Inc ("StoneMor").—a large national operator of cemeteries—is by far MSM's largest customer. MSM and StoneMor are parties to a Master Service Agreement whose term extends through December 31, 2024, pursuant to which MSM has been engaged to provide ground maintenance and burial services to 320 cemeteries in approximately 30 states.

14.     MLI is a Pennsylvania corporation formed on January 5, 1995, which operates as a landscape contractor for residential, commercial, and municipal projects. It also provides maintenance services to very high-end homes or estates. Landscape contracting may include developing concepts, design assistance (including permits and regulatory approvals), installation

3

or construction and follow-up service for both landscaping and hardscaping projects. Hardscaping refers to installation or construction of patios, terraces, walkways, retaining walls, embankments or borders made with bricks, pavers, stones timbers or similar materials integrated with landscape.

15.     MWI is a Pennsylvania corporation formed on January 5, 1995 for the purpose of operating a plant wholesaling business, and remains in good standing in the state of its formation.  However, with the limited exception of being a nominal party to certain contracts, MWI has been inactive for several years.

16.     Rickert is a Pennsylvania corporation formed on January 11, 1971 and remains in good standing in the jurisdictions of its formation.  Rickert previously operated a business similar to that of MSM and/or MLI, but has been substantially inactive for several years.

**Debtors' Assets and Liabilities**

17.     Upon information and belief, collectively, the Moon Entities have fixed assets (real property, inventory, and equipment) worth approximately thirty-one million dollars ($31,000,000.00), as follows: real estate - $12 million; inventory (plants and shrubs) - $15 million; machinery and equipment - $4 million.

18.     Collectively, the Moon Entities had annual gross revenue of $18,707,878 in 2019 and $52,659,443 in 2020.

19.     As of the date hereof, the Moon Entities have accounts receivable totaling $8,838,653, of which $3,065,970 are current to 30 days, $3,703,417 are aged from 30 to 60 days, $1,625,942 are aged 60 to 90 days, and $443, 323 are more than 90 days old.

20.     Two lenders have made loans that are secured by the Moon Entities' real property inventory and equipment:

a.  Newtek extended a commercial loan in the original principal amount of $5,000,000.00 pursuant to a loan and security agreement dated June 27, 2019; and

b.  North Avenue Capital extended a commercial loan in the original principal amount of $10,000,000.00 pursuant to a loan and security agreement dated June 28, 2019.

21.    The Moon Entities are not in default of either of the Newtek or North Avenue Capital loans.

22.    As set forth below, the debtors also have a line of credit with Kore Capital Corporation secured by their accounts receivables.  As of the petition date, the debtors estimate that their unsecured liabilities are between $6 and $8 million.

**The StoneMor Contract**

23.    The Moon Entities and StoneMor (Moon's largest customer) were parties to a master service agreement by which Moon would handle the maintenance work and burials at designated cemeteries.  In November 2019, StoneMor proposed that the Moon Entities assume the ground maintenance and burials for all of its cemeteries.  The Moon Entities and StoneMor reached an agreement by which the Moon Entities would gradually expand the services provided to StoneMor and acquire, retain and compensate directly the existing StoneMor employees working at acquired cemetery maintenance sites.

24.    In January 2020, the Moon Entities began the expansion by acquiring the maintenance for StoneMor sites in southeastern and southwestern Virginia.  One month later, the Moon Entities undertook the maintenance for the StoneMor sites in North and South Carolina.  Once the COVID-19 pandemic began in March 2020, StoneMor asked the Moon Entities to complete the full transition of all of its sites nationwide.  The Moon Entities thereafter

accelerated the acquisition process and completed the onboarding of StoneMor's cemetery employees in June 2020, following which they brought in regional managers, equipment managers, and certain remaining employees. The acquisition of the StoneMor sites and the StoneMor employees significantly increased the Moon Entities' revenues, but also dramatically increased its payroll obligations, especially in the spring and summer months where maintenance demands are highest.

25.    By their nature, the Moon Entities' businesses are seasonal, resulting in widely disparate income and expenses at varying times of the year.

