# EXHIBIT A

In re:

MOON GROUP, INC., *et al.*

      Debtors.

Chapter 11

Case No. 21-11140 (CSS)

## INTERIM ORDER AUTHORIZING
## DEBTOR-IN-POSSESSION FINANCING

Upon the motion (the "**Motion**"[1]) of the above-captioned debtors (collectively, the "**Debtors**") in these jointly administered chapter 11 cases (collectively, the "**Cases**") seeking entry of an interim order (this "**Interim Order**"), *inter alia*:

1.      Authorizing the Debtors to obtain postpetition financing, consisting of senior secured superpriority term loans in an aggregate maximum amount of $6,250,000 on an interim basis and $8,000,000 on a final basis (the "**DIP Loans**"), from certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner (as lender, agent, and collateral agent, the "**DIP Lender**"), as provided in the DIP Credit Agreement (as defined below) and the Budget (as defined below), and to incur the DIP Obligations contemplated thereby;

2.      Authorizing the Debtors to execute and enter into, and to perform all acts necessary or desirable to consummate the transactions contemplated by, the DIP Credit Agreement and other DIP Loan Documents;

3.      Authorizing the Debtors to use the proceeds of the DIP Loans, as permitted in the DIP Loan Documents;

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the DIP Credit Agreement, attached hereto as <u>Exhibit A</u>.

4.    Authorizing the Debtors to grant the DIP Lender automatically perfected DIP Liens (as defined below) in all DIP Collateral to secure payment of all DIP Obligations, comprising:

(i)    Pursuant to Bankruptcy Code section 364(c)(2), senior DIP Liens on all DIP Collateral not subject to Permitted Senior Liens (as defined below);

(ii)    Pursuant to Bankruptcy Code section 364(c)(3), junior DIP Liens on all DIP Collateral subject to Permitted Senior Liens; and

(iii)    Pursuant to Bankruptcy Code section 364(d)(1), senior DIP Liens on all Accounts and Cash (as defined below);

5.    Vacating and/or modifying the automatic stay, pursuant to Bankruptcy Code section 362, to the extent necessary to (x) consummate the transactions contemplated by the DIP Loan Documents and (y) permit the DIP Lender to exercise any right or remedy provided therein; and

6.    Granting the Debtors such other and further relief as is just and proper; and

The Court having held an interim hearing on the Motion on September 15, 2021, and considered any objection to the Motion, and good cause appearing therefor, it is hereby <u>FOUND</u> and <u>CONCLUDED</u> that:

**<u>The Debtors' Chapter 11 Cases; Procedural Background; Jurisdiction and Notice</u>**

A.    On August 12, 2021 (the "**Petition Date**"), the Debtors each filed voluntary petitions in this Court for relief under Bankruptcy Code chapter 11. Since the Petition Date, the Debtors have been operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Office of the United States Trustee (the "**UST**") appointed an official committee of unsecured creditors (the "**Committee**") on August 30, 2021. No request has been made for the appointment of a trustee or examiner in the Cases.

B.     This Court has jurisdiction over the Cases and the Motion under 28 U.S.C. §§ 157(b) and 1334, this matter is a core proceeding under 28 U.S.C. § 157(b)(2), venue is proper under 28 U.S.C. §§ 1408 and 1409, and the Court has authority to enter this Interim Order consistent with Article III of the United States Constitution.

C.     <u>Notice</u>. In compliance with Bankruptcy Rule 4001(b), the Debtors have provided notice of the Motion to (i) proposed counsel to the Committee; (ii) counsel for the Debtors' prepetition secured lenders; (iii) the Office of the United States Trustee for the District of Delaware; (iv) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Debtors' twenty largest unsecured creditors on a consolidated basis and/or their counsel; (vii) the DIP Lender; (viii) all parties having or claiming an interest in cash collateral and/or their counsel; and (ix) all parties that have requested special notice pursuant to Bankruptcy Rule 2002.

**The Need for Debtor-in-Possession Financing**

D.     A critical need exists for the Debtors to obtain post-petition financing in order to fund their business operations, solely to the extent set forth under the Budget and under the DIP Loan Facility (as defined below). The Debtors are unable to obtain further post-petition financing on an unsecured basis under sections 364(c)(1) or 503(b)(1) of the Bankruptcy Code. Further, the Debtors assert that they are also unable to obtain more favorable secured credit from sources other than the DIP Lender that would be allowable under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code for the purposes set forth in this Interim Order. If the Debtors do not obtain authorization to borrow under the DIP Loan Facility and the DIP Loan Facility is not approved, the Debtors will suffer immediate and irreparable harm. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Loan Facility is in the best interests of the estates and creditors.

E.     The DIP Lender has agreed to provide the requested DIP Loans under the DIP Credit Agreement and use of its cash collateral in accordance with the terms contained in this Interim Order and in accordance with the DIP Credit Agreement, in the amounts, categories and times set forth in the Budget, which shall be used for: (i) the necessary operation and maintenance costs associated with Debtors' ongoing business operations; and (ii) other costs and expenses of administration of the Cases.

F.     Without the DIP Loans, the Debtors will be unable to pay their necessary operation and maintenance costs, maintain employee obligations, pay lease expenses, and avoid irreparable harm to the Debtors' estates. At this time, the Debtors' ability to finance their operations and the availability of sufficient liquidity through the incurring of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation of their revenues and the value of the Debtors' assets.

G.     Pursuant the Motion, the Debtors have requested the DIP Lender to make an interim DIP Loan in the amount of $6,250,000 pursuant to this Interim Order and (in the aggregate) $8,000,000 upon the entry of the Final Order, which funds shall be used by the Debtors solely to the extent provided in the Budget, to fund operations, and to refinance the pre-petition secured loan made by KORE Capital Corporation ("KORE").

H.     The DIP Lender has indicated its willingness to provide the DIP Loans, subject to the terms and conditions set forth herein, including the provisions of this Interim Order and the DIP Credit Agreement, providing that the DIP Liens (as defined below) and the various claims, superpriority claims and other protections granted pursuant to this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

I.     The Lender's funding of the DIP Loans is conditioned upon (i) the grant of senior liens on all of the Debtors' unencumbered property (other than Avoidance Actions or their proceeds) pursuant to Bankruptcy Code section 364(c)(2), (ii) the grant of liens pursuant to Bankruptcy Code section 364(c)(3)on the Debtors' encumbered real and personal property other than accounts receivable (the "**Accounts**") and cash and cash equivalents ("Cash"), which liens shall be junior and subordinate to the liens of (a) the Debtors' prepetition lenders and/or secured creditors and (b) any valid and unavoidable liens on property of the Debtor in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code (the "**Permitted Senior Liens**")**,** and (iii) senior liens on all Accounts and Cash, subject only to the Carveout (as defined below).

J.     The terms of the DIP Loans, as set forth in the DIP Loan Documents, have been negotiated in good faith and at arm's length between the Debtors and DIP Lender, and the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, DIP Loan Documents, and rights and remedies of the DIP Lender. The terms of the DIP Loans are more favorable to the Debtors than terms generally available in the market. In connection with its consent to this Interim Order, the DIP Lender has exercised its rights and powers and used the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

K.     The terms of the DIP Loans are fair and commercially reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are enforceable in accordance with applicable law. As such, the funds advanced shall be deemed to

have been extended by the DIP Lender in "good faith" as that term is used in section 364(e) of the Bankruptcy Code and, based upon the express reliance of the protections offered by section 364(e) of the Bankruptcy Code, the DIP Liens and DIP Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

L.      Entry of this Interim Order is in the best interests of the Debtors' estates.

M.      The DIP Lender is willing to provide the DIP Loans to the Debtors, but only on the terms of the DIP Loan Documents.

N.      To the extent any portion of the foregoing constitute rulings of law, they shall constitute this Court's rulings with respect to the matters so-stated.

WHEREFORE, it is hereby <u>ORDERED</u> as follows:

1.      The Motion is <u>GRANTED</u> on an interim basis as set forth herein.

2.      Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

3.      The execution and delivery of the DIP Credit Agreement and all other DIP Loan Documents by the Debtors are authorized and approved, and the Debtors are authorized and empowered to (x) execute and deliver to the DIP Lender all other documents and instruments necessary or desirable to consummate the transactions contemplated thereby, (y) take all other actions necessary or desirable to carry out the intent and purpose of the DIP Loan Documents, and (z) otherwise comply with the DIP Loan Documents and all requests of the DIP Lender thereunder.

