## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOON GROUP, INC., *et al.*[1], | ) | Case No. 21-11140 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| MOON GROUP, INC., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Pro. No. 21-_____ (CSS) |
| v. | ) | |
| | ) | |
| KORE Capital Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Debtors Moon Group, Inc., Moon Landscaping, Inc., Moon Nurseries, Inc., Moon Site Management, Inc., Moon Wholesale, Inc. and Rickert Landscaping, Inc. (collectively, the "Moon Entities" or the "Plaintiffs"), bring this action by way of Complaint against KORE Capital Corporation ("KORE" or the "Defendant") and allege as follows:

### Parties, Jurisdiction and Venue

1.      Moon Group, Inc. is a Delaware corporation formed on December 30, 2002 as a holding company that wholly owns each of the other Moon Entities, which are its pre-existing operating subsidiaries, and through which the Moon Group operates several distinct businesses

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Moon Group, Inc. (7484); Moon Landscaping, Inc. (3442); Moon Nurseries, Inc. (8411); Moon Site Management, Inc. (0250); Moon Wholesale, Inc. (3232); and Rickert Landscaping, Inc. (3988).  The Debtors' headquarters and mailing address is 145 Moon Road, Chesapeake City, MD 21915.

from a single principal place of business located at 145 Moon Road, Chesapeake City, Maryland, 21915.

2.      Moon Landscaping, Inc. is a MLI is a Pennsylvania corporation formed on January 5, 1995, which operates as a landscape and hardscape contractor for the design and installation of residential, commercial and municipal projects. Its principal place of business is located at 145 Moon Road, Chesapeake City, Maryland, 21915.

3.      Moon Nurseries, Inc. is a Maryland corporation formed on December 26, 1989 that operates a nursery under the Moon Nurseries name growing, marketing and selling numerous varieties of field grown or container trees, shrubs and perennial plants from two farms comprising nearly 900 acres near Chesapeake City, Maryland. Its principal place of business is located at 145 Moon Road, Chesapeake City, Maryland, 21915.

4.      Moon Site Management, Inc. is a Pennsylvania corporation formed on January 4, 1974, providing traditional recurring grounds management services such as grass cutting, landscape maintenance, ground cover management, tree care, irrigation systems and snow removal to large commercial properties, apartment complexes, cemeteries, condominium associations, institutions, industrial sites and residential communities throughout the mid-Atlantic region of the United States. Its principal place of business is located at 145 Moon Road, Chesapeake City, Maryland, 21915.

5.      Moon Wholesale, Inc. is a Pennsylvania corporation formed on January 5, 1995 for the purpose of operating a plant wholesaling business.  Although it is currently inactive, Moon Wholesale, Inc. remains in good standing in the Commonwealth of Pennsylvania.

6. Rickert Landscaping, Inc. is a Pennsylvania corporation formed on January 11, 1971. Rickert Landscaping, Inc. is currently inactive, but remains in good standing in the Commonwealth of Pennsylvania.

7. KORE Capital Corporation is a Virginia corporation which provides short-term business loans secured by accounts receivable. Its principal place of business is located at 6701 Democracy Boulevard, Suite 300, Bethesda, Maryland, 20817.

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), insofar as the matters complained of herein arise in and/or are related to a pending case under title 11 of the Bankruptcy Code.

9. Venue in this court is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1408(1).

## Facts

10. Plaintiffs are longstanding members of the business community in the mid-Atlantic area. The lynchpin of the Moon Entities' business is the nursery which dates to 1767 and is America's oldest nursery. Many of the predecessor business operations which now comprise the current Moon Entities have been in existence and operation for fifty years.

11. Non-party John D. Pursell Jr. has operated the Moon Entities for several decades.

12. The Moon Entities have fixed assets worth approximately $30 million, consisting of real property worth approximately $15 million, inventory worth approximately $10 million, and equipment worth approximately $5 million.

13. The Moon Entities' typical combined monthly revenue exceeds $5 million.

14. The Moon Entities service large business customers, and the work can be seasonal – most active in late spring through fall, least active in winter and early spring. For this reason, the Moon Entitles carry substantial, multi-million-dollar accounts receivable.

