**Exhibit 1**

TRUE MOON

| | Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 8/14/21 | 8/21/21 | 8/28/21 | 9/4/21 | 9/11/21 | 9/18/21 | 9/25/21 | 10/2/21 | 10/9/21 | 10/16/21 | 10/23/21 | 10/30/21 | 11/6/21 | 11/13/21 |
| | | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | | | | | |
| **Total Cash Inflows From Operations** | | 316,454 | 652,823 | 852,291 | 65,171 | 578,029 | 41,712 | 853,805 | 165,915 | 928,624 | 618,101 | 837,802 | 184,755 | 1,071,590 | 97,507 |
| DIP Loan Proceeds | | | | | | | 6,250,000 | | | 1,750,000 | | | | | |
| Total Cash Received | | | | | | | 6,291,712 | | | 2,678,624 | | | | | |
| **Cash Outflows From Operations** | | | | | | | | | | | | | | | |
| Payroll & Taxes | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 480,203 | 121,932 | 650,000 | 0 | 675,000 | 0 | 675,000 | 0 | 650,000 |
| Health & Dental Insurance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 350,000 | 0 | 0 | 0 | 150,000 | 0 |
| Total Payroll Related Expenses | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 480,203 | 121,932 | 650,000 | 350,000 | 675,000 | 0 | 675,000 | 150,000 | 650,000 |
| Equip Rental - MOON | | 0 | 0 | 0 | 0 | 0 | 5,000 | 1,401 | 2,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 2,500 |
| Vehicle Leases | | | | 0 | | | 0 | 5,259 | 0 | 0 | 0 | 15,021 | 0 | 0 | 0 |
| Freight | | 0 | 0 | 0 | 0 | 0 | 1,800 | 1,700 | 10,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Fuel - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 0 | 6,000 | 6,000 | 6,000 | 6,000 | 8,000 | 8,000 | 8,000 |
| HMS GL/WC Insurance | | 0 | 0 | 28073 | 112,120 | 0 | 2,720 | 9,036 | 0 | 164,218 | 0 | 0 | 9,036 | | 0 |
| Material - MOON | | 0 | 2,800 | 0 | 4,590 | 1,500 | 5,000 | 0 | 0 | 15,000 | 15,000 | 25,000 | 15,000 | 25,150 | 15,150 |
| Misc MOON | | 0 | 0 | 165 | 311 | 235 | 285 | 0 | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Misc AP | | 0 | 0 | 0 | 10,000 | 11,968 | 1,665 | 255 | 10,000 | 20,000 | 20,000 | 30,000 | 30,000 | 40,000 | 0 |
| Pex - MOON | | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Plants and Materials | | 0 | 0 | 9,272 | 0 | 0 | 31,640 | 57,476 | 30,000 | 20,000 | 10,000 | 75,000 | 40,000 | 40,000 | 0 |
| Rent | | 0 | 0 | 0 | 7,500 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 0 | 20,000 | 0 |
| Sales Tax IRS/Sales/Property | | 0 | 0 | 0 | 0 | 25,903 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 |
| Stonemor - PEX | | 0 | 0 | 20,000 | 10,000 | 10,000 | 10,000 | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Material | | 0 | 0 | 0 | 10,000 | 12,236 | 23,478 | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Fuel | | 0 | 0 | 0 | 5,000 | 0 | 8,000 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Equip Rental | | 0 | 0 | 0 | 0 | 1,406 | 5,000 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Mowing | | 0 | 0 | 0 | 0 | 22,312 | 29,405 | 122,892 | 3,687 | 431,500 | 344,000 | 0 | 0 | 0 | 0 |
| Stonemor - Other Subs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,000 | 0 | 0 | 0 | 3,000 | 0 |
| Subcontracts - MOON | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100,000 | 0 | 0 | 0 | 0 |
| Utilities | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 0 | 10,000 | 0 | 10,000 | 0 |
| | | | | | | | | | | | | | | | |
| **Total Cash Outflows NON Payroll** | | 0 | 2,800 | 77,510 | 169,521 | 95,560 | 133,993 | 198,019 | 157,187 | 748,218 | 583,500 | 249,521 | 215,536 | 234,650 | 110,650 |
| Payroll Total | | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 480,203 | 121,932 | 650,000 | 350,000 | 675,000 | 0 | 675,000 | 150,000 | 650,000 |
| **Total Cash Outflows From Operations** | | 103,866 | 665,854 | 435,934 | 544,740 | 434,467 | 614,196 | 319,951 | 807,187 | 1,098,218 | 1,258,500 | 249,521 | 890,536 | 384,650 | 760,650 |
| | | | | | | | | | | | | | | | |
| **Cash Flow From Operations** | | 212,588 | (13,031) | 416,357 | (479,569) | 143,562 | 5,677,516 | 533,854 | (641,272) | 1,580,406 | (640,399) | 588,281 | (705,781) | 686,940 | (663,143) |
| | | | | | | | | | | | | | | | |
| **Debt Payments** | | | | | | | | | | | | | | | |
| North Ave Capital | | 0 | 0 | 83,372 | 0 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 | 83,371 | 0 | 0 |
| Newtek | | 0 | 0 | 0 | 0 | 56,695 | 0 | 0 | 0 | 61,286 | 0 | 0 | 0 | 61,286 | 0 |
| Kore Capital | | | | | 0 | | 5,455,456 | | | 121,279 | | | | | |
| **Total Debt Payments** | | 0 | 0 | 0 | 83,372 | 56,695 | 5,455,456 | 0 | 83,371 | 182,565 | 0 | 0 | 83,371 | 61,286 | 0 |
| | | | | | | | | | | | | | | | |
| **Chapter 11 Expenses** | | | | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | 40,000 | 30,968 | 36,000 | 241,057 | | | |
| UST Fees | | | | | | | | | | | | | 80,750 | | |
| **Ending Cash Balance** | 74,030 | 286,618 | 273,587 | 689,944 | 127,003 | 213,870 | 435,930 | 969,784 | 205,141 | 1,602,982 | 962,583 | 1,309,807 | 439,905 | 1,065,559 | 402,416 |