26.    For example, between spring and fall, when turf management and landscape management services are routinely provided to customers in the mid-Atlantic region of the United States, MSM and MLI carry large recurring payroll expenses, as these entities employ a large number of seasonal employees providing these services during these time periods,.

27.    However, from late fall until the following spring, neither MSM nor MLI require these large workforces, but, instead,  typically rely upon subcontractors to assist with the provision of snow removal services, which, by their nature, are impossible to predict in advance.

### The Kore Capital Receivables Line of Credit

28.    In addition to the two (2) asset-secured loans described above, to assist the Moon Entities in addressing cyclical cash flow needs as a result of the seasonality of their businesses, the Moon Entities obtained a third loan, a revolving line of credit from Kore Capital Corporation in May 2020.

29.    This line of credit is secured by the Moon Entities' accounts receivable, and the amount that the Moon Entities are permitted to draw is based upon a percentage of the Moon Entities' then outstanding eligible accounts receivable.

30.     As a result of the percentage of the Moon Entities' revenues represented by the StoneMor account and the resulting concentration limitations under the Kore loan and security agreement, Kore agreed to advance to the Moon Entities eighty percent (80%) of their receivables for customers other than StoneMor, but only thirty-five percent (35%) of the StoneMor receivables.

31.     The loan facility contemplated that the Moon Entities' receivables would be paid directly to a lock box established by Kore, and that the above noted percentages would then be advanced to meet the Moon Entities' short term cash flow needs.

32.     Shortly after the loan facility commenced, it was readily apparent to the Moon Entities and Kore that the loan program as initially contemplated was wholly impracticable for its intended purpose, as a result of the diminished borrowing availability in relation to the StoneMor receivables, particularly given the expenses associated with servicing the StoneMor account and the narrow margins associated therewith.

33.     As a result, the Kore loan facility was amended several times, both by formal amendment, and through custom and practice, to increase both the total availability under the line of credit and the percentage of the StoneMor receivables against which Kore would advance.

34.     However, as the Moon Entities made new borrowing requests, the time period between the request and the funding thereof began to increase materially, such that on a number of occasions, the Moon Entities were on the verge of defaulting on their payroll obligations as a result of the timing of Kore's funding.

**Kore Capital's Demands and Actions**

35.     In or about July 2021, Kore demanded that the Moon Entities engage, at the Moon Entities' significant cost and expense, a Kore-selected financial "cash flow consultant."

36.     Materially, this was not a request by Kore for a field exam, which is permitted under the applicable loan documents, but was clearly intended to serve as a de facto receivership.

37.     Kore made this demand despite: (1) there being no basis therefor under the parties' operative loan documents; and (2) there being no predicate act or circumstance that would give rise to a good faith basis for such a demand.  For example, there had been no meaningful change in the financial results of the Moon Entities' operations, and the Moon Entities' financial statements were already subject to third-party CPA review/audit.  Rather, the cash flow issues Kore contended was the basis for their demand were wholly unchanged since Kore underwrote the loan and then amended it multiple times, both by written amendment and custom and practice.

38.     At the time Kore made this demand, the outstanding principal balance of the Kore line of credit was approximately $5,000,000.00; however, the Moon Entities' accounts receivable in which Kore has a security interest totaled approximately $9,000,000.00, and thus Kore was substantially oversecured.

39.     As a result, the Moon Entities advised Kore that there was no contractual or factual basis for the demand and that the Moon Entities were not willing to  incur the expense for Kore's consultant.

40.     *However*, the Moon Entities' further informed Kore that they had no objection whatsoever to Kore engaging such a consultant in a more circumscribed role at Kore's cost if it so chose.

41.     As an alternative, Moon also offered to re-engage a highly-qualified and well-regarded consultant the Moon Entities had worked with in the past who already had substantial knowledge of Moon's business, to offer guidance regarding any potential cashflow issues.

42.     Kore rejected both of these alternatives, and insisted that the Moon Entities engage Kore's proposed consultant at the Moon Entities' substantial expense.

43.     The Moon Entities have concluded that  Kore's attempt to install the cash flow consultant and its rejection of  compromise proposals are indicative of bad faith conduct which will likely be addressed in future proceedings.