**The DIP Loan**

4.      Pursuant to sections 361 and 364 of the Bankruptcy Code and the terms and conditions hereof, until the occurrence of an Event of Default (as defined herein), the Debtors are

hereby authorized to borrow funds pursuant to the terms, conditions and provisions of this Interim Order and under that certain Debtor in Possession Credit and Security Agreement dated as of September ___, 2021 (the "**DIP Credit Agreement**") and other DIP Loan Documents (the "**DIP Loan Facility**") in an aggregate amount of up to $6,250,000 upon entry of this Interim Order and up to an aggregate amount of up to $8,000,000 subject to the entry of the Final Order; provided, however, that the Debtors shall use the proceeds of the DIP Loans ("Proceeds") and the DIP Lender's "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") solely in compliance with the budget attached hereto as **Exhibit 1** (the "**Budget**") and incorporated herein by reference (as it may be amended from time to time with the consent of the DIP Lender and as provided herein) provided, however, that the Debtors may exceed any line item in the Budget by up to ten percent (10%) in any week, so long as the aggregate amount of the variance from the Budget for any week on a rolling net basis is not exceeded by more than ten percent (10%). Further, the Debtors may use Proceeds and Cash Collateral for any particular line item in any given period under the Budget up to the aggregate amount set forth for that line item from the beginning of the period of the Budget through such applicable date. A true and accurate copy of the DIP Credit Agreement is attached hereto as **Exhibit 2**.

5.      The Debtors are authorized to borrow up to $6,250,000 in DIP Loans on an interim basis in one or more DIP Draws on the terms of the DIP Loan Documents, without application to or further order by the Court.

6.      Payment of Principal, Interest, Etc. The DIP Loans shall accrue interest from the Effective Date at the U.S. prime rate (subject to a 4.00% minimum) plus 11.75% per annum; provided, however, that upon an Event of Default, the DIP Loans shall accrue interest at the additional per annum interest rate of 4.75%. The principal, interest and other obligations owed

with respect to the DIP Loans shall be due and payable upon the Maturity Date without further order of the Court.

7. <u>DIP Liens</u>. The DIP Lender is hereby granted security interests in and liens on (i) senior security interests in and liens on all of the Debtors' unencumbered property (other than Avoidance Actions or their proceeds) pursuant to Bankruptcy Code section 364(c)(2), (ii) pursuant to Bankruptcy Code section 364(c)(3), security interests in and liens on the Debtors' encumbered real and personal property other than Accounts and Cash, which liens shall be junior and subordinate to the Permitted Senior Liens, and (iii) senior liens on all Accounts and Cash subject only to the Carveout, which the Debtors have (to the extent of their respective right, title, and interest therein) assigned and conveyed as security, hypothecated, mortgaged, pledged, and set over and unto the DIP Lender, and which have been automatically perfected notwithstanding any notice or recordation requirements of non-bankruptcy law (collectively, the "**DIP Liens**").

8. Superpriority Claims. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Claims shall constitute allowed senior administrative expense claims against the Debtor (the **"Superpriority Claims")** with priority over any and all adequate protection claims, diminution claims, unsecured claims, and all administrative claims against the Debtor's estate of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the Carve-Out; provided, however, that in no event shall proceeds of Avoidance Actions be used to pay the Superpriority Claims.

9.      <u>Reimbursement of Fees and Expenses</u>.  The Debtors shall reimburse the DIP Lender's reasonable fees and expenses, including without limitation attorneys' fees and expenses (not including the fees of in-house attorneys) (the **<u>DIP Lender's Expenses</u>**) up to the amount set forth in the Budget; provided, however, that copies of all invoices reflecting the DIP Lender's Expenses shall be served by email on the Debtor, the DIP Lender, the United States Trustee and Counsel to the Official Committee of Unsecured Creditors (collectively, the "<u>Fee Notice Parties</u>"). The invoices of attorneys shall include the names of the professionals rendering services, their hourly rates, the number of hours billed for each professional, and the year of law school graduation or year of first admission to the bar of any United States Court.  The Notice shall have ten (10) business days to review and to assert any objections thereto; provided further, however, that such invoices may contain redactions (other than invoices provided to the United States Trustee, which shall be unredacted); providing such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  Unredacted copies of invoices provided to the United States Trustee shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code.  Absent written objection by any of the Fee Notice Parties within the ten-day objection period, the DIP Lender Expenses shall be promptly paid by the Debtors.  If an objection is made in writing within the ten-day period by any of the Fee Notice Parties, then the disputed portion of such DIP Lender Expense shall be reserved by the Debtors pending good faith resolution of the objection by the parties or order of the Court.  Notwithstanding anything to the contrary in the DIP Credit Agreement, the DIP Lender shall not be entitled to reimbursement of fees and expenses if the DIP Loan does not close.

10.      <u>Adequate Protection</u>. The Internal Revenue Service ("IRS") asserts a lien on substantially all of the Debtors' assets, including the Debtors' Accounts.  As adequate protection

for the priming liens on Accounts granted to the DIP Lender, (i) the IRS shall be, and hereby is, granted Replacement Liens on the Debtors' pre and postpetition property that is the type of property to which the IRS' liens extended before the Petition Date, and proceeds of such property other than accounts, in the same priority it had as of the Petition Date relative to the liens of North Avenue Capital, LLC and Newtek Small Business Finance, LLC (collectively, the "Term Loan Lenders") and (ii) Replacement Liens on the Debtors' pre and postpetition accounts receivable subordinate to the liens granted to the DIP Lender and KORE and senior to the Replacement Liens granted to the Term Loan Lenders in the *Final Order (A) Authorizing the Debtors to Use Cash Collateral of Primary Lenders and Granting Adequate Protection for Its Use* [Docket No. ___] ("Final Cash Collateral Order"). As additional adequate protection, the Debtors shall make monthly adequate protection payments to the IRS in the amount of $25,000. All rights and objections of parties in interest with respect to the validity, extent and priority of the liens of the IRS and the Term Loan Lenders are fully preserved.

11.     Nothing in this Interim Order shall modify, alter or amend the adequate protection granted to any party in the Final Cash Collateral Order provide, however, that the Replacement Liens granted to KORE in Accounts shall be junior to the liens of the DIP Lender.

12.     <u>Use of DIP Loan Proceeds</u>. The DIP Loans shall be used solely as set forth in the DIP Credit Agreement (including the Budget) and as otherwise provided in this Interim Order for: (i) the necessary operating costs of the Debtors; (ii) to satisfy the pre-petition KORE credit facility; (iii) payment of the DIP Loan Expenses and other DIP Obligations, and (iv) other costs and expenses of administration of the Cases as set forth in the Budget; <u>provided</u> that no portion of the DIP Loans shall be used for fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other

Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

13.     Reservation of Rights. Notwithstanding the refinancing of the KORE credit facility, all rights, claims and counterclaims of the Debtors against KORE are preserved to the fullest possible extent.

14.     Payments to DIP Lender. Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order or otherwise shall be received indefeasibly by the DIP Lender, free and clear of any claim, charge, assessment or other liability, including, upon entry of a Final Order, any such claim or charge arising out of or based on section 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtors.

15.     So long as any DIP Obligation remains outstanding, the Debtors shall perform each covenant contained in the DIP Loan Documents (other than those covenants that, under the DIP Loan Documents, shall not survive full and indefeasible payment of the DIP Obligations).

**Default and Remedies**

16.     The DIP Loans shall mature, and all DIP Obligations shall be immediately due and payable, upon the Maturity Date.

17.     An Event of Default shall exist during the occurrence and continuation of each of the events so identified in the DIP Loan Documents.

18.     Notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of or application to the Court:

(i)      Declare the DIP Commitment terminated; and

(ii)     Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtors.

19.     Notwithstanding the foregoing, if the DIP Lender intends to assert an Event of Default, the DIP Lender shall provide written notice of default to the Debtor, the U.S. Trustee, and the Committee, and such parties shall have fourteen (14) days to cure or seek an emergency hearing in the Bankruptcy Court. The Debtors or any other party in interest, including the Committee shall, subject to the Court's availability, be entitled to an emergency hearing before this Court within fourteen (14) days after the giving of written notice by the DIP Lender of the occurrence of an Event of Default. If the Debtors or any other party in interest do not contest the occurrence of the Event of Default within such fourteen (14) day period, or if there is a timely contest of the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Maturity Date shall be deemed to have occurred for all purposes and the automatic stay, as to the DIP Lender, shall automatically terminate in all respects.