15.     As a result, the Moon Entities have encountered cash flow shortages when awaiting remittances from customers on a seasonal basis.

16.     KORE is a provider of short-term high-rate revolving loans secured by accounts receivable; upon information and belief, KORE does not fund the loans it makes from its own capital, but rather borrows its capital from other lenders, attempting to earn a profit from the margin between the low rate at which it borrows these funds and the high rate at which it lends them.

17.     Moon had two existing secured loan facilities;[2] to assist the Moon Entities in addressing cyclical cash flow needs as a result of the seasonality of their businesses, the Moon Entities obtained a line of credit from KORE, secured only by the Moon Entities' accounts receivable.

18.     Specifically, on May 15, 2020, the Moon Entities entered into a revolving accounts receivable financing facility with KORE documented by a Revolving Credit and Security Agreement, under which KORE advanced funds to the Moon Entities based upon invoices issued by the Moon Entities to its customers for services rendered (the "Line of Credit," a true and correct copy of which is attached hereto as **Exhibit 1**).[3]

19.     The Line of Credit is secured only by a security interest in the Moon Entities' accounts receivable, and by the personal guaranty of Mr. Pursell.

---

[2] Two lenders have made loans that are secured by the Moon Entities' real property, inventory and equipment: Newtek extended a commercial loan in the original principal amount of $5,000,000.00 pursuant to a loan and security agreement dated June 27, 2019 and North Avenue Capital extended a commercial loan in the original principal amount of $10,000,000.00 pursuant to a loan and security agreement dated June 28, 2019. The Moon Entities are not in default of either of these loans, nor are either of these loans collateralized by any accounts receivable of the Moon Entities.

[3] The Moon Entities and KORE subsequently entered into a Loan Modification Agreement on September 16, 2020, a Forbearance/Loan Modification Agreement on December 30, 2020, a Second Loan Modification Agreement on May 24, 2021 and a Waiver/Loan Modification Agreement on June 28, 2021. These agreements are collectively referenced as the "Line of Credit" and attached as Exhibit 1 hereto.

20.     KORE has no security interest in the Moon Entities' real estate, inventory or equipment.

21.     The amount that the Moon Entities are permitted to draw from the Line of Credit is based upon a percentage of the Moon Entities' then-outstanding accounts receivable.

22.     One of the Moon Entities – Moon Site Management, Inc. – is a party to a master service agreement with StoneMor, Inc. (the "StoneMor Agreement," a true and correct copy of which is attached hereto as **Exhibit 2**) whose term extends through December 31, 2024. StoneMor is also a creditor of the Moon Entities.

23.     StoneMor, Inc. ("StoneMor") is a leading owner and operator of cemeteries and funeral homes, and is the largest customer of Moon Site Management, Inc.

24.     Under the StoneMor Agreement, Moon Site Management provides total ground maintenance services to a large number of StoneMor cemeteries in Pennsylvania, Maryland, Virginia, and the District of Columbia.

25.     The StoneMor Agreement results in monthly cash flow to the Moon Entities of approximately $3 million, and pursuant to its terms, has another three years to run.

26.     Partly as a result of the percentage of the Moon Entities revenues represented by the StoneMor account, KORE initially agreed to advance to the Moon Entities 80 percent of the receivables for customers other than StoneMor, but only 35 percent of the StoneMor receivables.

27.     The Line of Credit contemplates that the Moon Entities'' receivables will be paid by customers directly to KORE, and that funds (not exceeding the above-noted percentages) would then be advanced to meet the Moon Entities' short-term cash flow needs.

28.     Shortly after the Line of Credit commenced, it became readily apparent to the Moon Entities and KORE that the loan facility as initially contemplated was wholly

impracticable for its intended purpose because of the unreasonably low percentage of the StoneMor receivables against which KORE would make cash advances. The 35 percent limit was particularly unworkable in light of the expenses (including massive payroll obligations) incurred to service the very large StoneMor account, and the narrow profit margins associated therewith.