| Week | 15 | 16 | 17 | 18 | 19 | 20 | 21 | |
|---|---|---|---|---|---|---|---|---|
| Week Ending | 11/20/21 Projected | 11/27/21 Projected | 12/4/21 Projected | 12/11/21 Projected | 12/18/21 Projected | 12/25/21 Projected | 1/1/22 Projected | 21 Wk total* Projected |
| **BALANCE SHEET DATA** | | | | | | | | |
| *Total Cash Inflows From Operations* | 1,914,832 | 202,263 | 1,629,192 | 50,461 | 1,255,302 | 972,520 | 1,008,050 | 14,297,199 |
| DIP Loan Proceeds | | | | | | | | 8,000,000 |
| **Total Cash Received** | | | | | | | | 22,297,199 |
| *Cash Outflows From Operations* | | | | | | | | |
| Payroll & Taxes | 0 | 650,000 | 0 | 600,000 | 0 | 600,000 | 0 | 6,941,605 |
| Health & Dental Insurance | 150,000 | 0 | 0 | 0 | 150,000 | 0 | 0 | 800,000 |
| **Total Payroll Related Expenses** | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,741,605 |
| Equip Rental - MOON | 2,500 | 2,500 | 62,500 | 2,500 | 2,500 | 2,500 | 0 | 103,901 |
| Vehicle Leases | 0 | 14,000 | 0 | 0 | 0 | 13,000 | 0 | 47,280 |
| Freight | 40,000 | 10,000 | 10,000 | 10,000 | 0 | 0 | 0 | 323,500 |
| Fuel - MOON | 8,000 | 8,000 | 5,000 | 5,000 | 5,000 | 2,500 | 2,500 | 109,000 |
| HMS GL/WC Insurance | 165,135 | 9,036 | 0 | 134,218 | 0 | 9,036 | 0 | 642,628 |
| Material - MOON | 25,150 | 15,150 | 22,750 | 12,750 | 15,750 | 0 | 0 | 215,740 |
| Misc MOON | 60,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 0 | 170,996 |
| Misc AP | 80,000 | 40,000 | 35,000 | 35,000 | 35,000 | 0 | 0 | 398,888 |
| Pex - MOON | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 2,000 | 5,000 | 97,000 |
| Plants and Materials | 80,000 | 40,000 | 107,500 | 7,500 | 7,500 | 0 | 0 | 555,888 |
| Rent | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 87,500 |
| Sales Tax IRS/Sales/Property | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 125,903 |
| Stonemor - PEX | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 190,000 |
| Stonemor - Material | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 185,714 |
| Stonemor - Fuel | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 83,000 |
| Stonemor - Equip Rental | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 76,406 |
| Stonemor - Mowing | 175,000 | 0 | 0 | 0 | 0 | 0 | 0 | 1,128,796 |
| Stonemor - Other Subs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,000 |
| Subcontracts - MOON | 100,000 | 0 | 0 | 40,000 | 0 | 0 | 0 | 240,000 |
| Utilities | | | 10,000 | | | | 10,000 | 50,000 |
| *Total Cash Outflows NON Payroll* | 770,785 | 208,686 | 317,750 | 291,968 | 110,750 | 94,036 | 67,500 | 4,838,140 |
| Payroll Total | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,741,605 |
| *Total Cash Outflows From Operations* | 920,785 | 858,686 | 317,750 | 891,968 | 260,750 | 694,036 | 67,500 | 12,579,745 |
| *Cash Flow From Operations* | 994,047 | (656,423) | 1,311,442 | (841,507) | 994,552 | 278,484 | 940,550 | 1,717,454 |
| *Debt Payments* | | | | | | | | |
| North Ave Capital | 0 | 0 | 83,371 | 0 | 0 | 0 | 83,371 | 416,856 |
| Newtek | 0 | 0 | 61,286 | 0 | 0 | 0 | 61,286 | 301,839 |
| Kore Capital | | | | | | | | 5,576,735 |
| **Total Debt Payments** | 0 | 0 | 144,657 | 0 | 0 | 0 | 144,657 | 6,295,430 |
| *Chapter 11 Expenses* | | | | | | | | |
| Professional Fees | 300,000 | | | | 340,000 | | | 988,025 |
| UST Fees | | | | | | | | 80,750 |
| **Ending Cash Balance** 74,030 | 1,096,463 | 440,040 | 1,606,825 | 765,318 | 1,419,870 | 1,698,354 | 2,494,247 | 2,427,279 |