44.     After the Moon Entities reasonably refused to pay to acquiesce to Kore's demands,  Kore *refused* to fund further advances under the line of credit, *but continued to insist that the Moon Entities' customers make payments directly to Kore*.

45.     Kore did so despite having actual knowledge that absent a contractually-required advance from Kore and consistent with Kore's practices and procedures during the course of its lending relationship with the Moon Entities, the Moon Entities would be unable to pay certain imminent obligations, most significantly, the Moon Entities' substantial payroll obligations. Kore's bad faith conduct and breach of its funding obligations during the height of the summer grounds maintenance season put at risk the wages of  the Moon Entities' entire labor force.

46.     In addition to putting the Moon Entities' employees at risk, Kore put the Moon Entities' future receivables (i.e., Kore's primary security) at substantial risk by knowingly creating a scenario whereby the Moon Entities' ability to perform would be materially compromised.

47.     Moreover, absent the necessary and indicated advance to the Moon Entities by Kore, the Moon Entities only other source of cash would be customer accounts receivable payments themselves.

48.     Kore continued to refuse to fund necessary advances in accordance with the governing loan documents even after the Moon Entities placed Kore on notice of the impropriety

of its position, the breach of the loan relationship it would create, and the untenable position in which Kore had placed the Moon Entities.  In so doing, Kore materially breached the parties' contracts.

49.    Importantly, since Kore would only fund 35% of the StoneMor accounts receivable rather than the 80% of the accounts receivable of other Moon Entities' customers, Kore affirmatively knew that under the terms of its lending relationship with the Moon Entities, the Moon Entities would eventually have insufficient cash from the Kore facility to fulfill the purpose of the Kore loan.

50.    <u>After</u> Kore's material breach of contract by refusing to fund the required next advance, and as a direct result thereof, the Moon Entities requested StoneMor to pay its next receivables directly to Moon Landscaping, Inc. ("MLI") to allow MLI to fund payroll and thus continue to operate its business. This allowed MLI to generate revenues to satisfy its obligations to Kore and the Moon Entities' senior lenders, and to avoid defaulting on its obligations to its many clients under recurring service contracts, such as the large StoneMor contract.

51.    Thereafter, despite the above-stated facts, Kore issued a Notice of Default to the Moon Entities on  July 16, 2021, ignoring that its predicate material default relieved the Moon Entities' of their duty of further performance and was the precise cause of the actions of which Kore was complaining.

52.    Upon receipt of the Notice of Default, the Moon Entities promptly responded to Kore, setting forth  these  facts and rejecting the contention that a default had occurred.

53.    *However*, at the same time, the Moon Entities also offered a pragmatic proposed resolution: (1) if Kore confirmed in writing that it would honor the parties' loan agreements, and fund the requested advance, the Moon Entities would turn over the StoneMor payment to Kore,

and (2) the Moon Entities would promptly seek an alternate lender to refinance the Kore line of credit with the goal of ultimately ending the parties' business relationship.

54.    Kore rejected this proposal, and, instead, engaged in a series of retaliatory tactics, which have included, *inter alia*, repeatedly tortiously interfering with the Moon Entities' contractual relationships with its customers such as StoneMor; the filing of a Receivership Motion for the appointment of a receiver on an emergent basis; suit against StoneMor in Pennsylvania; confessing judgment against the Moon Entities' guarantors; and, most recently, attempting to obstruct and steal the Moon Entities' mail based upon a fraudulent misrepresentation to the postmaster in a glaring violation of both 18 U.S.C. § 1701 and 18 U.S.C. § 1708.

**Impact on the Debtors' Business**

55.    Due to the constriction of available funds during the 2021 maintenance season, the Moon Entities' fell behind on their subcontractor payments, primarily for StoneMor sites.  As a result, StoneMor implemented a plan to take back the maintenance for certain properties to reduce the saturation of the Moon Entities' businesses.  In June 2021, StoneMor initiated a plan to take back maintenance control of 75 properties.  In July 2021, StoneMor expanded this take back to include 60% of the properties originally included in the master service agreement with the Moon Entities.  This take back was completed on August 1, 2021.