20.     In consideration of the DIP Lender's (x) consent to the current payment of administrative expenses of the Debtors' estates to the extent of the Budget and (y) concessions with respect to the Carveout (as described herein), subject to the entry of the Final Order, the DIP Lender shall be entitled to a full and complete waiver, with respect to all parties, of Bankruptcy Code section 506(c) and in no event shall any the DIP Lender or DIP Collateral be subject to any "surcharge" or the doctrine of "marshalling" by any party in any way whatsoever.

21.     Notwithstanding anything to the contrary contained in this Interim Order and Article I, Section 1.01 of the DIP Credit Agreement, the liens, claims and other protections granted to the DIP Lender in this Interim Order shall be subject to a carveout of $400,000 plus any fees due and payable to the UST and/or Clerk of the Court under 28 U.S.C. § 1930 (the **"Carveout"**). Unless and until the Carveout Trigger Date (defined below) occurs, the Debtors shall pay in the

ordinary course and as permitted by the Budget all administrative expenses of the Cases, including

all unpaid fees and expenses of the professionals retained by the Debtors and the Committee (the

"Professionals") after application of any retainer held by a Professional, as provided in any order

by the Court regarding payment of the fees and expenses of Professionals. Notwithstanding the

Budget or anything else herein or in any other DIP Loan Document to the contrary, from and after

the date (the "**Carveout Trigger Date**") of delivery by the DIP Lender to the counsel to the

Debtors, counsel to the Committee and the UST of notice that both (a) an Event of Default has

occurred and is continuing and (b) the DIP Lender has triggered the Carveout, administrative

expenses shall (subject to the last sentence of this Paragraph 16) be funded solely from the

Carveout, which shall be set aside solely for payment of (x) fees and expenses of Professionals,

(y) fees, expenses, and costs then due and payable to the UST and/or Clerk of the Court under 28

U.S.C. § 1930 and (z) potential future fees, expenses, and costs of a statutory trustee appointed in

Cases in the amount of $25,000 which, for the avoidance of doubt, is part of and not in addition to

the Carveout; provided that in no event shall:

> (i)  Payment of any amount contemplated by the Carveout (or any other amount owed to any Professional) constitute a personal liability of the DIP Lender, any Affiliate, or any other Indemnified Person; or

> (ii)  Any such amount be used to fund fees, costs, or expenses incurred in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

For the avoidance of doubt, the foregoing shall in no way limit payment, as a carveout of the DIP

Lenders' Collateral, of fees and expenses of (i) Professionals incurred in accordance with the

Budget prior to the Carveout Trigger Date and otherwise approved by the Court or (ii) any

Transaction Fees approved by the Court becoming due to SC&H Group, Inc. as a result of the

closing of a Transaction (as defined in the Debtors' Application to Retain SC&H Group, Inc. as

Investment Banker [Docket No. 73]) regardless of when such closing occurs), and the DIP Lender consents to any Court approved fees due to SC&H being paid directly from proceeds of the Transaction generating such fees, separate and apart from the Carveout, and such payment of such approved fees to SC&H shall not reduce the Carveout.

22.     All information and documents provided by the Debtors to the DIP Lender pursuant to Article V, Section 5.01 of the DIP Credit Agreement, shall be contemporaneously provided to the Committee.

23.     DIP Lender acknowledges (a) that there have been alleged liens and security interests asserted in pleadings filed by creditors on the docket of these Cases to date and (b) that there may be additional liens and security interests asserted under section 546(b) of the Bankruptcy Code, and that such liens and security interests are not a violation of Debtors' representations and warranties in Article IV of the DIP Credit Agreement. DIP Lender further acknowledges that that no pleading or allegation in a pleading filed to date on the docket of these Cases constitutes a "material adverse effect" within the meaning of the DIP Credit Agreement.

24.     Subject to Paragraph 14 above, the automatic stay imposed by Bankruptcy Code section 362(a) is and shall remain modified to the extent necessary to implement and effectuate in full this Interim Order and the other DIP Loan Documents (expressly including any exercise of rights and remedies by the DIP Lender) and the transactions contemplated thereby.

**Miscellaneous Provisions**

25.     The reversal or modification on appeal of this Interim Order shall not affect the DIP Loan, the DIP Claims, the DIP Lien, the DIP Loan Documents or the Superpriority Claim..

26.     This Interim Order shall survive entry of any order, in this Court or any other court of competent jurisdiction, (w) confirming a chapter 11 plan (and, to the extent not satisfied in full

in cash on the effective date thereof, the DIP Obligations shall not be discharged under or by entry of such order, notwithstanding Bankruptcy Code section 1141(d)), (x) appointing an examiner or chapter 11 trustee, (y) converting the Cases to cases under Bankruptcy Code chapter 7, or (z) dismissing the Cases. This Interim Order, together with all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender shall continue in full force and effect, notwithstanding the entry of any such order, until full and indefeasible payment of all DIP Obligations.

27.    No Third-Party Beneficiaries. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors). No rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary.

28.    Modification of Stay. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit (i) the Debtors to grant the DIP Liens to the DIP Lender, as applicable, and (ii) the parties to take any action specifically authorized or contemplated by this Interim Order.

29.    Notice. The Debtors shall, within two business days following the entry of this Interim Order, serve by regular mail, copies of a notice of entry of this Interim Order, together with a copy of this Interim Order, to: (i) proposed counsel to the Committee; (ii) counsel for the Debtors' prepetition secured lenders; (iii) the Office of the United States Trustee for the District of Delaware; (iv) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Debtors' twenty largest unsecured creditors on a consolidated

basis and/or their counsel; (vii) the DIP Lender; (viii) all parties having or claiming an interest in cash collateral and/or their counsel; and (ix) all parties that have requested special notice pursuant to Bankruptcy Rule 2002. The notice of entry of this Interim Order shall state that any party-in-interest objecting to the entry of a final order on the Motion shall file a written objection with the United States Bankruptcy Court Clerk for the District of Delaware no later than 4:00 p.m. on _____, 2021. A final hearing shall be held on the Motion and any objections thereto on _____ , 2021 at __:__ .m. prevailing Eastern time.

30.     In the event of any inconsistency between any other DIP Loan Document and this Interim Order, the terms of this Interim Order shall govern.

31.     <u>Effectiveness</u>. The findings of fact and conclusions of law contained in this Interim Order shall take effect immediately upon the Effective Date. The liens and claims granted to the DIP Lender under this Interim Order, and the priority thereof, and any payments made pursuant to this Interim Order, shall be binding (subject to the terms of this Interim Order) on the Debtors, any successor trustee or examiner, any Chapter 7 Trustee, and all creditors of the Debtors, as provided in section 364(e) of the Bankruptcy Code.

32.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9014, or anything else in the Bankruptcy Rules or any other applicable rule of procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof. There shall be no stay of execution or effectiveness of this Interim Order, all of which are hereby waived for cause shown.

33.     The Court has and shall retain jurisdiction to enforce this Interim Order, including to hear any motion or application by the DIP Lender related hereto or to any other DIP Loan Document, according to its terms.