29.     Furthermore, from the commencement of the Line of Credit, StoneMor made reliable payments under the StoneMor Agreement, which inured to the benefit of KORE.

30.     As a result, the Line of Credit was amended several times, both by formal amendment, and through the parties' mutual custom and actual practice, to increase both the total availability of funds under the Line of Credit and the percentage of StoneMor receivables relative to which KORE would make advances.

31.     However, as the Moon Entities made new requests for loan advances, the time period between the request and KORE's provision of funds inexplicably increased materially; on a number of occasions, the Moon Entities risked defaulting on their payroll obligations because of KORE's late funding of advances.

32.     In or about July 2021, KORE demanded that the Moon Entities engage a financial "cash flow consultant" selected by KORE, at significant expense to the Moon Entities.

33.     This was not merely a request by KORE for a field exam, which is permitted under the Line of Credit. Nor was this demand precipitated by any meaningful change in the Moon Entities' operations or income, and the Moon Entities' financial statements were already subject to review and audit by a third-party CPA under the terms of the Line of Credit.

34.     The Moon Entities' cash flow status has been largely unchanged since KORE extended the Line of Credit, as amended both by written amendment and custom and practice.

35.     At the time KORE made its baseless demand to install its exorbitantly expensive cash flow consultant, the outstanding principal balance of the Line of Credit was approximately $5 million, however the Moon Entities' accounts receivable (which secure the Line of Credit) totaled approximately $9 million.  Thus, KORE's Line of Credit was substantially *over*-secured.

36.     The Moon Entities rejected KORE's unsubstantiated demand to pay for the high cost KORE-selected cash flow consultant.

37.     However, the Moon Entities welcomed and encouraged KORE to engage a cash flow consultant at KORE's sole expense for its intended purpose.

38.     The Moon Entities previously engaged Joe Klinger, a highly qualified and well regarded financial consultant. The Moon Entities then offered to re-engage Mr. Klinger, who possessed substantial knowledge of the Moon Entities' businesses, to address any cash flow concerns KORE had with respect to the Moon Entities.

39.     KORE insisted that the Moon Entities engage KORE's own consultant at enormous expense to the Moon Entities.

40.     When the Moon Entities rejected this demand with finality, KORE accused the Moon Entities of defaulting on the Line of Credit, terminated the Line of Credit, and insisted that Moon Entities' customers make payment for services directly to KORE.

41.     On multiple occasions in conversation with Mr. Pursell, KORE's President and CEO, Kwesi Rogers, insisted that the Moon Entities were overdrawn on the Line of Credit, and he threatened to notify the Moon Entities' existing secured lenders and its customers of the alleged default under the Line of Credit.

42. The Moon Entities notified KORE that it was creating an untenable financial situation and that KORE's own refusal to extend cash advances breached the Line of Credit's terms.

43. The Moon Entities require cash on hand to run their day-to-day operations, service customers, pay employee payroll and sub-contractors, maintain equipment, purchase inventory and manage their large pool of total customer receivables. Indeed, the need for reliable operational cash flow in a seasonal business context necessitated the Line of Credit with KORE in the first place.

44. KORE's sudden refusal on or about July 10, 2021, to fund the next draw on the Line of Credit (consistent with the many, many previous draws granted and made), would have caused the Moon Entities not to be able to make their payroll obligations, thus causing a default on the StoneMor Agreement, and in turn rendering the Moon Entities immediately insolvent. Therefore, the Moon Entities asked StoneMor to pay its then upcoming invoice directly to Moon Site Management instead of to KORE so that Moon Site Management could fund its StoneMor Agreement required and necessary payroll and in so doing avoid a default on the StoneMor Agreement.

45. On July 15, 2021, KORE instructed StoneMor via e-mail to make its payment to KORE, and not to Moon Site Management. A true and correct copy of KORE's July 15, 2021 e-mail to StoneMor is attached hereto as **Exhibit 3**. Therein, KORE wrote to StoneMor that "[p]ayment to any other party will not relieve Stonemor [sic] of its obligation to KORE." Ex. 3.

46. On July 16, 2021, counsel for KORE issued a Notice of Default to the Moon Entities, a true and correct copy of which is attached as **Exhibit 4**.