**Exhibit 2**

**DEBTOR-IN-POSSESSION**
**TERM LOAN CREDIT AGREEMENT**

**among each of**

**MOON GROUP, INC.,**
**MOON LANDSCAPING, INC.,**
**MOON NURSERIES, INC.,**
**MOON SITE MANAGEMENT, INC.,**
**MOON WHOLESALE, INC., and**
**RICKERT LANDSCAPING, INC.**
**as Debtor,**

**and**

**Certain Investment Fund(s) for Which**
**LEGALIST DIP GP, LLC**
**Serves as General Partner,**
**as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of September __, 2021, is entered into among each of Moon Group, Inc., Moon Landscaping, Inc., Moon Nurseries, Inc., Moon Site Management, Inc., Moon Wholesale, Inc., and Rickert Landscaping, Inc. (each and, collectively, the "**Debtor**") and certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner, as lender, agent, and collateral agent (in such capacities, the "**DIP Lender**").

## RECITALS

WHEREAS, on August 12, 2021 (the "**Petition Date**"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and its chapter 11 cases are being jointly administered under the caption *In re Moon Group, Inc.*, No. 21-11140 (CSS) (the "**Case**");

WHEREAS, the Debtors have continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtors to obtain funds in order to fund the Cases and work toward a successful exit from chapter 11 and, accordingly, the Debtors requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $8,000,000 (the "**DIP Commitment**") in accordance with the allocation on Addendum 1;

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

## ARTICLE I
## DEFINED TERMS

**Section 1.01 Definitions.** As used in this Agreement:

"**Accounts**" means Cash and Cash Equivalents.

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as Exhibit A and otherwise in Approved Form.

"**Budget**" means a budget encompassing, on a monthly basis, the period from the date hereof through the satisfaction of the final Milestone and containing detailed line items of the Debtors' projected receipts and disbursements, in Approved Form, including as the same may be revised by the Debtors from time to time in Approved Form. The Budget as of the date hereof is attached hereto as Exhibit B.

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"**Carve-Out**" means an amount up to $200,000 for the payment of allowed administrative expenses and professional fees and statutory fees payable by the Debtors to the Office of the United States Trustee and/or the Clerk of the Bankruptcy Court which shall be available following an Event of Default.

"**Case**" has the meaning given to it in the Recitals.

"**Cash**" means cash and cash equivalents.

"**Commitment Fee**" has the meaning given to it in Section 2.05(i).

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (as defined in the DIP Orders)) and (y) all other unsecured claims against the Debtor.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtors now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), together with (in each case) all proceeds thereof; provided that the DIP Collateral shall not include Excluded Collateral and shall be subject to the Carve-Out.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Credit Agreement, the DIP Orders, the Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

"**DIP Obligations**" means DIP Lender Expenses, together with all principals of, and interest and fees on (including, without limitation, any applicable Undrawn Line Fee, the Monitoring Fee, Commitment Fee, and Underwriting Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtors under any DIP Loan Document.

"**DIP Orders**" means the Interim DIP Order and/or Final DIP Order, as applicable.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

"**Existing Liens**" means the Liens set forth on Schedule 2.

"**Final DIP Order**" means a final order of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court approving the DIP Loans in approved Form.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Maturity Date**" means the earliest to occur of (x) 18 months after the Effective Date of the first DIP Draw, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.

"**Milestones**" means, collectively, the events and corresponding deadlines set forth on Schedule 1.

"**Monitoring Fee**" has the meaning given to it in Section 2.05(iii).

"**Permitted Senior Liens**" means the Liens set forth on Schedule 3.

"**Permitted Variances**" has the meaning given to it in

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Underwriting Fee**" has the meaning given to it in Section 2.05(ii).

"**Undrawn Line Fee**" has the meaning given to it in Section 2.04(c).

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08.[1]

## ARTICLE II
## DIP LOANS

**Section 2.01 In General.**

(a) Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount DIP Commitment (such term loans, the "**DIP Loans**").

(b) Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

**Section 2.02 Use of Proceeds.** The proceeds of the DIP Loans shall be used by the Debtors solely to:

(i) Pay DIP Lender Expenses;

(ii) Pay all other DIP Obligations; and

(iii) Pay other amounts permitted under the Budget.

In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

**Section 2.03 [Omitted].**

**Section 2.04 Interest; Undrawn Line Fee.**

(a) Interest Rate. The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue interest from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 11.75% per year, which shall accrue and be compounded and capitalized monthly; provided that, if the Debtors failed to move for approval of the DIP Order by September 30, 2021, such interest rate shall include an additional 1.00%.

(b) Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue an additional 4.75% in interest per year, which shall accrue and be compounded and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c) Undrawn Line Fee. Any undrawn portion of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from date hereof at 4.75% per year, which shall accrue and be compounded and capitalized monthly.