56.    At its fullest, the StoneMor master services contract generated monthly revenues for the Moon Entities of approximately $3.8 million.  Within the last two months, the StoneMor contract monthly revenues dropped to $3.4 million.  As of the completion of the take back of properties on August 1, 2021, expected monthly revenues from the StoneMor contract will drop below $2 million.

57.     These bankruptcy cases have been filed to ensure that the Moon Entities can continue to operate their businesses, stabilize their cash flow, and ensure that all creditors are treated equitably.

A.      **First Day Motions.**

      (i)      **Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Related Chapter 11 Cases.**

58.     By this Motion, the Debtors request an order jointly administering the Debtors' bankruptcy cases.  The Debtors anticipate that numerous notices, applications, motions, hearings, and orders in these cases will affect both of the Debtors.  With two debtors before the Court, each with its own case docket, the failure to administer these cases jointly would result in the filing of duplicative pleadings for each issue that arises in these cases, and the service of each of these duplicative pleadings on numerous overlapping service lists.  Joint administration of these cases will eliminate these cumbersome filings and reduce the waste and burden on judicial resources associated with the administration of these chapter 11 cases.  I also understand that Joint administration will reduce the burden on the United States Trustee in supervising these chapter 11 cases.

59.     Moreover, I understand that joint administration will not adversely affect creditors' rights, as this Motion requests only administrative, and not substantive, consolidation of the Debtors' cases.  Rather, the reduced costs resulting from joint administration of the Debtors' estates will enhance the rights of all creditors.  Accordingly, I believe that an order authorizing the joint administration of the Debtors' case is in the best interests of the Debtors' estates and their creditors.

      (ii)     **Motion for Authority to Use Cash Collateral on an Interim and Final Basis (the "Cash Collateral Motion").**

60. Concurrently herewith, the Moon Entities have filed the Cash Collateral Motion pursuant to section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b). By this motion, the Debtors seek authority to use cash collateral on an interim and final basis.

61. The Debtors require immediate access to Cash Collateral to ensure that they are able to continue the operation of their business. Absent the ability to use Cash Collateral, the Debtors will not be able to pay insurance, wages, utility charges, and other critical operating expenses. Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and would likely be forced to cease operations immediately and commence a fire sale of their assets.

62. The Debtors have been negotiating with potential lenders for postpetition financing and I believe that the Debtors will be in a position to seek court approval of postpetition financing in the near future. Until then, the Cash Collateral is the Debtors' sole source of funding for their operations and the costs of administering the chapter 11 process. Absent authority to immediately use Cash Collateral, the Debtors, their creditors and the estates generally would suffer irreparable harm because the Debtors would immediately cease operations, which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtors' business. Thus, the Debtors' access to Cash Collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtors' stakeholders.

63. In conjunction with this request to use Cash Collateral, the Debtors have formulated the budget attached to the Cash Collateral Motion (the "Budget"). The Debtors believe that the Budget will provide the Debtors with adequate liquidity. The Interim Budget contains line items for each category of cash flows anticipated to be received or disbursed during

the time period for which the Budget is prepared.  I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budget.

64.     The Budget demonstrates that the Debtors will remain essentially cash flow neutral through week 6 and the Debtors anticipate that they will be able to pay Kore Capital in full from the proceeds of a postpetition financing in week 7.  Accordingly, Kore Capital's interest in the Cash Collateral will not diminish in value prior to being paid in full.  In addition, the Debtors will grant the Primary Lenders replacement liens in all of the collateral that they had liens on as of the Petition Date as well as superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code.

**(iii)    Motion for Interim and Final Orders: (I) Authorizing, But Not Requiring, Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Maintain Benefits Programs; and (II) Authorizing and Directing Banks to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")**

65.     As of the Petition Date, the Debtors employed approximately 683 people in full time positions.  Approximately 614 of the Debtors' employees were hourly and the remaining were salaried.

66.     The Debtors' salaried and hourly employees are both currently paid every two weeks for wages or salary earned in the prior two work weeks.

67.     The Debtors' work week begins on a Monday and ends on the following Sunday.  Each bi-weekly pay period ends on a Sunday, and wages and salary are paid the following Friday.

68.     Payroll is funded to the Debtors' payroll service, ADP (the "Payroll Service"), two business days in advance of pay day for all employees.