Dated: _____

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

# Exhibit 1
**(Revised Budget)**


**TRUE**

| | Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 8/14/21 | 8/21/21 | 8/28/21 | 9/4/21 | 9/11/21 | 9/18/21 | 9/25/21 | 10/2/21 | 10/9/21 | 10/16/21 | 10/23/21 |
| | | Actual | Actual | Actual | Actual | Actual | Projected | Projected | Projected | Projected | Projected | Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total Cash Inflows From Operations** | | 316,454 | 652,823 | 852,291 | 65,171 | 578,029 | 79,447 | 848,144 | 165,915 | 928,624 | 618,101 | 837,802 |
| DIP Loan Proceeds | | | | | | | 6,250,000 | | 1,750,000 | | | |
| Total Cash Received | | | | | | | 6,329,447 | | 1,915,915 | | | |
| **Cash Outflows From Operations** | | | | | | | | | | | | |
| Payroll & Taxes | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 |
| Health & Dental Insurance | | 0 | 0 | 0 | 0 | 0 | 0 | 300,000 | 50,000 | 0 | 0 | 150,000 |
| Total Payroll Related Expenses | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| Equip Rental - MOON | | 0 | 0 | 0 | 0 | 0 | 0 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Vehicle Leases | | 0 | 0 | 0 | 0 | 0 | 0 | 16,463 | 0 | 0 | 0 | 15,021 |
| Freight | | 0 | 0 | 0 | 0 | 0 | 2,500 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Fuel - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| HMS GL/WC Insurance | | 0 | 0 | 28073 | 112,120 | 0 | 0 | 134,218 | 30,000 | 0 | 0 | 138,226 |
| Material - MOON | | 0 | 2,800 | 0 | 4,590 | 1,500 | 0 | 0 | 0 | 15,000 | 15,000 | 25,000 |
| Misc MOON | | 0 | 0 | 165 | 311 | 235 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc AP | | 0 | 0 | 0 | 10,000 | 11,968 | 0 | 15,000 | 10,000 | 20,000 | 20,000 | 30,000 |
| Pex - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Plant Materials | | 0 | 0 | 9,272 | 0 | 0 | 82,779 | 50,000 | 60,000 | 20,000 | 10,000 | 75,000 |
| Rent | | 0 | 0 | 0 | 7,500 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 |
| Sales Tax IRS/Sales/Property | | 0 | 0 | 0 | 0 | 25,903 | 0 | 25,000 | 0 | 0 | 0 | 0 |
| Stonemor - PEX | | 0 | 0 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Material | | 0 | 0 | 0 | 10,000 | 12,236 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Fuel | | 0 | 0 | 0 | 5,000 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Equip Rental | | 0 | 0 | 0 | 0 | 1,406 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Mowing | | 0 | 0 | 0 | 0 | 22,312 | 0 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Stonemor - Other Subs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities | | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 10,000 | 0 | 0 | 10,000 |
| | | | | | | | | | | | | |
| **Total Cash Outflows NON Payroll** | | 0 | 2,800 | 77,510 | 169,521 | 95,560 | 135,279 | 354,181 | 293,500 | 193,500 | 183,500 | 431,747 |
| Payroll Total | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| **Total Cash Outflows From Operations** | | 103,866 | 665,854 | 435,934 | 544,740 | 434,467 | 785,279 | 654,181 | 993,500 | 193,500 | 833,500 | 581,747 |
| | | | | | | | | | | | | |
| **Cash Flow From Operations** | | 212,588 | (13,031) | 416,357 | (479,569) | 143,562 | 5,544,168 | 193,963 | 922,415 | 735,124 | (215,399) | 256,055 |
| | | | | | | | | | | | | |
| **Debt Payments** | | | | | | | | | | | | |
| North Ave Capital | | 0 | 0 | 0 | 83,372 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 |
| Newtek | | 0 | 0 | 0 | 0 | 56,695 | 0 | 0 | 61,286 | 0 | 0 | 0 |
| Kore Capital | | | | | 0 | | 5,500,000 | | | | | |
| **Total Debt Payments** | | 0 | 0 | 0 | 83,372 | 56,695 | 5,500,000 | 83,371 | 61,286 | 0 | 0 | 0 |
| | | | | | | | | | | | | |
| **Chapter 11 Expenses** | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | 240,000 | | | 180,000 |
| UST Fees | | | | | | | | | | | | |
| **Ending Cash Balance** | 74,030 | 286,618 | 273,587 | 689,944 | 127,003 | 213,870 | 258,038 | 368,630 | 989,759 | 1,724,883 | 1,509,484 | 1,585,539 |


TRUE [logo]

| | Week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 21 Wk total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 10/30/21 | 11/6/21 | 11/13/21 | 11/20/21 | 11/27/21 | 12/4/21 | 12/11/21 | 12/18/21 | 12/25/21 | 1/1/22 | |
| | | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| *Total Cash Inflows From Operations* | | 184,755 | 1,071,590 | 97,507 | 1,914,832 | 202,263 | 1,629,192 | 50,461 | 1,255,302 | 972,520 | 1,008,050 | 14,329,273 |
| DIP Loan Proceeds | | | | | | | | | | | | 8,000,000 |
| **Total Cash Received** | | | | | | | | | | | | 22,329,273 |
| *Cash Outflows From Operations* | | | | | | | | | | | | |
| Payroll & Taxes | | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 | 600,000 | 0 | 600,000 | 0 | 6,939,470 |
| Health & Dental Insurance | | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 150,000 | 0 | 0 | 800,000 |
| **Total Payroll Related Expenses** | | 650,000 | 0 | 650,000 | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,739,470 |
| Equip Rental - MOON | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 1,500 | 1,500 | 1,500 | 1,000 | 0 | 30,500 |
| Vehicle Leases | | 0 | 0 | 0 | 0 | 14,000 | 0 | 0 | 0 | 13,000 | 0 | 58,484 |
| Freight | | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 0 | 0 | 0 | 272,500 |
| Fuel - MOON | | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 5,000 | 5,000 | 5,000 | 2,500 | 2,500 | 115,000 |
| HMS GL/WC Insurance | | 0 | 26,909 | 0 | 134,218 | 0 | 0 | 0 | 0 | 0 | 0 | 603,764 |
| Material - MOON | | 15,000 | 25,150 | 15,150 | 25,150 | 15,150 | 22,750 | 12,750 | 15,750 | 0 | 0 | 210,740 |
| Misc MOON | | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,711 |
| Misc AP | | 30,000 | 40,000 | 40,000 | 40,000 | 40,000 | 35,000 | 35,000 | 35,000 | 0 | 0 | 411,968 |
| Pex - MOON | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 2,000 | 5,000 | 97,000 |
| Plant Materials | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 7,500 | 7,500 | 7,500 | 0 | 0 | 529,551 |
| Rent | | 0 | 20,000 | | | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 87,500 |
| Sales Tax IRS/Sales/Property | | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 125,903 |
| Stonemor - PEX | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 200,000 |
| Stonemor - Material | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 182,236 |
| Stonemor - Fuel | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 85,000 |
| Stonemor - Equip Rental | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 81,406 |
| Stonemor - Mowing | | 75,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 472,312 |
| Stonemor - Other Subs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | | 240,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 240,000 |
| Utilities | | 0 | 10,000 | | | | 10,000 | | | | 10,000 | 60,000 |
| | | | | | | | | | | | | |
| *Total Cash Outflows NON Payroll* | | 490,500 | 232,559 | 165,650 | 309,868 | 204,650 | 171,750 | 121,750 | 99,750 | 73,500 | 67,500 | 3,874,575 |
| Payroll Total | | 650,000 | 0 | 650,000 | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,739,470 |
| *Total Cash Outflows From Operations* | | 1,140,500 | 232,559 | 815,650 | 459,868 | 854,650 | 171,750 | 721,750 | 249,750 | 673,500 | 67,500 | 11,614,045 |
| | | | | | | | | | | | | |
| *Cash Flow From Operations* | | (955,745) | 839,031 | (718,143) | 1,454,964 | (652,387) | 1,457,442 | (671,289) | 1,005,552 | 299,020 | 940,550 | 2,715,228 |
| | | | | | | | | | | | | |
| Debt Payments | | | | | | | | | | | | |
| North Ave Capital | | 83,371 | 0 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 | 83,371 | 416,856 |
| Newtek | | 0 | 61,286 | 0 | 0 | 61,286 | 0 | 0 | 0 | 0 | 61,286 | 301,839 |
| Kore Capital | | | | | | | | | | | | 5,500,000 |
| Total Debt Payments | | 83,371 | 61,286 | 0 | 0 | 144,657 | 0 | 0 | 0 | 0 | 144,657 | 6,218,695 |
| | | | | | | | | | | | | |
| Chapter 11 Expenses | | | | | | | | | | | | |
| Professional Fees | | | | | 375,000 | | | | 375,000 | | | 1,170,000 |
| UST Fees | | 80,750 | | | | | | | | | | 80,750 |
| *Ending Cash Balance* | 74,030 | 465,673 | 1,243,418 | 525,275 | 1,605,239 | 808,195 | 2,265,637 | 1,594,348 | 2,224,900 | 2,523,920 | 3,319,813 | 3,319,813 |

# EXHIBIT 2

## DIP CREDIT AGREEMENT

**DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT**

**among each of**

**MOON GROUP, INC.,
MOON LANDSCAPING, INC.,
MOON NURSERIES, INC.,
MOON SITE MANAGEMENT, INC.,
MOON WHOLESALE, INC., and
RICKERT LANDSCAPING, INC.
as Debtor,**

**and**

**Certain Investment Fund(s) for Which
LEGALIST DIP GP, LLC
Serves as General Partner,
as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of September __, 2021, is entered into among each of Moon Group, Inc., Moon Landscaping, Inc., Moon Nurseries, Inc., Moon Site Management, Inc., Moon Wholesale, Inc., and Rickert Landscaping, Inc. (each and, collectively, the "**Debtor**") and certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner, as lender, agent, and collateral agent (in such capacities, the "**DIP Lender**").