47.     That same day, counsel for Moon Entities responded by letter, a true and correct copy of which is attached hereto as **Exhibit 5**.

48.     In Moon Entities' counsel's letter, the Moon Entities rejected KORE's declaration of default as invalid; declared that, in fact, KORE breached the Line of Credit first by refusing and/or failing to fund the next draw, and made a counter-proposal: if KORE provided written confirmation that it would honor the Line of Credit as amended, including the oral modifications thereto, and fund the necessary cash advance, the Moon Entities would turn over the StoneMor payment to KORE and promptly seek an alternate lender to refinance the Line of Credit.  Ex. 5.

49.     Counsel for the Moon Entities reminded KORE that it "has consistently and repeatedly over-advanced on the Line [of Credit] despite the $3,000,000 credit limit in the Revolving Credit and Security Agreement dated May 15, 2020 [and . . .] has allowed Borrower to rely upon such over-advances and to repay the Line in the ordinary course and has consistently re-advanced funds to Borrower over and above the credit limit on the Line." *Id.*

50.     Counsel for the Moon entities also noted that KORE never raised any concern about the over-advances

> until Borrower refused to hire a cash flow consultant at substantial expense to Borrower as demanded by Mr. Rogers without any authority to do so under the Loan Documents; there is no provision whatsoever in either the Loan Agreement or the other Loan Documents evidencing and/or securing the Line pursuant to which KORE is entitled to compel Borrower to hire KORE's consultant at Borrower's expense. KORE has the right to conduct field examinations using KORE's own employees, agents and consultants and can take reasonable steps to review and collect Borrower's accounts, and KORE may charge these expenses to Borrower only as provided in the Loan Agreement. Borrower has consistently cooperated with KORE and KORE's field examinations and will cooperate and assist any cash flow consultant which KORE elects to hire on its own behalf. However, Borrower has not budgeted for the hiring of a cash flow consultant, sees no reason to make such a substantial expenditure and is under no obligation to do so under the Loan Documents.

Ex. 5.

51.     KORE's material default under the Line of Credit loan facility which occurred prior to any payment by StoneMor to Moon Site Management relieved the Moon Entities of its further performance obligations thereunder.

52.     Counsel for the Moon Entities concluded that, because "KORE's over-advances are not defaults under the Line or the Loan Documents and since Borrower's failure to hire KORE's consultant is not a default under the Loan Documents, neither of those events are grounds for KORE to either refuse additional advances under the Line or for termination of the Line." *Id.*

53.     On July 23, 2021, KORE filed a complaint in confession of judgment against the Moon Entities, seeking imposition of a receivership over the Moon Entities despite the fact that the Line of Credit only gives KORE an interest in the Moon Entities' accounts receivable, and despite KORE's status a junior lender only secured by the accounts receivable.

54.     KORE also filed a separate confession of judgment action against Mr. Pursell in his individual capacity in Maryland. KORE also filed a civil suit against StoneMor first in the Court of Common Pleas of Bucks County, Pennsylvania, and then in United States District Court for the Eastern District of Pennsylvania.

55.     Outrageously, at or about the same time, KORE also attempted to obstruct delivery of the Moon Entities' mail by willfully making a fraudulent misrepresentation to the Chesapeake City postmaster, in violation of 18 U.S.C. §§ 1701 and 1708.

56.     In order to protect their centuries-old business, the Moon Entities filed a Chapter 11 petition before this Court, allowing the Moon Entities to continue operations while it took every step necessary to reorganize and address the debt owed under the KORE Line of Credit facility. Thereupon, the Maryland receivership action against the Moon Entities was stayed.

## Count I: Breach of Contract

57.     Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

58.     On a claim of breach of contract, the plaintiff must prove the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff. *Lorenzetti v. Hodges,* 62 A.3d 1224 (D. Del. 2013) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003)).

59.     In this case, the Moon Entities and KORE entered into the Line of Credit, an agreement which was initiated by the May 15, 2020 Revolving Credit and Security Agreement and was subsequently amended both in writing and by the parties' actual, repeated course of performance. *See* Ex. 1.