(d) Payment Terms. All interest (including default interest) and any applicable Undrawn Line Fee (which shall be DIP Obligations for all purposes), together with the fees described in Section 2.05, shall be compounded and capitalized in arrears on

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the DIP Orders.

the first Business Day of month and due and payable upon the Maturity Date.

**Section 2.05 Fees.** The following fees shall be deemed fully and irrevocably earned upon the date hereof, but subject to approval of the Bankruptcy Court, and shall be DIP Obligations for all purposes:

(i) A onetime "**Commitment Fee**" of 2% of the DIP Commitment, due and payable in cash upon the Maturity Date;

(ii) A onetime "**Underwriting Fee**" of 1.00% of the DIP Commitment, due and payable in cash upon the Maturity Date; and

(iii) A "**Monitoring Fee**" of 1.75% of the DIP Commitment per year, payable in kind monthly as provided in Section 2.04(d).

**Section 2.06 Repayment.** Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtors unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

**Section 2.07 Prepayments.**

(a) Voluntary Prepayments. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning one year after the Effective Date, in the minimum amount of $50,000 without penalty or premium.

(b) Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtors' receipt of, any net proceeds from the sale or other disposition of any DIP Collateral outside of the ordinary course, subject to the prior payment of senior lienholders; provided that no such sale or disposition shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form.

**Section 2.08 General Provisions Regarding Payments.**

(a) Payments. All payments by or on behalf of the Debtors of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b) Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c) Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d) Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section 2.09 Termination of Commitments.** The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans under Section 8.02(a)(i) or (ii) the election of the DIP Lender while an Event of Default has occurred and is continuing.

## ARTICLE III
## CONDITIONS PRECEDENT

**Section 3.01 Conditions Precedent to DIP Draws.** The obligation of the DIP Lender to make DIP Draws available to the Debtors in the aggregate amount of the DIP Commitment (provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i) The Bankruptcy Court's entry of the applicable DIP Order, which remains in full force and effect as so entered and in Approved Form; provided that, upon entry of the Interim DIP Order but prior to entry of the Final DIP Order, the Debtors shall be permitted to draw no more than $6.25 million of the DIP Commitment in the aggregate;

(ii) The Debtors' satisfaction of all applicable Milestones;

(iii) Omitted;

(iv) The Debtors' delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(v) Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct as of such earlier date.

**Section 3.02 Effective Date.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date.**"

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

To induce the DIP Lender to provide the DIP Loans, the Debtors make to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section 4.01 Corporate Status; Corporate Authorization.**

(a) The Debtors are duly organized, validly existing, and in good standing under the respective laws of its jurisdiction of formation and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtors of this Agreement (x) are within its authority, (y) have been duly authorized, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

3

(b) Except with respect to the Bankruptcy Court's entry of the DIP Orders, the execution, delivery, and performance of obligations under this Agreement by the Debtors(x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtors or (iii) other instrument or agreement, in each case binding on the Debtors or affecting its property.

**Section 4.02 Execution and Binding Effect.** Subject to the Bankruptcy Court's entry of the DIP Orders, upon execution and delivery hereof, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

**Section 4.03 DIP Collateral.** The Debtors have good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens.

**Section 4.04 Absence of Material Adverse Effect.** There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtors or their operations since the Petition Date.

**Section 4.05 Governmental Approvals and Filings.** Except as has already been obtained, no approval, authorization, or other action by, or filing, recording, or registration with, or notice to, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section 4.06 Misstatements and Omissions.** Since the Petition Date, no information furnished or made available by the Debtors (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

## ARTICLE V
## AFFIRMATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtors shall perform all of the following covenants:

**Section 5.01 Budget Reporting and Compliance.**

(a) No later than the first Tuesday of each month, the Debtors shall provide the DIP Lender (each in Approved Form):

  (i) A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding month and cumulatively from the date hereof, together with detailed explanations of all variances (if any); and

  (ii) A rolling 13-week cashflow forecast for the Debtor.

(b) In no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Budget (on a line-item, monthly, or cumulative basis) by more than 10% provided that the Debtors may make disbursements for any particular line item in any given period under the Budget up to the aggregate amount set forth for that line item from the beginning of the period of the Budget through such applicable date. (the "**Permitted Variances**").

**Section 5.02 Accounting; Financial Statements.** The Debtors shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section 5.03 Maintenance of Existence.** The Debtors shall do all things necessary to maintain (x) their corporate or other existence in accordance with its organizational documents (which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises.

**Section 5.04 Preservation of Assets.** The Debtors shall maintain its assets (including all DIP Collateral) in good operating conditions and shall make such repairs and replacements as are required, in accordance with the Budget; provided that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section 5.05 Notice of Material Events.** The Debtors shall notify the DIP Lender promptly in writing of:

(i) The occurrence of any default or Event of Default;

(ii) Any threatened or pending litigation or other proceeding or claim affecting the Debtor; and

(iii) Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtors or its operations.

**Section 5.06 Use of Proceeds.** The Debtors shall use the proceeds of the DIP Loans only as permitted by Section 2.02.

**Section 5.07 [Omitted].**

**Section 5.08 Taxes.** The Debtors will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtors have set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section 5.09 Milestones.** The Debtors shall comply with all applicable Milestones.