69.     The Payroll Service issues payment through checks and direct deposit.

70.     The Payroll Service also handles all payments to third-parties that arise from or relate to payroll (*e.g.*, withholdings and taxes).

71.     The Debtors' most recently closed pay period ended on August 1, 2021, and the gross payroll was approximately $1,119,915.00 for the hourly employees, and $182,295.00 for salaried employees, and was funded and paid in the ordinary course of business.

72.     As set forth more fully in the Wages and Benefits Motion, the Debtors' current pay period for employees covers the period from Monday, August 2, 2021 to Sunday, August 15, 2021 and is payable on August 20, 2021.

73.     The total salaries, wages, commissions, benefits, employment-related expenses (as previously defined) that the Debtors' employees are entitled to and funds sufficient to cover the necessary withholdings for the August 20, 2021 pay period is approximately $972,588. Because this amount is an estimate, and because the Debtors' employee obligations are changing as a result of modifications in the StoneMor master services agreement (as set forth in the First Day Declaration of John Pursell, Jr.) the Debtors request that they be authorized to pay a total amount of up to $1,072,588.00 for the August 20, 2021 payment of employees' salaries, wages, commissions, benefits, employment-related expenses (excluding health insurance payments, which are paid directly to the third-party provider), and funds sufficient to cover withholdings.

74.     During each applicable pay period, the Debtors routinely deduct certain amounts from employee' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an employee's

share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

75.    Further, the Debtors are required by law to withhold from an employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholding Obligations"). The Debtors must then pay the employer's portion of social security and Medicare taxes and pay additional amounts for federal and state unemployment insurance (collectively, the "Payroll Taxes").

76.    The Wages and Benefits Motion seeks permission to pay the pre-petition Deductions, Withholding Obligations and Payroll taxes for the current payroll period, as well as to forward any Deductions or Withholding Obligations from a prior period that may not have been forwarded to the applicable third parties.

77.    The Debtors also provide their employees with access to third-party insurance through Highmark/Blue Cross Blue Shield.

78.    The employee's third-party insurance is administered through Veris. The type of insurance offered is PPO/HMO. The insurance provides for prescription drug coverage. Approximately 174 employees participate in this health insurance plan.

79.    The Debtors contribute a portion of the costs of the employee's medical and prescription plans, and estimates that the cost for the month of August (covering the Debtors' portion of the costs of these plans for August) is approximately $245,000.00.  In the event that this estimate is incorrect, the Debtors request that they be authorized to cover these costs up to a maximum amount of $300,000.00 for amounts due for August.

80.     Additionally the Debtors have not paid the premiums due for the medical and prescription plans for June and July in the total amount of approximately $360,000. The Debtors request authority to pay this additional prepetition amount.

81.     The Debtors provides their employees with dental and vision insurance, but do not believe that they will incur any further prepetition administrative costs with respect to either plan.   In the event that this estimate is incorrect, the Debtors request that they be authorized to cover these costs up to a maximum amount of $5,000.00 per plan (administration costs only).

82.     The Debtors' workers' compensation policy is with Arch Insurance and has a policy period of August 1, 2021 to January 1, 2022. The Debtors are not aware of any employees with pending or anticipated claims against the workers' compensation policy.

83.     Full-time employees also accrue paid time off and earned day allowance each year, based on their tenure with the company. Employees are not permitted to carry-forward or cash-out unused vacation, sick, and/or personal time.

84.     In summary, due to the timing of the Debtors' petitions for relief under Chapter 11,  the Debtors' employees have accrued as many as 11 days of pre-petition salaries, wages, commissions, insurance benefits, expenses, and/or similar compensation (collectively, the "Pre-Petition Obligations").

85.     It is imperative that the Debtors maintain their relations with their employees so that they may continue to provide essential services to their customers and maintain normal operations as much as possible during the restructuring. process If the requested relief is not granted, the Moon Entities' relationships with its employees would be adversely affected and there could well be irreparable harm to the employees' morale, dedication, confidence and

cooperation during the Chapter 11 cases.  The Moon Entities' business hinges on its relationships with customers, and the ability to provide superior services is vital.  The employees' support for the Moon Entities' efforts is critical to the success of these Chapter 11 cases.  At this early stage, the Moon Entities simply cannon risk the substantial damage to its business that would inevitably attend any decline in employee morale attributable to the Debtor's failure to pay wages, salaries, benefits and other similar items.  This would cause immediate and irreparable harm to the Debtors and their estates.