<u>**RECITALS**</u>

WHEREAS, on August 12, 2021 (the "**Petition Date**"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and its chapter 11 cases are being jointly administered under the caption *In re Moon Group, Inc.*, No. 21-11140 (CSS) (the "**Case**");

WHEREAS, the Debtors have continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtors to obtain funds in order to fund the Cases and work toward a successful exit from chapter 11 and, accordingly, the Debtors requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $8,000,000 (the "**DIP Commitment**") in accordance with the allocation on Addendum 1;

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

<u>**ARTICLE I**</u>
<u>**DEFINED TERMS**</u>

**Section 1.01** <u>Definitions</u>. As used in this Agreement:

"**Accounts**" means Cash and Cash Equivalents.

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as <u>Exhibit A</u> and otherwise in Approved Form.

"**Budget**" means a budget encompassing, on a monthly basis, the period from the date hereof through the satisfaction of the final Milestone and containing detailed line items of the Debtors' projected receipts and disbursements, in Approved Form, including as the same may be revised by the Debtors from time to time in Approved Form. The Budget as of the date hereof is attached hereto as <u>Exhibit B</u>.

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"Carve-Out" means an amount up to $200,000 for the payment of allowed administrative expenses and professional fees and statutory fees payable by the Debtors to the Office of the United States Trustee and/or the Clerk of the Bankruptcy Court which shall be available following an Event of Default.

"**Case**" has the meaning given to it in the Recitals.

"**Cash**" means cash and cash equivalents.

"**Commitment Fee**" has the meaning given to it in Section 2.05(i).

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (as defined in the DIP Orders)) and (y) all other unsecured claims against the Debtor.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtors now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), together with (in each case) all proceeds thereof; <u>provided</u> that the DIP Collateral shall not include Excluded Collateral and shall be subject to the Carve-Out.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Credit Agreement, the DIP Orders, the Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

"**DIP Obligations**" means DIP Lender Expenses, together with all principals of, and interest and fees on (including, without limitation, any applicable Undrawn Line Fee, the Monitoring Fee, Commitment Fee, and Underwriting Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtors under any DIP Loan Document.

"**DIP Orders**" means the Interim DIP Order and/or Final DIP Order, as applicable.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

"**Existing Liens**" means the Liens set forth on Schedule 2.

"**Final DIP Order**" means a final order of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court approving the DIP Loans in approved Form.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Maturity Date**" means the earliest to occur of (x) 18 months after the Effective Date of the first DIP Draw, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.

"**Milestones**" means, collectively, the events and corresponding deadlines set forth on Schedule 1.

"**Monitoring Fee**" has the meaning given to it in Section 2.05(iii).

"**Permitted Senior Liens**" means the Liens set forth on Schedule 3.

"**Permitted Variances**" has the meaning given to it in

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Underwriting Fee**" has the meaning given to it in Section 2.05(ii).

"**Undrawn Line Fee**" has the meaning given to it in Section 2.04(c).

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08. [1]

## ARTICLE II
## DIP LOANS

**Section 2.01 In General.**

(a)  Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount DIP Commitment (such term loans, the "**DIP Loans**").

(b)  Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

**Section 2.02 Use of Proceeds.** The proceeds of the DIP Loans shall be used by the Debtors solely to:

(i)  Pay DIP Lender Expenses;

(ii)  Pay all other DIP Obligations; and

(iii)  Pay other amounts permitted under the Budget.

In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

**Section 2.03 [Omitted].**

**Section 2.04 Interest; Undrawn Line Fee.**

(a)  Interest Rate. The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue interest from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 11.75% per year, which shall accrue and be compounded and capitalized monthly; provided that, if the Debtors failed to move for approval of the DIP Order by September 30, 2021, such interest rate shall include an additional 1.00%.

(b)  Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue an additional 4.75% in interest per year, which shall accrue and be compounded and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c)  Undrawn Line Fee. Any undrawn portion of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from date hereof at 4.75% per year, which shall accrue and be compounded and capitalized monthly.

(d)  Payment Terms. All interest (including default interest) and any applicable Undrawn Line Fee (which shall be DIP Obligations for all purposes), together with the fees described in Section 2.05, shall be compounded and capitalized in arrears on

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the DIP Orders.

the first Business Day of month and due and payable upon the Maturity Date.

**Section 2.05 Fees.** The following fees shall be deemed fully and irrevocably earned upon the date hereof, but subject to approval of the Bankruptcy Court, and shall be DIP Obligations for all purposes:

(i) A onetime "**Commitment Fee**" of 2% of the DIP Commitment, due and payable in cash upon the Maturity Date;

(ii) A onetime "**Underwriting Fee**" of 1.00% of the DIP Commitment, due and payable in cash upon the Maturity Date; and

(iii) A "**Monitoring Fee**" of 1.75% of the DIP Commitment per year, payable in kind monthly as provided in Section 2.04(d).

**Section 2.06 Repayment.** Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtors unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

**Section 2.07 Prepayments.**

(a) Voluntary Prepayments. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning one year after the Effective Date, in the minimum amount of $50,000 without penalty or premium.

(b) Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtors' receipt of, any net proceeds from the sale or other disposition of any DIP Collateral outside of the ordinary course, subject to the prior payment of senior lienholders; provided that no such sale or disposition shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form.

**Section 2.08 General Provisions Regarding Payments.**

(a) Payments. All payments by or on behalf of the Debtors of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b) Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c) Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d) Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section 2.09 Termination of Commitments.** The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans under Section 8.02(a)(i) or (ii) the election of the DIP Lender while an Event of Default has occurred and is continuing.

# ARTICLE III
## CONDITIONS PRECEDENT

**Section 3.01 Conditions Precedent to DIP Draws.** The obligation of the DIP Lender to make DIP Draws available to the Debtors in the aggregate amount of the DIP Commitment (provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i) The Bankruptcy Court's entry of the applicable DIP Order, which remains in full force and effect as so entered and in Approved Form; provided that, upon entry of the Interim DIP Order but prior to entry of the Final DIP Order, the Debtors shall be permitted to draw no more than $6.25 million of the DIP Commitment in the aggregate;

(ii) The Debtors' satisfaction of all applicable Milestones;

(iii) Omitted;

(iv) The Debtors' delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(v) Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct as of such earlier date.

**Section 3.02 Effective Date.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date**."

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

To induce the DIP Lender to provide the DIP Loans, the Debtors make to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section 4.01 Corporate Status; Corporate Authorization.**

(a) The Debtors are duly organized, validly existing, and in good standing under the respective laws of its jurisdiction of formation and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtors of this Agreement (x) are within its authority, (y) have been duly authorized, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

(b) Except with respect to the Bankruptcy Court's entry of the DIP Orders, the execution, delivery, and performance of obligations under this Agreement by the Debtors(x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtors or (iii) other instrument or agreement, in each case binding on the Debtors or affecting its property.

**Section 4.02** <u>**Execution and Binding Effect.**</u> Subject to the Bankruptcy Court's entry of the DIP Orders, upon execution and delivery hereof, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

**Section 4.03** <u>**DIP Collateral.**</u> The Debtors have good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens.

**Section 4.04** <u>**Absence of Material Adverse Effect.**</u> There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtors or their operations since the Petition Date.