60.     KORE attempted to force a cash flow consultant upon the Moon Entities' without a contractual basis or factual predicate.

61.     When the Moon Entities reasonably refused to hire KORE's cash flow consultant (while offering numerous attempts at compromise), KORE failed and refused to make any further advances on the Line of Credit.

62.     KORE's pretense for its refusal to continue to fund the Moon Entities' advance requests was that the Moon Entities were overdrawn under the Line of Credit. However, throughout the life of the Line of Credit KORE consistently and exclusively permitted and encouraged advances by the Moon Entities of the same type, quantity and nature.

63.     The Line of Credit states that KORE's advances to the Moon Entities are "subject to the receipt of such financial information as Lender shall require and as otherwise provided in this Agreement." Ex. 1, Revolving Credit and Security Agreement § 2.1.

64.     The Moon Entities provided KORE with all required financial disclosures, adhered to required financial covenants and made their business operations available for any field examination requested by KORE.  *Id*. §§ 6.1, 6.4, 6.15 & 6.17.

65.     The Line of Credit contemplates that KORE may require additional financial assurances from the Moon Entities prior to making requested advances, but stipulates that such assurances must be "reasonably request[ed] in order to fully effectuate the purposes, terms and conditions of this Agreement[.]" *Id.* § 6.13.

66.     KORE's demand that the Moon Entities hire a cash flow consultant selected by KORE does not constitute a reasonable additional financial assurance under the Line of Credit, and KORE has made no effort to demonstrate that its identified consultant is necessary to achieve the purposes of the parties' agreement.

67.     Net of the $15 million combined debt to senior secured lenders, the value of the Moon Entities' non-collateral fixed assets (which cannot be easily liquidated) and the remainder of the collateral accounts receivable is more than sufficient to re-pay all outstanding sums owed to KORE by a wide margin.

68.     KORE knows that the Moon Entities had and have immediate and ongoing cash flow needs – including but not limited to plant materials, payroll, equipment and vehicle maintenance – which require the Moon Entities to make regular draws on the Line of Credit.

69.     KORE had the obligation to fund the Line of Credit in keeping with the parties' pattern and practice throughout the term of the Line of Credit.

70.     KORE failed and refused to fund the requested advance on the Line of Credit after the Moon Entities rejected KORE's demand to hire a cash flow advisor selected unilaterally by KORE.

71.     As a result of KORE's refusal to fund the requested advance on the Line of Credit without justification or a contractual basis on which to rely, the Moon Entities have been damaged insofar as they cannot meet their cash flow needs, risk losing longstanding clients, must locate alternative financing, in addition to defending themselves against KORE's spurious confession of judgment action in Maryland, and the extensive costs and expenses of the within bankruptcy action wholly necessitated by KORE's blatant breach of contract.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for breach of the Line of Credit and order such other and further relief as the Court deems just and equitable.

## Count II: Breach of Implied Duty of Good Faith and Fair Dealing

72.     Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

73.     Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract. *Anderson v. Wachovia Mortg. Corp.,* 497 F. Supp. 2d 572, 581 (D. Del. 2007) (*citing Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 920 (Del. Ch. 1999); *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del. Ch. 1985) (superseded by statute on other grounds), *aff'd,* 748 A.2d 407 (Del. 2000)).

74.     The Delaware Supreme Court "has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled . . . when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter may a party invoke the covenant's protections." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 116 (Del. 2006) (quoting *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005)).

75.     The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms. *Dunlap,* 878 A.2d at 442.

76.     KORE had an obligation to advance sums to the Moon Entities under the terms of the Line of Credit and pursuant to the parties' pattern and practice with respect thereto.

77.     The overarching purpose of the Line of Credit was to enable the Moon Entities to meet their operational cash flow needs in a seasonal business with significant accounts receivable.

78.     KORE breached that obligation when it failed and refused to advance further sums to the Moon Entities upon their refusal to hire a cash flow consultant selected by KORE.

79.     KORE has complete control over the implementation of the terms of the Line of Credit. KORE's refusal to make further advancements under the Line of Credit renders the Moon Entities unable to meet their operational cash flow needs.