**Section 5.10 Compliance with Laws.** The Debtors shall comply with all applicable laws, rules, and regulations.

**Section 5.11 Bankruptcy Court Filings.** The Debtors shall commence all actions in, file all motions, applications, and proposed orders with, and make all other submissions to the Bankruptcy Court only in Approved Form.

**Section 5.12 Full Access to Information.** The Debtors shall promptly provide the DIP Lender with all requested information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; provided that, without any prior request from the DIP Lender, the Debtors shall deliver to the DIP Lender in real time copies of all offers (whether formal or informal, firm or contingent) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence, and all other materials regarding the Debtors' progress on the Milestones.

**Section 5.13 Stay, Extension, and Usury Laws.** The Debtors (x) covenant that they will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waive the benefit of all such laws.

**Section 5.14 Timely Payment of DIP Lender Expenses, Other DIP Obligations.** The Debtors shall, in addition to repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses.

**Section 5.15 Further Assurances.** The Debtors shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may reasonably request or require, in furtherance of this Agreement and the transactions contemplated hereby, expressly including all steps necessary or appropriate to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

### ARTICLE VI
### NEGATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtors shall perform all of the following covenants:

**Section 6.01 Indebtedness.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (x) Debt existing as of the Petition Date, (y) the DIP Obligations, and (z) Debt expressly contemplated by the Budget.

**Section 6.02 Liens.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any Lien other than (x) Existing Liens and (y) the DIP Liens.

**Section 6.03 Superpriority Claims.** The Debtors shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget.

**Section 6.04 Payments.** The Debtors shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget.

**Section 6.05 Merger or Sale.** The Debtors shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) unless the net proceeds thereof shall be sufficient to repay the DIP Obligations (subject to Section 2.07) in full, sell any DIP Collateral; *provided* any such sale shall be in Approved Form.

**Section 6.06 Business.** The Debtors shall not engage in any business other than its line of business as of the Petition Date.

**Section 6.07 Amendments to Organizational Documents.** The Debtors shall not amend any corporate-governance or organizational document.

**Section 6.08 Bankruptcy Court Filings.** The Debtors shall not commence any action in, file any motion, application, or proposed order with, or make any other submission to the Bankruptcy Court other than in Approved Form.

### ARTICLE VII
### INDEMNIFICATION

**Section 7.01 Indemnification by the Debtor.** The Debtors shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc. and Legalist DIP GP, LLC), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtors' payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

### ARTICLE VIII
### EVENTS OF DEFAULT

**Section 8.01 Events of Default.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i) The Debtors shall:

  (A) Fail to timely pay any DIP Lender Expense or other DIP Obligation;

  (B) Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens;

  (C) Fail to satisfy any Milestone, within 2 business days of its stated deadline; or

  (D) Make any payment not expressly contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances);

(ii) Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtors shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii) The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender:

  (A) Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget;

(B) Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral with a value in excess of $50,000;

(C) Subject to the Carve-Out, surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

(D) Approving credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral;

(E) Approving any administrative-expense claim, expense, or cost against the Debtors (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(F) Modifying, staying, vacating, or rescinding any part of any DIP Order;

(G) Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

(H) Enjoining, restraining, or in any other way preventing a Debtors from conducting any material part its business affairs;

(I) Appointing an examiner or trustee in the Debtors' Case;

(J) Confirming any chapter 11 plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations;

(K) Converting the Debtors' Cases to a cases under Bankruptcy Code chapter 7; or

(L) Dismissing the Debtors' Cases;

(iv) The Debtor, or an Affiliate thereof, shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender;

(v) Any party (other than the Debtors or an Affiliate thereof) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; provided that the Debtors have not timely filed a reasonable objection or opposition to such action, motion, or other submission; and

(vi) The Debtors shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtors' becoming aware of such failure or (ii) the Debtors' receipt of written notice from the DIP Lender of such failure.

**Section 8.02 Remedies.**

(a) Subject only to the DIP Orders, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:

(i) Declare the DIP Commitment terminated; and

(ii) Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

(b) While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i) Terminating the automatic stay with respect to any DIP Collateral;

(ii) Terminating the Debtors' exclusivity to propose a chapter 11 plan;

(iii) Appointing an examiner or chapter 11 trustee; and

(iv) Converting the Debtors' Cases to chapter 7.

(c) If the DIP Lender so moves or applies, the Debtors shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtors expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(d) In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(e) For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section 8.03 Application of Funds.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i) First: To the DIP Lender, for accrued and unpaid DIP Lender Expenses;

(ii) Second: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees;

(iii) Third: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv) Fourth: To the DIP Lender, for all other unpaid DIP Obligations (including reasonable reserves for Indemnified Liabilities and other contingent DIP Obligations); and

6

(v) <u>Fifth</u>: After all DIP Obligations (including reasonable reserves) have been indefeasibly paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.

For the avoidance of doubt, the Debtors shall remain liable for any deficiency.

## ARTICLE IX
## JOINT AND SEVERAL OBLIGATIONS

**Section 9.01** <u>In General</u>. All representations and warranties, and all covenants, agreements, and other obligations, hereunder of the Debtors shall, for all purposes, be joint and several obligations of each debtor signatory hereto.