86.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Moon Entities' estates, creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.

>           **(iv)     Debtor's Motion for an Order Regarding Adequate Assurance of Payment for Utility Services (the "Utilities Motion")**

87.     In the Utilities Motion, the Moon Entities seek entry of an order (a) determining that the Debtor's proposed offer of deposits provide the Utility Providers listed in the Utilities Motion with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utility Providers for additional or different assurances beyond those set forth in the Motion, and (c) prohibiting the Utility Providers from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance.

88.     The Moon Entities currently utilize electric, cable, internet, telephone and other utility services in their operations provided by certain Utility Providers as described in grater detail in the Utilities Motion.

89.     Because the Utility Providers render essential services, any interruption in such services would prove devastating to the Moon Entities' ability to continue their operations.  The temporary or permanent discontinuation of utility services at the Moon Entities' offices and related operations would severely restrict the Debtors' ability to continue operating and could cause irreparable harm.  Uninterrupted utility services are essential to the Moon Entities' ongoing operations and the failure to maintain uninterrupted utility services would cause immediate and irreparable harm to the Debtors and their estates.

90.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, creditors and all other parties in interest in constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

**(v)`Motion for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance Coverage Policies and Practices; and (II) Directing Banks to Honor All Payments Related Thereto ("Insurance Motion").**

91.     As set forth more fully in the Insurance Motion, the Debtors currently maintain numerous insurance policies and programs providing coverage for, among other things, the following: General Liability, Automobile Liability, Workers' Compensation, Property and Equipment, Management Liability, Crime, and Excess Liability (collectively, the "Insurance Programs").  Several of these policies and programs are up for renewal on September 1, 2021, and the Debtors do not believe that any prepetition amounts remain due and owing on these policies.  However, prepetition amounts are due and owing with respect to policies issued by the Arch Insurance Company for the Debtors, Commercial General Liability, Automobile and Workers Compensation policies (the "Arch Policies").

92.     The monthly premiums for these policies under the Debtors' premium financing program for the Arch Policies totals $95,139.  The Debtors believe that the total prepetition

premiums due with respect to the Arch Policies is $380,556. This motion seeks authority to pay prepetition premiums owed to Arch, in the aggregate amount of $380,556, plus additional installments that come due post-petition on these policies.

93.     In view of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interest of their estates and their creditors for the Court to authorize the Debtors to honor their Insurance Obligations. Any other alternative would likely require considerable cash expenditures, result in the Debtors obtaining insurance coverage on less desirable terms than their current coverage, and would be detrimental to the Debtors' restructuring efforts.

(vi)     **Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Their Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; and (III) Granting Related Relief ("Cash Management Motion")**

102.     *By the Cash Management Motion, Debtors seek authorization to maintain its* current bank accounts and cash management system. Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained three operating accounts with First Citizens Community Bank ("First Citizens") one for each operating entity (Moon Nurseries, Inc., Moon Landscaping, Inc., and Moon Site Management, Inc.). The Debtors' Cash Management System primarily relies upon the Debtors' accounts with First Citizens, which handles all of the Debtors' banking requirements from a single account for each of the three operating debtors.

103.     All operating expenses of the individual operating Debtors are paid, usually by check, or wire, from the respective Bank Accounts. Payroll is handled by a third-party payroll processing company (ADP) and is funded by transfers from each of the respective Bank Accounts for the employees of each operating entity.

**104.**     Debtors believe that the Bank Accounts are in a financially stable banking

institution (First Citizens Community Bank), with FDIC insurance (up to a $250,000 applicable limit, if any), and that permitting them to maintain these accounts with First Citizens will facilitate their transition into Chapter 11.

I, the undersigned Chief Executive Officer of the above-referenced Debtors, declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 13, 2021                    _/s/ John D. Pursell, Jr._____
                                            John D. Pursell, Jr.