**Section 4.05** <u>**Governmental Approvals and Filings.**</u> Except as has already been obtained, no approval, authorization, or other action by, or filing, recording, or registration with, or notice to, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section 4.06** <u>**Misstatements and Omissions.**</u> Since the Petition Date, no information furnished or made available by the Debtors (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

So long as any DIP Obligation remains outstanding, the Debtors shall perform all of the following covenants:

**Section 5.01** <u>**Budget Reporting and Compliance.**</u>

(a) No later than the first Tuesday of each month, the Debtors shall provide the DIP Lender (each in Approved Form):

(i) A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding month and cumulatively from the date hereof, together with detailed explanations of all variances (if any); and

(ii) A rolling 13-week cashflow forecast for the Debtor.

(b) In no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Budget (on a line-item, monthly, or cumulative basis) by more than 10% provided that the Debtors may make disbursements for any particular line item in any given period under the Budget up to the aggregate amount set forth for that line item from the beginning of the period of the Budget through such applicable date. (the "**Permitted Variances**").

**Section 5.02** <u>**Accounting; Financial Statements.**</u> The Debtors shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section 5.03** <u>**Maintenance of Existence.**</u> The Debtors shall do all things necessary to maintain (x) their corporate or other existence in accordance with its organizational documents (which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises.

**Section 5.04** <u>**Preservation of Assets.**</u> The Debtors shall maintain its assets (including all DIP Collateral) in good operating conditions and shall make such repairs and replacements as are required, in accordance with the Budget; <u>provided</u> that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section 5.05** <u>**Notice of Material Events.**</u> The Debtors shall notify the DIP Lender promptly in writing of:

(i) The occurrence of any default or Event of Default;

(ii) Any threatened or pending litigation or other proceeding or claim affecting the Debtor; and

(iii) Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtors or its operations.

**Section 5.06** <u>**Use of Proceeds.**</u> The Debtors shall use the proceeds of the DIP Loans only as permitted by Section 2.02.

**Section 5.07** **[Omitted].**

**Section 5.08** <u>**Taxes.**</u> The Debtors will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtors have set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section 5.09** <u>**Milestones.**</u> The Debtors shall comply with all applicable Milestones.

**Section 5.10** <u>**Compliance with Laws.**</u> The Debtors shall comply all applicable laws, rules, and regulations.

**Section 5.11** <u>**Bankruptcy Court Filings.**</u> The Debtors shall commence all actions in, file all motions, applications, and proposed orders with, and make all other submissions to the Bankruptcy Court only in Approved Form.

**Section 5.12** <u>**Full Access to Information.**</u> The Debtors shall promptly provide the DIP Lender with all requested information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; <u>provided</u> that, without any prior request from the DIP Lender, the Debtors shall deliver to the DIP Lender in real time copies of all offers (whether formal or informal, firm or contingent) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence, and all other materials regarding the Debtors' progress on the Milestones.

**Section 5.13 <u>Stay, Extension, and Usury Laws</u>.** The Debtors (x) covenant that they will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waive the benefit of all such laws.

**Section 5.14 <u>Timely Payment of DIP Lender Expenses, Other DIP Obligations</u>.** The Debtors shall, in addition to repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses.

**Section 5.15 <u>Further Assurances</u>.** The Debtors shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may reasonably request or require, in furtherance of this Agreement and the transactions contemplated hereby, expressly including all steps necessary or appropriate to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

**ARTICLE VI**
**NEGATIVE COVENANTS**

So long as any DIP Obligation remains outstanding, the Debtors shall perform all of the following covenants:

**Section 6.01 <u>Indebtedness</u>.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (x) Debt existing as of the Petition Date, (y) the DIP Obligations, and (z) Debt expressly contemplated by the Budget.

**Section 6.02 <u>Liens</u>.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any Lien other than (x) Existing Liens and (y) the DIP Liens.

**Section 6.03 <u>Superpriority Claims</u>.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget.

**Section 6.04 <u>Payments</u>.** The Debtors shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget.

**Section 6.05 <u>Merger or Sale</u>.** The Debtors shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) unless the net proceeds thereof shall be sufficient to repay the DIP Obligations (subject to Section 2.07) in full, sell any DIP Collateral; <u>provided</u> any such sale shall be in Approved Form.

**Section 6.06 <u>Business</u>.** The Debtors shall not engage in any business other than its line of business as of the Petition Date.

**Section 6.07 <u>Amendments to Organizational Documents</u>.** The Debtors shall not amend any corporate-governance or organizational document.

**Section 6.08 <u>Bankruptcy Court Filings</u>.** The Debtors shall not commence any action in, file any motion, application, or proposed order with, or make any other submission to the Bankruptcy Court other than in Approved Form.

**ARTICLE VII**
**INDEMNIFICATION**

**Section 7.01 <u>Indemnification by the Debtor</u>.** The Debtors shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc. and Legalist DIP GP, LLC), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); <u>provided</u> that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtors' payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

**ARTICLE VIII**
**EVENTS OF DEFAULT**

**Section 8.01 <u>Events of Default</u>.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i)   The Debtors shall:

    (A)  Fail to timely pay any DIP Lender Expense or other DIP Obligation;

    (B)  Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens;

    (C)  Fail to satisfy any Milestone, within 2 business days of its stated deadline; or

    (D)  Make any payment not expressly contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances);

(ii)  Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtors shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii) The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender:

    (A)  Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget;

(B) Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral with a value in excess of $50,000;

(C) Subject to the Carve-Out, surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

(D) Approving credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral;

(E) Approving any administrative-expense claim, expense, or cost against the Debtors (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(F) Modifying, staying, vacating, or rescinding any part of any DIP Order;

(G) Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

(H) Enjoining, restraining, or in any other way preventing a Debtors from conducting any material part its business affairs;

(I) Appointing an examiner or trustee in the Debtors' Case;

(J) Confirming any chapter 11 plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations;

(K) Converting the Debtors' Cases to a cases under Bankruptcy Code chapter 7; or

(L) Dismissing the Debtors' Cases;

(iv) The Debtor, or an Affiliate thereof, shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender;

(v) Any party (other than the Debtors or an Affiliate thereof) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; provided that the Debtors have not timely filed a reasonable objection or opposition to such action, motion, or other submission; and

(vi) The Debtors shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtors' becoming aware of such failure or (ii) the Debtors' receipt of written notice from the DIP Lender of such failure.

**Section 8.02 <u>Remedies</u>.**

(a) Subject only to the DIP Orders, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:

(i) Declare the DIP Commitment terminated; and

(ii) Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

(b) While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i) Terminating the automatic stay with respect to any DIP Collateral;

(ii) Terminating the Debtors' exclusivity to propose a chapter 11 plan;

(iii) Appointing an examiner or chapter 11 trustee; and

(iv) Converting the Debtors' Cases to chapter 7.

(c) If the DIP Lender so moves or applies, the Debtors shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtors expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(d) In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(e) For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section 8.03 <u>Application of Funds</u>.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i) <u>First</u>: To the DIP Lender, for accrued and unpaid DIP Lender Expenses;

(ii) <u>Second</u>: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees;

(iii) <u>Third</u>: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv) <u>Fourth</u>: To the DIP Lender, for all other unpaid DIP Obligations (including reasonable reserves for Indemnified Liabilities and other contingent DIP Obligations); and

(v) **Fifth**: After all DIP Obligations (including reasonable reserves) have been indefeasibly paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.

For the avoidance of doubt, the Debtors shall remain liable for any deficiency.

## ARTICLE IX
### JOINT AND SEVERAL OBLIGATIONS

**Section 9.01 In General.** All representations and warranties, and all covenants, agreements, and other obligations, hereunder of the Debtors shall, for all purposes, be joint and several obligations of each debtor signatory hereto.

## ARTICLE X
### COLLATERAL, SECURITY, AND PRIORITY

**Section 10.01 DIP Claims.** The Debtors covenant, represent, and warrant that, upon entry of the Interim DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtors' estates (expressly including all DIP Collateral).

**Section 10.02 Grant of Security Interest.** Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtors assign and convey as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtors in the DIP Collateral (collectively, the "**DIP Liens**"). The Debtors acknowledge that, pursuant to the DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section 10.03 DIP Liens.** The Debtors covenant, represent, and warrant that, upon entry of the Interim DIP Order, the DIP Liens shall comprise:

(i) Pursuant to Bankruptcy Code section 364(c)(2), automatically perfected, senior DIP Liens on all DIP Collateral not subject to Existing Liens;

(ii) Pursuant to Bankruptcy Code section 364(c)(3), automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens other than Accounts and Cash; and

(iii) Pursuant to Bankruptcy Code section 364(d)(1), automatically perfected, senior DIP Liens on all Accounts and Cash subject to the Carve-Out.