80.     Furthermore, KORE has engaged in arbitrary and unreasonable conduct toward the Moon Entities designed to hobble their business operations and render them defenseless, thereby revealing KORE's ultimate goal—the Line of Credit was a "loan to own" scheme which KORE always intended to manipulate to the detriment of the Moon Entities, to wit:

      a.     KORE interfered with the Moon Entities' ongoing business operations by falsely and fraudulently intercepting the Moon Entities' U.S. Mail delivery. KORE presented a security agreement to the postmaster of Chesapeake City, Maryland, and prevailed upon the postmaster to convey all of Moon Entities' mail to KORE

despite the plain and obvious fact that the security agreement does <u>not</u> permit KORE to obtain possession of all of the Moon Entities' mail.

    b. KORE sued the Moon Entities' customer, StoneMor, in United States District Court for the Eastern District of Pennsylvania.

    c. KORE threatened to contact the Moon Entities' other customers for the presumed purpose of dissuading those current customers from continuing their ongoing business relationships with the Moon Entities.

    d. KORE threatened to contact the Moon Entities' secured lenders to dissuade them from continuing their ongoing lending relationships with the Moon Entities.

81. KORE's conduct breaches the covenant of good faith and fair dealing implicit in the Line of Credit, and by doing so, the Moon Entities have been damaged insofar as they cannot meet their cash flow needs, risk losing longstanding client and lending relationships, have suffered reputational harm and must locate alternative financing, in addition to defending themselves against KORE's spurious confession of judgment action in Maryland, in addition to the Moon Entities incurring the extensive costs and expenses of the within bankruptcy proceeding.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for breach of the implied covenant of good faith and fair dealing and order such other and further relief as the Court deems just and equitable.

## <u>Count III: Tortious Interference with Contract</u>

82. Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

83.     Delaware courts recognize a cause of action for tortious interference with contractual relations. *Gill v. Del. Park, LLC,* 294 F. Supp. 2d 638, 645 (D. Del. 2003) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch. 1987)).

84.     A plaintiff must prove the existence of the following five elements to make a claim for tortious interference: (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury. *Irwin & Leighton, Inc.,* 532 A.2d at 992 (citing Restatement (Second) of Torts § 766 20).

85.     KORE is aware that Moon Site Management, Inc. is engaged in the StoneMor Agreement with non-party StoneMor.

86.     KORE refused to make any further advances to the Moon Entities on the Line of Credit on the purported grounds that the Moon Entities were overdrawn under the terms of the Line of Credit, despite the parties' longstanding pattern and practice of requesting and granting such advances beyond the initial limits contained in the original Line of Credit.

87.     As a result of KORE's refusal to advance funds, the Moon Entities had no choice but to request that StoneMor pay its outstanding bill directly to Moon Site Management, Inc.

88.     Without use of the Line of Credit, if the Moon Entities did not receive payment directly from StoneMor, the Moon Entities could not satisfy their payroll obligations to employees and sub-contractors, would breach the StoneMor Agreement and other major client contracts, and would quickly be out of business.

89.     KORE has maliciously pursued StoneMor for diversion of StoneMor's payment from KORE, despite KORE's absolute knowledge that StoneMor made said payment to Moon

Site Management, Inc. at the direction of the Moon Entities, and not at StoneMor's own determination, in order to protect performance under the StoneMor Agreement.

90.     Furthermore, payment to Moon Site Management, Inc. enabled the Moon Entities to make payroll, and keeping the Moon Entities in business so as to carry out the obligations set forth in the StoneMor Agreement serves StoneMor's interests, and also serves KORE's ultimate interests as well.

91.     KORE's intent is to dissuade StoneMor, as well as the Moon Entities' other current and prospective customers, from engaging the Moon Entities' services.

92.     KORE has thereby tortiously interfered with the StoneMor Agreement between the Moon Entities and StoneMor, and KORE may well have similarly interfered with other agreements by and between any of the Moon Entities and their respective customers.