## ARTICLE X
## COLLATERAL, SECURITY, AND PRIORITY

**Section 10.01** <u>DIP Claims</u>. The Debtors covenant, represent, and warrant that, upon entry of the Interim DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtors' estates (expressly including all DIP Collateral).

**Section 10.02** <u>Grant of Security Interest</u>. Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtors assign and convey as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtors in the DIP Collateral (collectively, the "**DIP Liens**"). The Debtors acknowledge that, pursuant to the DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section 10.03** <u>DIP Liens</u>. The Debtors covenant, represent, and warrant that, upon entry of the Interim DIP Order, the DIP Liens shall comprise:

(i) Pursuant to Bankruptcy Code section 364(c)(2), automatically perfected, senior DIP Liens on all DIP Collateral not subject to Existing Liens;

(ii) Pursuant to Bankruptcy Code section 364(c)(3), automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens other than Accounts and Cash; and

(iii) Pursuant to Bankruptcy Code section 364(d)(1), automatically perfected, senior DIP Liens on all Accounts and Cash subject to the Carve-Out.

**Section 10.04** <u>Further Assurances</u>. The Debtors further agree that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.01** <u>Amendments and Waivers</u>. No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtors therefrom, shall be effective without the express written consent of the DIP Lender. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtors in any given instance shall entitle the Debtors to any other or further notice or demand in similar or other circumstances.

**Section 11.02** <u>Notices</u>. All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i) If to the Debtor:

Attn: John D. Pursell, Jr.  (jpursell@moonnurseries.com)

With a copy (which shall not constitute notice) to:

Sullivan Hazeltine Allinson LLC
Attn: William D. Sullivan, Esq. (bsullivan@sha-llc.com)

and

Kurtzman | Steady, LLC
Attn: Jeffrey Kurtzman, Esq. (kurtzman@kurtzmansteady.com)

(ii) If to the DIP Lender:

c/o Legalist, Inc. (dip@legalist.com).

**Section 11.03** <u>DIP Lender Expenses</u>. Whether or not the transactions contemplated hereby are consummated or any DIP Loan is made, the Debtors agree to pay promptly all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtors or their Cases, the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor.

**Section 11.04** <u>Enforceability; Successors and Assigns</u>. This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties. No Debtor may assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void *ab initio* and shall not relieve the Debtors of any obligation thereunder.

**Section 11.05** <u>Integration</u>. The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section 11.06** <u>No Waiver; Remedies Cumulative</u>. No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another right, power, or privilege. The rights and remedies provided in the DIP Loan Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

MOON GROUP, INC.
MOON LANDSCAPING, INC.
MOON NURSERIES, INC.
MOON SITE MANAGEMENT, INC.
MOON WHOLESALE, INC.
RICKERT LANDSCAPING, INC.

By: _____
Name: John D. Pursell, Jr.
Title: Chief Executive Officer

**DIP LENDER:**

LEGALIST/DIP GP, LLC, as general partner of the investment fund(s) listed on Addendum 1

By: _____
Name: Christian G.B. Haigh
Title: Managing Member

## Schedule 1
### (Milestones)

| Event | Deadline |
|---|---|
| Entry of Final DIP Order | November 4, 2021 |
| File Sale Motion | November 1, 2021 |
| Approval of Sale Procedures | November 22, 2021 |
| Bid Deadline | December 13, 2021 |
| Auction | December 16. 2021 |
| Sale Hearing | December 20, 2021 |
| Sale Closing | December 31, 2021 |
| Maturity Date | +18 months |

## Schedule 2
### (Existing Liens)

North Avenue Capital, LLC

Newtek Small Business Finance LLC (guaranteed by the SBA)

Ross Capital Partners, LLC

Padco Financial Services, Inc. (Equipment Lease)

Ailco Equipment Finance Group, Inc. (Secured by Equipment)

The Internal Revenue Service

| **Schedule 3** | **Schedule 4** |
|---|---|
| **(Permitted Senior Liens)** | **(Excluded Collateral)** |
| North Avenue Capital, LLC | Avoidance Actions and the proceeds thereof |
| Newtek Small Business Finance LLC (guaranteed by the SBA) | |
| Padco Financial Services, Inc. (Equipment Lease) | |
| Ailco Equipment Finance Group, Inc. (Secured by Equipment) | |
| The Internal Revenue Service | |

**Exhibit A**
**(Form of Borrowing Request)**

Legalist DIP Fund I, LP
Legalist DIP SPV II, LP
c/o Legalist, Inc. (dip@legalist.com)

RE: *In re Moon Group, Inc., et al.* Case No. 21-11140

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "Credit Agreement"), among Moon Group, Inc., *et al.* (collectively, the "Debtor") and the addressee(s) hereof (the "DIP Lender"). The Debtors acknowledge that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized term used but not defined herein have the meanings given to them in the Credit Agreement

The Borrower hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "DIP Draw").