**Section 10.04 Further Assurances.** The Debtors further agree that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

## ARTICLE XI
### MISCELLANEOUS

**Section 11.01 Amendments and Waivers.** No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtors therefrom, shall be effective without the express written consent of the DIP Lender. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtors in any given instance shall entitle the Debtors to any other or further notice or demand in similar or other circumstances.

**Section 11.02 Notices.** All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i) If to the Debtor:

Attn: John D. Pursell, Jr. (jpursell@moonnurseries.com)

With a copy (which shall not constitute notice) to:

Sullivan Hazeltine Allinson LLC
Attn: William D. Sullivan, Esq. (bsullivan@sha-llc.com)

and

Kurtzman | Steady, LLC
Attn: Jeffrey Kurtzman, Esq. (kurtzman@kurtzmansteady.com)

(ii) If to the DIP Lender:

c/o Legalist, Inc. (dip@legalist.com).

**Section 11.03 DIP Lender Expenses.** Whether or not the transactions contemplated hereby are consummated or any DIP Loan is made, the Debtors agree to pay promptly all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtors or their Cases, the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor.

**Section 11.04 Enforceability; Successors and Assigns.** This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties. No Debtor may assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void *ab initio* and shall not relieve the Debtors of any obligation thereunder.

**Section 11.05 Integration.** The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section 11.06 No Waiver; Remedies Cumulative.** No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another right, power, or privilege. The rights and remedies provided in the DIP Loan Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

**Section 11.07 <u>Submission to Jurisdiction</u>.** Each Party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same.

**Section 11.08 <u>Governing Law</u>.** The DIP Loan Documents, and any dispute arising therefrom, shall be governed by the Bankruptcy Code and, to the extend not preempted thereby, New York state law. This Agreement constitutes an instrument for the payment of money only, within the meaning of N.Y. C.P.L.R. § 3213. Any reference herein to the "**Uniform Commercial Code**" refers to the New York Uniform Commercial Code as in effect from time to time.

**Section 11.09 <u>WAIVER OF JURY TRIAL</u>.** EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING FROM THIS AGREEMENT.

**Section 11.10 <u>Severability</u>.** If any term of any DIP Loan Document is held invalid, illegal, or incapable of being enforced by any rule of law or public policy, all terms of such DIP Loan Document shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any manner adverse to any party thereto. Upon such holding, the Parties shall negotiate in good faith to modify the same such that the transactions contemplated thereby are fulfilled to the maximum extent possible.

**Section 11.11 <u>Survival</u>.** All representations, warranties, covenants, and agreements made by the Debtors in any DIP Loan Document shall survive until full and indefeasible payment of all DIP Obligations, irrespective of any earlier default, Event of Default, acceleration, or termination thereunder; <u>provided</u> that Article VII and Section 11.3 shall survive such full and indefeasible payment of all DIP Obligations.

**Section 11.12 <u>Maximum Lawful Interest</u>.** Notwithstanding anything to the contrary herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. The Debtors and the DIP Lender, in executing and delivering this Agreement, intend legally to agree on the rate or rates of interest and other charges for the use of money and manner of payment permitted by such law; <u>provided</u> that, if such amount exceeds such maximum allowable amount, then the Debtors are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtors in excess of such legal maximum shall be applied to reduce the principal balance of the DIP Loans to the extent of any such excess.

**Section 11.13 <u>Foreseeable Circumstances</u>.** The Parties acknowledge that (x) the COVID-19 pandemic any/or other instances of pandemic or widespread virus or infection and (y) ongoing riots, insurrections, terrorist acts, and/or other domestic unrest and uncertainty shall not be considered unforeseeable circumstances for purposes of this Agreement. The Parties agree that any claim of unenforceability, force majeure, or other claim and/or defense related to the foregoing (including with respect to any court closure) is expressly waived.

**Section 11.14 <u>Execution in Counterparts</u>.** Each DIP Loan Document may be executed, including electronically, in any number of counterparts and by different Parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same DIP Loan Document.

*     *     *

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

MOON GROUP, INC.
MOON LANDSCAPING, INC.
MOON NURSERIES, INC.
MOON SITE MANAGEMENT, INC.
MOON WHOLESALE, INC.
RICKERT LANDSCAPING, INC.

By: _____
Name: John D. Pursell, Jr.
Title: Chief Executive Officer

**DIP LENDER:**

LEGALIST DIP GP, LLC, as general partner of the investment fund(s) listed on Addendum 1

By: _____
Name: Christian G.B. Haigh
Title: Managing Member

## Schedule 1
### (Milestones)

| Event | Deadline |
|---|---|
| Entry of Final DIP Order | November 4, 2021 |
| File Sale Motion | November 1, 2021 |
| Approval of Sale Procedures | November 22, 2021 |
| Bid Deadline | December 13, 2021 |
| Auction | December 16. 2021 |
| Sale Hearing | December 20, 2021 |
| Sale Closing | December 31, 2021 |
| Maturity Date | +18 months |

## Schedule 2
### (Existing Liens)

North Avenue Capital, LLC

Newtek Small Business Finance LLC (guaranteed by the SBA)

Ross Capital Partners, LLC

Padco Financial Services, Inc. (Equipment Lease)

Ailco Equipment Finance Group, Inc. (Secured by Equipment)

The Internal Revenue Service

| **Schedule 3** | **Schedule 4** |
| --- | --- |
| **(Permitted Senior Liens)** | **(Excluded Collateral)** |
| North Avenue Capital, LLC | Avoidance Actions and the proceeds thereof |
| Newtek Small Business Finance LLC (guaranteed by the SBA) | |
| Padco Financial Services, Inc. (Equipment Lease) | |
| Ailco Equipment Finance Group, Inc. (Secured by Equipment) | |
| The Internal Revenue Service | |

**<u>Exhibit A</u>**
**(Form of Borrowing Request)**

Legalist DIP Fund I, LP
Legalist DIP SPV II, LP
c/o  Legalist, Inc. (dip@legalist.com)

RE: <u>*In re Moon Group, Inc., et al.*</u> Case No. 21-11140

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "<u>Credit Agreement</u>"), among Moon Group, Inc., *et al.* (collectively, the "<u>Debtor</u>") and the addressee(s) hereof (the "<u>DIP Lender</u>"). The Debtors acknowledge that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized term used but not defined herein have the meanings given to them in the Credit Agreement

The Borrower hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "<u>DIP Draw</u>").

The Debtors hereby acknowledge that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct as of such earlier date. The Debtors agree that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Account Name: _____
Bank: _____
ABA (for wires): _____
Account Number: _____


Very truly yours,

Moon Group, Inc., individually and on behalf
of its affiliated debtors party to the Credit Agreement