93.     As a result of KORE's tortious interference with the StoneMor Agreement, the Moon Entities have been damaged insofar as they may not be able to meet their cash flow needs, risk StoneMor's massive business as represented by the StoneMor Agreement, and have suffered reputational harm.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for tortious interference with contract and order such other and further relief as the Court deems just and equitable.

## Count IV: Common Law Fraud

94.     Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

95.     On a claim of fraud, the plaintiff must prove a) a false representation; b) the defendant's knowledge or belief that the representation was false, or was made with reckless

indifference to the truth; c) an intent to induce the plaintiff to act or to refrain from acting; d) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and e) resulting damage to the plaintiff. *Lorenzetti v. Hodges,* 62 A.3d 1224 (D. Del. 2013) (citing *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del. 1992)).

96.    KORE wished to encourage and accommodate the Moon Entities' increasing draw requests under the Line of Credit, as KORE profited massively from the substantial interest rate spread between the Moon Entities' interest rates paid and KORE's actual cost of capital.

97.    KORE was aware that its limitation on the Moon Entities' draws against the StoneMor accounts receivable was unreasonable because (1) KORE was over-secured (with $9 million in accounts receivable securing a $5 million Line of Credit), (2) StoneMor was a reliable payor making regular payments on the StoneMor Agreement, and (3) the low limits on the Line of Credit left the Moon Entities unable to meet the cash flow needs of their business operations.

98.    Thereupon, KORE recklessly engaged in a pattern and practice of granting the Moon Entities' requests for advances which exceeded the initial limits set in the Line of Credit thereby amending the Line of Credit accordingly.  KORE did this repeatedly and without fail, in order to lull the Moon Entities into a false confidence that the Line of Credit would meet the Moon Entities' cash flow needs during their busy season.

99.    The Moon Entities did, in fact, believe that KORE effectively lifted the initial limits on advances as set forth in the Line of Credit, and justifiably relied on KORE's desire, ability and agreement to fund the Moon Entities' cash flow needs on a continuing basis.

100.    When KORE suddenly and without notice or viable cause refused to make further advances under the Line of Credit to the Moon Entities, the Moon Entities were rendered

effectively unable to satisfy their payroll obligations and the ongoing viability of their business was threatened.

101. To wit, the Moon Entities were forced to declare Chapter 11 bankruptcy as a result of KORE's fraud against them, thereby incurring massive expenses and costs, they must find alternate emergency funding to meet their cash flow needs, putting at risk longstanding client relationships, in addition to suffering reputational harm.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for fraud and order such other and further relief as the Court deems just and equitable.

## Count V: Fraudulent Misrepresentation

102. Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

103. A claim for fraudulent misrepresentation requires: (1) false representation (usually one of fact); (2) that defendant knew or believed the representation was false; (3) that the false representation was intended to induce the plaintiff to act or refrain from acting; (4) that the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) plaintiff was damaged by such reliance. *J.C. Trading Limited v. Wal-Mart Stores, Inc.,* 947 F. Supp. 2d 449, 458 (D. Del. 2013)(citing *Carrow v. Arnold,* 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006), *aff'd,* 933 A.2d 1249 (Del. 2007)).

104. KORE wished to secure the Moon Entities' ever-increasing draw requests under the Line of Credit, as KORE profits from the spread in substantial interest rate payments it receives from the Moon Entities as compared to their actual cost of capital.

105. KORE was aware that its limitation on the Moon Entities' draws against the StoneMor accounts receivable was unreasonable because (1) KORE was over-secured (with $9 million in accounts receivable securing a $5 million Line of Credit), (2) StoneMor was a reliable payor making regular payments on the StoneMor Agreement, and (3) the low limits on the Line of Credit left the Moon Entities unable to meet the cash flow needs of their business operations.

106. Thereupon, KORE misrepresented that it raised the limits set in the Line of Credit for the Moon Entities' advances, without repercussions to the Moon Entities.

107. KORE did not intend to permanently alter the Line of Credit, but behaved as though it did.

108. In justifiable reliance on KORE's representation that there were new, higher limits on the Line of Credit, the Moon Entities requested and received regular and repeated advances from KORE which exceeded the limits initially stated in the Line of Credit.