The Debtors hereby acknowledge that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct as of such earlier date. The Debtors agree that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Account Name: *MOON NURSERIES INC*
Bank: *First Citizens Bank*
ABA (for wires): *031309589*
Account Number: *30041730 1*

Very truly yours,

Moon Group, Inc., individually and on behalf
of its affiliated debtors party to the Credit Agreement

By: _____
Name: John D. Pursell, Jr.
Title: Chief Executive Officer

**Exhibit B**
**(Budget)**

TRUE [logo]

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 8/14/21 Actual | 8/21/21 Actual | 8/28/21 Actual | 9/4/21 Actual | 9/11/21 Actual | 9/18/21 Projected | 9/25/21 Projected | 10/2/21 Projected | 10/9/21 Projected | 10/16/21 Projected | 10/23/21 Projected |
| **BALANCE SHEET DATA** | | | | | | | | | | | |
| *Total Cash Inflows From Operations* | 316,454 | 652,823 | 852,291 | 65,171 | 578,029 | 79,447 | 848,144 | 165,915 | 928,624 | 618,101 | 837,802 |
| DIP Loan Proceeds | 0 | | | | | 6,250,000 | | 1,750,000 | | | 0 |
| Total Cash Received | | | | | | 6,329,447 | | 1,915,915 | | | |
| *Cash Outflows From Operations* | | | | | | | | | | | |
| Payroll & Taxes | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 |
| Health & Dental Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 300,000 | 50,000 | 0 | 0 | 150,000 |
| **Total Payroll Related Expenses** | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| Equip Rental - MOON | 0 | 0 | 0 | 0 | 0 | 0 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Vehicle Leases | | 0 | 0 | 0 | | 0 | 16,463 | 0 | 0 | 0 | 15,021 |
| Freight | 0 | 0 | 0 | 0 | 0 | 2,500 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Fuel - MOON | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| HMS GL/WC Insurance | 0 | 0 | 0 | 112,120 | 0 | 0 | 134,218 | 30,000 | 0 | 0 | 138,226 |
| Material - MOON | 0 | 2,800 | 28073 | 4,590 | 1,500 | 0 | 0 | 0 | 15,000 | 15,000 | 25,000 |
| Misc MOON | 0 | 0 | 0 | 311 | 235 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc AP | 0 | 0 | 165 | 10,000 | 11,968 | 0 | 15,000 | 10,000 | 20,000 | 20,000 | 30,000 |
| Pex - MOON | 0 | 0 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Plant Materials | 0 | 0 | 9,272 | 0 | 0 | 82,779 | 50,000 | 60,000 | 20,000 | 10,000 | 75,000 |
| Rent | 0 | 0 | 0 | 7,500 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 |
| Sales Tax IRS/Sales/Property | 0 | 0 | 0 | 0 | 25,903 | 0 | 0 | 25,000 | 0 | 0 | 0 |
| Stonemor - PEX | 0 | 0 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Material | 0 | 0 | 0 | 10,000 | 12,236 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Stonemor - Fuel | 0 | 0 | 0 | 5,000 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Equip Rental | 0 | 0 | 0 | 0 | 1,406 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Stonemor - Mowing | 0 | 0 | 0 | 0 | 22,312 | 0 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Stonemor - Other Subs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 10,000 | 0 | 0 | 10,000 |
| *Total Cash Outflows NON Payroll* | 0 | 2,800 | 77,510 | 169,521 | 95,560 | 135,279 | 354,181 | 293,500 | 193,500 | 183,500 | 431,747 |
| Payroll Total | 103,866 | 663,054 | 358,424 | 375,219 | 338,907 | 650,000 | 300,000 | 700,000 | 0 | 650,000 | 150,000 |
| *Total Cash Outflows From Operations* | 103,866 | 665,854 | 435,934 | 544,740 | 434,467 | 785,279 | 654,181 | 993,500 | 193,500 | 833,500 | 581,747 |
| *Cash Flow From Operations* | 212,588 | (13,031) | 416,357 | (479,569) | 143,562 | 5,544,168 | 193,963 | 922,415 | 735,124 | (215,399) | 256,055 |
| **Debt Payments** | | | | | | | | | | | |
| North Ave Capital | 0 | 0 | 0 | 83,372 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 |
| Newtek | 0 | 0 | 0 | 0 | 56,695 | 0 | 0 | 61,286 | 0 | 0 | 0 |
| Kore Capital | | | | 0 | | 5,500,000 | | | | | |
| *Total Debt Payments* | 0 | 0 | 0 | 83,372 | 56,695 | 5,500,000 | 83,371 | 61,286 | 0 | 0 | 0 |
| **Chapter 11 Expenses** | | | | | | | | | | | |
| Professional Fees | | | | | | 40,000 | | 200,000 | | | 180,000 |
| UST Fees | 74,030 | | | | | | | | | | |
| *Ending Cash Balance* | 286,618 | 273,587 | 689,944 | 127,003 | 213,870 | 218,038 | 328,630 | 989,759 | 1,724,883 | 1,509,484 | 1,585,539 |