By: _____
Name: John D. Pursell, Jr.
Title: Chief Executive Officer

**<u>Exhibit B</u>**
**(Budget)**

 TRUE

| | Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 8/14/21 | 8/21/21 | 8/28/21 | 9/4/21 | 9/11/21 | 9/18/21 | 9/25/21 | 10/2/21 | 10/9/21 | 10/16/21 | 10/23/21 |
| | | Actual | Actual | Actual | Actual | Actual | Projected | Projected | Projected | Projected | Projected | Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| ***Total Cash Inflows From Operations*** | | 316,454 | 652,823 | 852,291 | 65,171 | 578,029 | 79,447 | 848,144 | 165,915 | 928,624 | 618,101 | 837,802 |
| DIP Loan Proceeds | | | | | | | 6,250,000 | | 1,750,000 | | | |
| Total Cash Received | | | | | | | 6,329,447 | | 1,915,915 | | | |
| *Cash Outflows From Operations* | | | | | | | | | | | | |
| Payroll  & Taxes | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 |
| Health & Dental Insurance | | 0 | 0 | 0 | 0 | 0 | 0 | 300,000 | 50,000 | 0 | 0 | 150,000 |
| Total Payroll Related Expenses | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| Equip Rental - MOON | | 0 | 0 | 0 | 0 | 0 | 0 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Vehicle Leases | | 0 | 0 | 0 | 0 | 0 | 0 | 16,463 | 0 | 0 | 0 | 15,021 |
| Freight | | 0 | 0 | 0 | 0 | 0 | 2,500 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Fuel - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| HMS GL/WC Insurance | | 0 | 0 | 28073 | 112,120 | 0 | 0 | 134,218 | 30,000 | 0 | 0 | 138,226 |
| Material - MOON | | 0 | 2,800 | 0 | 4,590 | 1,500 | 0 | 0 | 0 | 15,000 | 15,000 | 25,000 |
| Misc MOON | | 0 | 0 | 165 | 311 | 235 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc AP | | 0 | 0 | 0 | 10,000 | 11,968 | 0 | 15,000 | 10,000 | 20,000 | 20,000 | 30,000 |
| Pex - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Plant Materials | | 0 | 0 | 9,272 | 0 | 0 | 82,779 | 50,000 | 60,000 | 20,000 | 10,000 | 75,000 |
| Rent | | 0 | 0 | 0 | 7,500 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 |
| Sales Tax IRS/Sales/Property | | 0 | 0 | 0 | 0 | 25,903 | 0 | 25,000 | 0 | 0 | 0 | 0 |
| Stonemor - PEX | | 0 | 0 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Material | | 0 | 0 | 0 | 10,000 | 12,236 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Fuel | | 0 | 0 | 0 | 5,000 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Equip Rental | | 0 | 0 | 0 | 0 | 1,406 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Mowing | | 0 | 0 | 0 | 0 | 22,312 | 0 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Stonemor - Other Subs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities | | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 10,000 | 0 | 0 | 10,000 |
| | | | | | | | | | | | | |
| ***Total Cash Outflows NON Payroll*** | | 0 | 2,800 | 77,510 | 169,521 | 95,560 | 135,279 | 354,181 | 293,500 | 193,500 | 183,500 | 431,747 |
| Payroll  Total | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| **Total Cash Outflows From Operations** | | 103,866 | 665,854 | 435,934 | 544,740 | 434,467 | 785,279 | 654,181 | 993,500 | 193,500 | 833,500 | 581,747 |
| | | | | | | | | | | | | |
| ***Cash Flow From Operations*** | | 212,588 | (13,031) | 416,357 | (479,569) | 143,562 | 5,544,168 | 193,963 | 922,415 | 735,124 | (215,399) | 256,055 |
| | | | | | | | | | | | | |
| **Debt Payments** | | | | | | | | | | | | |
| North Ave Capital | | 0 | 0 | 0 | 83,372 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 |
| Newtek | | 0 | 0 | 0 | 0 | 56,695 | 0 | 0 | 61,286 | 0 | 0 | 0 |
| Kore Capital | | | | | 0 | | 5,500,000 | | | | | |
| **Total Debt Payments** | | 0 | 0 | 0 | 83,372 | 56,695 | 5,500,000 | 83,371 | 61,286 | 0 | 0 | 0 |
| | | | | | | | | | | | | |
| **Chapter 11 Expenses** | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | 240,000 | | | 180,000 |
| UST Fees | | | | | | | | | | | | |
| *Ending Cash Balance* | 74,030 | | 286,618 | 273,587 | 689,944 | 127,003 | 213,870 | 258,038 | 368,630 | 989,759 | 1,724,883 | 1,509,484 | 1,585,539 |

 TRUE

| | Week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 21 Wk total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 10/30/21 Projected | 11/6/21 Projected | 11/13/21 Projected | 11/20/21 Projected | 11/27/21 Projected | 12/4/21 Projected | 12/11/21 Projected | 12/18/21 Projected | 12/25/21 Projected | 1/1/22 Projected | Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| *Total Cash Inflows From Operations* | | 184,755 | 1,071,590 | 97,507 | 1,914,832 | 202,263 | 1,629,192 | 50,461 | 1,255,302 | 972,520 | 1,008,050 | 14,329,273 |
| DIP Loan Proceeds | | | | | | | | | | | | 8,000,000 |
| **Total Cash Received** | | | | | | | | | | | | 22,329,273 |
| Cash Outflows From Operations | | | | | | | | | | | | |
| Payroll & Taxes | | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 | 600,000 | 0 | 600,000 | 0 | 6,939,470 |
| Health & Dental Insurance | | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 150,000 | 0 | 0 | 800,000 |
| Total Payroll Related Expenses | | 650,000 | 0 | 650,000 | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,739,470 |
| Equip Rental - MOON | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 1,500 | 1,500 | 1,500 | 1,000 | 0 | 30,500 |
| Vehicle Leases | | 0 | 0 | 0 | 0 | 14,000 | 0 | 0 | 0 | 13,000 | 0 | 58,484 |
| Freight | | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 0 | 0 | 0 | 272,500 |
| Fuel - MOON | | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 5,000 | 5,000 | 5,000 | 2,500 | 2,500 | 115,000 |
| HMS GL/WC Insurance | | 0 | 26,909 | 0 | 134,218 | 0 | 0 | 0 | 0 | 0 | 0 | 603,764 |
| Material - MOON | | 15,000 | 25,150 | 15,150 | 25,150 | 15,150 | 22,750 | 12,750 | 15,750 | 0 | 0 | 210,740 |
| Misc MOON | | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,711 |
| Misc AP | | 30,000 | 40,000 | 40,000 | 40,000 | 40,000 | 35,000 | 35,000 | 35,000 | 0 | 0 | 411,968 |
| Pex - MOON | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 2,000 | 5,000 | 97,000 |
| Plant Materials | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 7,500 | 7,500 | 7,500 | 0 | 0 | 529,551 |
| Rent | | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 87,500 |
| Sales Tax IRS/Sales/Property | | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 125,903 |
| Stonemor - PEX | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 200,000 |
| Stonemor - Material | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 182,236 |
| Stonemor - Fuel | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 85,000 |
| Stonemor - Equip Rental | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 81,406 |
| Stonemor - Mowing | | 75,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 472,312 |
| Stonemor - Other Subs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | | 240,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 240,000 |
| Utilities | | 0 | 10,000 | | | | 10,000 | | | | 10,000 | 60,000 |
| | | | | | | | | | | | | |
| *Total Cash Outflows NON Payroll* | | 490,500 | 232,559 | 165,650 | 309,868 | 204,650 | 171,750 | 121,750 | 99,750 | 73,500 | 67,500 | 3,874,575 |
| Payroll Total | | 650,000 | 0 | 650,000 | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,739,470 |
| **Total Cash Outflows From Operations** | | 1,140,500 | 232,559 | 815,650 | 459,868 | 854,650 | 171,750 | 721,750 | 249,750 | 673,500 | 67,500 | 11,614,045 |
| | | | | | | | | | | | | |
| *Cash Flow From Operations* | | (955,745) | 839,031 | (718,143) | 1,454,964 | (652,387) | 1,457,442 | (671,289) | 1,005,552 | 299,020 | 940,550 | 2,715,228 |
| | | | | | | | | | | | | |
| **Debt Payments** | | | | | | | | | | | | |
| North Ave Capital | | 83,371 | 0 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 | 83,371 | 416,856 |
| Newtek | | 0 | 61,286 | 0 | 0 | 61,286 | 0 | 0 | 0 | 0 | 61,286 | 301,839 |
| Kore Capital | | | | | | | | | | | | 5,500,000 |
| **Total Debt Payments** | | 83,371 | 61,286 | 0 | 0 | 144,657 | 0 | 0 | 0 | 0 | 144,657 | 6,218,695 |
| | | | | | | | | | | | | |
| **Chapter 11 Expenses** | | | | | | | | | | | | |
| Professional Fees | | | | | 375,000 | | | | 375,000 | | | 1,170,000 |
| UST Fees | | 80,750 | | | | | | | | | | 80,750 |
| *Ending Cash Balance* | 74,030 | 465,673 | 1,243,418 | 525,275 | 1,605,239 | 808,195 | 2,265,637 | 1,594,348 | 2,224,900 | 2,523,920 | 3,319,813 | 3,319,813 |

**<u>Addendum 1</u>**
**(Allocation of DIP Commitment)**

- Legalist DIP Fund I, LP: 62.50%

- Legalist DIP SPV II, LP: 37.50%