109. When KORE suddenly and without notice or viable cause refused to make further advances to the Moon Entities, the Moon Entities were rendered effectively unable to satisfy their payroll obligations and the ongoing viability of their business operations was threatened in addition to the direct consequence that the Moon Entities would breach the StoneMor Agreement.

110. To wit, the Moon Entities were forced to declare Chapter 11 bankruptcy as a result of KORE's misrepresentations to them, has incurred resulting massive costs, must find alternate emergency funding to meet their cash flow needs, and they risk losing longstanding client relationships, in addition to suffering reputational harm.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for fraudulent misrepresentation and order such other and further relief as the Court deems just and equitable.

## Count VI: Promissory Estoppel

111.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

112.    Promissory estoppel "is an equitable remedy designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *J.C. Trading Limited v. Wal-Mart Stores, Inc.,* 947 F. Supp. 2d 449, 457 (D. Del. 2013) (quoting *Weiss v. Northwest Broad., Inc.,* 140 F. Supp. 2d 336, 344-45 (D. Del. 2001)).

113.    A promissory estoppel claim requires "that defendant made a promise with intent to induce action or forbearance, that plaintiff actually relied on the promise, and that he suffered injury as a result." *Id.* (citing *VonFeldt v. Stifel Fin. Corp.,* 714 A.2d 79, 87 (Del. 1998)).

114.    The Moon Entities bring this claim in the alternative to their breach of contract claim against KORE.

115.    The Line of Credit, by its terms, allows KORE certain discretion in its decision to advance funds pursuant to a request for advancement from the Moon Entities, and prevents the Moon Entities from over-drawing under the Line of Credit.

116.    However, without regard to the language of the Line of Credit, KORE promised the Moon Entities that the limits imposed therein on the Moon Entities' draw requests would be raised in order to meet the Moon Entities' ongoing cash-flow needs, and for a long period of time, KORE acted accordingly.

117.     The Moon Entities relied on KORE's promise to fund their Line of Credit draw requests in excess of the initial limits set forth in the Line of Credit, and in reliance thereupon the Moon Entities commenced and continued making advance requests in excess of the amounts allowed under the initial terms of the Line of Credit.

118.     KORE commenced and continued funding the advance requests made by Moon in excess of the initial limits set forth in the Line of Credit, thereby causing the Moon Entities to reasonably rely thereon.

119.     When KORE suddenly refused and failed to fund future advance requests on the purported basis that the Moon Entities were overdrawn under the terms of the Line of Credit, and likely because the Moon Entities refused to employ KORE's cash management consultant, despite KORE's promises to abide by its increased draw limits, the Moon Entities were rendered effectively unable to satisfy their payroll obligations and the ongoing viability of their business was threatened.

120.     To wit, the Moon Entities were forced to declare Chapter 11 bankruptcy as a result of KORE's misrepresentations to them, has incurred resulting massive costs, must find alternate emergency funding to meet their cash flow needs, and they risk losing longstanding client relationships, in addition to suffering reputational harm.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against KORE in an amount to be determined at trial for promissory estoppel and order such other and further relief as the Court deems just and equitable.

Date:   September 22, 2021
        Wilmington, Delaware

**SULLIVAN HAZELTINE ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

-and-

Kevin J. Silverang, Esq.
Philip S. Rosenzweig, Esq.
Mark S. Haltzman, Esq.
Silverang, Rosenzweig & Haltzman, LLC
Woodlands Center, Suite 300
900 East Eighth Avenue
King of Prussia, PA 19406
Tel: (610) 263-0115
Fax: (610) 754-4934
Email: ksilverang@sanddlawyers.com
        prosenzweig@sanddlawyers.com
        mhaltzman@sanddlawyers.com

-and-

Jeffrey Kurtzman, Esq.
KURTZMAN | STEADY, LLC
555 City Avenue, Suite 480
Bala Cynwyd, PA 19004
Telephone: (215) 839-1222
Facsimile:  (609) 482-8011
Email:  kurtzman@kurtzmansteady.com

*Counsel for Debtors and Debtors in
Possession*