TRUE [logo]

| Week Ending | 12<br>10/30/21<br>Projected | 13<br>11/6/21<br>Projected | 14<br>11/13/21<br>Projected | 15<br>11/20/21<br>Projected | 16<br>11/27/21<br>Projected | 17<br>12/4/21<br>Projected | 18<br>12/11/21<br>Projected | 19<br>12/18/21<br>Projected | 20<br>12/25/21<br>Projected | 21<br>1/1/22<br>Projected | 21 Wk total*<br>Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET DATA** | | | | | | | | | | | |
| | | | | | | | | | | | |
| *Total Cash Inflows From Operations* | 184,755 | 1,071,590 | 97,507 | 1,914,832 | 202,263 | 1,629,192 | 50,461 | 1,255,302 | 972,520 | 1,008,050 | 14,329,273 |
| DIP Loan Proceeds | | | | | | | | | | | 8,000,000 |
| **Total Cash Received** | | | | | | | | | | | 22,329,273 |
| *Cash Outflows From Operations* | | | | | | | | | | | |
| Payroll & Taxes | 650,000 | 0 | 650,000 | 0 | 650,000 | 0 | 600,000 | 0 | 600,000 | 0 | 6,939,470 |
| Health & Dental Insurance | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 150,000 | 0 | 0 | 800,000 |
| **Total Payroll Related Expenses** | **650,000** | **0** | **650,000** | **150,000** | **650,000** | **0** | **600,000** | **150,000** | **600,000** | **0** | **7,739,470** |
| Equip Rental - MOON | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 1,500 | 1,500 | 1,500 | 1,000 | 0 | 30,500 |
| Vehicle Leases | 0 | 0 | 0 | 0 | 14,000 | 0 | 0 | 0 | 13,000 | 0 | 58,484 |
| Freight | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 0 | 0 | 0 | 272,500 |
| Fuel - MOON | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 5,000 | 5,000 | 5,000 | 2,500 | 2,500 | 115,000 |
| HMS GL/WC Insurance | 0 | 26,909 | 0 | 134,218 | 0 | 0 | 0 | 0 | 0 | 0 | 603,764 |
| Material - MOON | 15,000 | 25,150 | 15,150 | 25,150 | 15,150 | 22,750 | 12,750 | 15,750 | 0 | 0 | 210,740 |
| Misc MOON | 0 | 0 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,711 |
| Misc AP | 30,000 | 40,000 | 40,000 | 40,000 | 40,000 | 35,000 | 35,000 | 35,000 | 0 | 0 | 411,968 |
| Pex - MOON | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 2,000 | 5,000 | 97,000 |
| Plant Materials | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 7,500 | 7,500 | 7,500 | 0 | 0 | 529,551 |
| Rent | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 87,500 |
| Sales Tax IRS/Sales/Property | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 125,903 |
| Stonemor - PEX | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 200,000 |
| Stonemor - Material | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 182,236 |
| Stonemor - Fuel | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 85,000 |
| Stonemor - Equip Rental | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 81,406 |
| Stonemor - Mowing | 75,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 472,312 |
| Stonemor - Other Subs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subcontracts - MOON | 240,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 240,000 |
| Utilities | 0 | 10,000 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 10,000 | 60,000 |
| | | | | | | | | | | | |
| *Total Cash Outflows NON Payroll* | 490,500 | 232,559 | 165,650 | 309,868 | 204,650 | 171,750 | 121,750 | 99,750 | 73,500 | 67,500 | 3,874,575 |
| Payroll Total | 650,000 | 0 | 650,000 | 150,000 | 650,000 | 0 | 600,000 | 150,000 | 600,000 | 0 | 7,739,470 |
| *Total Cash Outflows From Operations* | 1,140,500 | 232,559 | 815,650 | 459,868 | 854,650 | 171,750 | 721,750 | 249,750 | 673,500 | 67,500 | 11,614,045 |
| | | | | | | | | | | | |
| Cash Flow From Operations | (955,745) | 839,031 | (718,143) | 1,454,964 | (652,387) | 1,457,442 | (671,289) | 1,005,552 | 299,020 | 940,550 | 2,715,228 |
| | | | | | | | | | | | |
| Debt Payments | | | | | | | | | | | |
| North Ave Capital | 83,371 | 0 | 0 | 0 | 83,371 | 0 | 0 | 0 | 0 | 83,371 | 416,856 |
| Newtek | 0 | 61,286 | 0 | 0 | 61,286 | 0 | 0 | 0 | 0 | 61,286 | 301,839 |
| Kore Capital | | | | | | | | | | | 5,500,000 |
| **Total Debt Payments** | 83,371 | 61,286 | 0 | 0 | 144,657 | 0 | 0 | 0 | 0 | 144,657 | 6,218,695 |
| | | | | | | | | | | | |
| Chapter 11 Expenses | | | | | | | | | | | |
| Professional Fees | | | | 375,000 | | | | 375,000 | | | 1,170,000 |
| UST Fees | 80,750 | | | | | | | | | | 80,750 |
| | | | | | | | | | | | |
| **Ending Cash Balance** 74,030 | 465,673 | 1,243,418 | 525,275 | 1,605,239 | 808,195 | 2,265,637 | 1,594,348 | 2,224,900 | 2,523,920 | 3,319,813 | 3,319,813 |

## Addendum 1
### (Allocation of DIP Commitment)

- Legalist DIP Fund I, LP: 62.50%
- Legalist DIP SPV II, LP: 37.50%