# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MOON GROUP INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-11140 (CSS)<br><br>Jointly Administered<br><br>**Related to Docket Nos. 468, 483** |

**JOINDER OF STONEMOR OPERATING LLC TO (I) MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE AND (II) UNITED STATES TRUSTEE'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. § 1112(B), CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

StoneMor Operating LLC ("StoneMor"), by and through its undersigned counsel, hereby files this Joinder (the "Joinder") to the *Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Converting The Debtors' Chapter 11 Cases To Cases Under Chapter 7 Of The Bankruptcy Code* [Docket No. 468] (the "Committee Conversion Motion") and to the *United States Trustee's Motion For Entry Of An Order, Pursuant To 11 U.S.C. § 1112(B), Converting The Debtors' Chapter 11 Cases To Cases Under Chapter 7 Of The Bankruptcy Code* [Docket No. 483] (the "Trustee Conversion Motion," and together with the Committee Conversion Motion, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Moon Group, Inc. (7484); Moon Landscaping, Inc. (3442); Moon Nurseries, Inc. (8411); Moon Site Management, Inc. (0250); Moon Wholesale, Inc. (3232); and Rickert Landscaping, Inc. (3988). The Debtors' headquarters and mailing address is 145 Moon Road, Chesapeake City, MD 21915. A description of the Debtors and their respective businesses is set forth in the Declaration of John Pursell in support of First Day Pleadings filed on the petition date.

"Conversion Motions")[2], and in support of the Joinder, StoneMor respectfully represents as follows:

## PRELIMINARY STATEMENT

StoneMor joins in the relief requested in the Conversion Motions and, for the reasons set forth therein, believes that conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code is warranted. In addition to the grounds set forth in the Conversion Motions, StoneMor believes that additional grounds amply support conversion. In particular, the Debtors have, during the course of these cases, preferred certain creditors over others, electing to make payment on debts of certain estates while foregoing payment on others. This triaging of creditors, essentially "robbing Peter to pay Paul," reflects a pattern of indifference the Debtors have exhibited with respect to their ongoing obligations to employees, subcontractors and contractual undertakings. Since the commencement of these bankruptcy cases, StoneMor has been inundated with complaints by the Debtors' subcontractors regarding the Debtors' failure to pay them for services performed on StoneMor Properties (as defined herein), resulting in either StoneMor having to pay these subcontractors directly or these subcontractors walking off of the job sites[3].

In addition to failing to pay their subcontractors for their post-petition services, the Debtors, post-petition, also failed to pay their own employees, especially employees who were performing services at StoneMor Properties. This has occurred on several occasions since the commencement of these bankruptcy cases. Indeed, during the week prior to Christmas, 2021, the Debtors failed

---

[2] KORE Capital Corporation also filed the *Motion by KORE Capital Corporation To Convert Cases To Chapter 7 And Joinder In Pending Motions* on January 19, 2022 [Docket No. 484] (the "KORE Conversion Motion"). StoneMor does not object to the relief requested in the KORE Conversion Motion.

[3] On or about December 28, 2021, one of the Debtors' subcontractors actually filed several mechanics' liens against several of StoneMor's properties for post-petition work performed by that subcontractor which the Debtors' failed and refused to pay.

to pay at least seventy four (74) of these employees leading to significant disruptions in the services provided by the Debtors to StoneMor under the Master Services Agreements (as defined herein). As inexcusable as this was given the timing, the Debtors amplified this indifference during the week of January 7, 2022, when the Debtors stopped payment on approximately 200 payroll checks sent to their employees. These actions have resulted in substantial hardship for not only StoneMor, which proceeded to pay out of pocket, again, to make these employees whole but, and perhaps most consequently, for the employees, many of whom were left unpaid the week leading to Christmas.

The Debtors have refused to take responsibility for these shortfalls and, instead have tried to blame these operational problems on other third parties, including, StoneMor and their "bank." At the end of the day, however, all of these operational shortfalls are due to the fact that the Debtors are administratively insolvent.

Even the Debtors' own monthly operating reports, have established that these estates are administratively insolvent. Based on the numbers the Debtors have reported, there exists little potential for any confirmable plan for any Debtor[4]. The Debtors cannot be permitted to continue to force StoneMor, their employees and their subcontractors to stand idle while they continue to dwindle away what little estate resources and assets remain. Accordingly, the conversion of these cases and an appointment of an independent fiduciary to investigate potential intercompany and third party claims, liquidate the remaining assets of the estates, and otherwise maximize what

---

[4] Given the Debtors' pre-and post-petition operations, which are collective in nature, it is clear that the Debtors and their respective estates should be substantively consolidated. While that issue is not currently before the Court, StoneMor reserves all of its rights on this issue, including, but not limited to, the right to assert an administrative claim for the Cure Amount (as defined herein) against all of the Debtors, not just the counterparties to the Master Services Agreements.

value, if any, remains within these estates is warranted and in the best interests of the Debtors' creditors.

## RELEVANT FACTUAL BACKGROUND

I. **StoneMor's Relationship with the Debtors And The Master Services Agreements.**

1. StoneMor owns and/or operates more than 300 cemeteries and 70 funeral homes (together with any other properties owned or operated by StoneMor, collectively, the "StoneMor Properties") in multiple states throughout the United States of America.

2. Prior to the Petition Date, StoneMor, pursuant to the Master Services Agreements outsourced the grounds and maintenance services (collectively, the "Service Obligations") at most of the StoneMor Properties to the Debtors.

3. The Debtors were obligated to provide the Service Obligations pursuant to (a) that certain Master Services Agreement by and between StoneMor Operating LLC and Debtor Moon Landscaping, Inc. ("Moon Landscaping") dated April 2, 2020 and effective as of April 1, 2020 (the "Moon MSA") and (b) that certain Master Services Agreement (Unionized Locations) by and between StoneMor Operating LLC and Debtor Rickert Landscaping, Inc., dated April 2, 2020 and effective as of April 1, 2020  (the "Rickert MSA" and, together with the Moon MSA, the "Master Services Agreements").

4. Prior to the commencement of the Chapter 11 Cases (as defined herein), the Debtors were in default of various of their obligations due and owing to StoneMor pursuant to the terms and conditions of the Master Services Agreements.

5. As a result of these defaults, StoneMor, prior to the commencement of the Chapter 11 Cases, paid many of the Debtors' costs for obligations covered by the Master Services

Agreements (collectively, the "Prepetition Excess Payments")[5], including, without limitation, location materials and supplies, uniforms, repair of marker damage, customer refunds and direct payments to certain of the Debtors' subcontractors as well as vendors despite the fact that payment of all of these expenses was entirely the Debtors' obligation and responsibility under the Master Services Agreements. StoneMor made these payments so as to avoid the subcontractors from walking off the job to the detriment of StoneMor, to avoid the potential for liens being recorded against any of the StoneMor Properties, to avoid the Debtors failing to provide the contracted services and to ensure continued performance by the Debtors' subcontractors and avoid disruption in StoneMor's operations. Based upon the Debtors' schedules, many of these payments were made on behalf of Debtors, other than those who were parties to the Master Services Agreements.

6. As of the Petition Date (as defined herein), StoneMor was owed Prepetition Excess Payments of at least $5.1 million.

7. Since the Petition Date, StoneMor, in an effort to stabilize the Debtors' post-petition operations, has either advanced significant post-petition payments to the Debtors and/or made significant direct payments to the Debtors' subcontractors on an unsecured basis, with no guarantee of payment. At present, the Debtors owe StoneMor at least $381,355 on account of these post-petition advances, exclusive of the gift cards (in the aggregate amount of $240,000) and

---

[5] As of the Petition Date, the Prepetition Excess Payments were in excess of $5 million and this arrearage was reflected in the *Debtors' List of Creditors Who Have The 20 Largest Unsecured Claims and are not Insiders* [Docket No. 65]. Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the pleadings filed of record in this case. *See* Fed. R. Evid. 201(b); *see also Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("[C]ourts may take judicial notice of filings or developments in related proceedings … A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute … [and] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

another $271,158.33, representing the Debtors' missed payroll paid by StoneMor on behalf of the Debtors' former employees[6].

## II.     The Chapter 11 Cases.

### A.     Relevant Activity

8.      On August 12, 2021 (the "Petition Date"), the Debtors each filed petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing the instance proceedings (the "Chapter 11 Cases").

9.      On October 14, 2021, the Debtors filed the *Debtors' Motion For Entry Of An Order Pursuant To Sections 105(a) And 365(a) Of The Bankruptcy Code Authorizing The Debtors To Assume Master Services Agreements* [Docket No. 262] (the "MSA Assumption Motion").

10.     On November 4, 2021, the Court entered the *Order Granting Debtors' Motion For Entry Of An Order Pursuant To Sections 105(a) And 365(a) Of The Bankruptcy Code Authorizing The Debtors To Assume Master Services Agreements* [Docket No. 316] (the "MSA Assumption Order"), granting the relief requested in the MSA Assumption Motion.

11.     Pursuant to the MSA Assumption Order, the Debtors were authorized and directed to assume the Master Services Agreements pursuant to the term sheet attached to the MSA Assumption Order as Exhibit 1 (the "Term Sheet").

12.     In particular, the Term Sheet provided, *inter alia*, that, in connection with the assumption of the Master Services Agreements, the Debtors agreed that: (i) StoneMor's pre-petition cure amount would be in an amount of at least $5.1 million (the "Pre-Petition Cure Amount") and (ii) StoneMor's post-petition cure amount would be in an amount of at least

---

[6] StoneMor reserves any and all of its rights to file an administrative claim for these payments.

$572,605 (the "Post-Petition Cure Amount," and together with the Pre-Petition Cure Amount, the "Cure Amount"). *See* Term Sheet at ¶ 2.

13. Pursuant to the Term Sheet, the Debtors and StoneMor also agreed, *inter alia*, that StoneMor would be permitted to take back, immediately, approximately fifty percent (50%) of the properties that were being serviced by the Debtors but that for the sixty (60) days following entry of the MSA Assumption Order, StoneMor would not take back any of the remaining properties (notwithstanding the terms and conditions of the Master Services Agreement) absent a material breach by the Debtors of the Master Services Agreements. *See* Term Sheet at ¶ 7.

14. As set forth herein, despite ongoing and numerous defaults under the MSA Assumption Order and Master Services Agreements (all of which constituted material breaches thereunder), including, but not limited to, one of the Debtors' subcontractors filing mechanics' liens against some of the Remaining Properties, StoneMor waited more than sixty (60) days to take back the remaining StoneMor Properties, finally taking back the remaining properties on January 7, 2022.

15. On January 14, 2022, the Official Committee of Unsecured Creditors (the "Committee") filed the Committee Motion, and on January 19, 2022, the United States Trustee filed the Trustee Motion.

**B.     The Debtors' Operating Reports and Financial Status**

16. Through the Debtors' monthly operating reports (which, as noted in the Trustee Conversion Motion, have consistently been filed significantly late), it is clear that the Debtors' and their estates have incurred and are continuing to incur substantial losses following the Petition Date.

17.     In fact, as of the most recently-filed operating report for October, 2021, the three operating debtors, Moon Landscaping, Inc., Moon Site Management, Inc., and Moon Nurseries, Inc., only held a cumulative of $92,869.00 cash on hand at the end of the month of October.

18.     Furthermore, these monthly operating reports fail to specifically reflect the post-petition, bi-weekly payments made by StoneMor, although, StoneMor is unable to ascertain whether such payments were included in a general description of "gross income/sales" or another category.

19.     No detail is provided about what expenses are being paid by the Debtors and why the same are being paid over others such as, for example, their obligations to their employees and subcontractors. What is clear, however, is that certain expenses are still being paid while many are not. Not only is this unfair, it also has resulted in an inaccurate depiction of the Debtors' fiscal condition as it appears that the Debtors actually have "cash on hand" when, in reality, this is money due and owing for post-petition services provided either to the Debtors or on their behalf.

**III.    Ongoing Post-petition Defaults And Other Shortcomings**

20.     Since the Petition Date, StoneMor has been inundated with complaints from, and spent a substantial amount of time dealing with, the Debtors' subcontractors, many of whom were not paid for their pre-petition services and were refusing to continue to perform services on the Debtors' behalf absent payment.

21.     Incredibly, and likely due to the utter failure of the Debtors to even communicate with their subcontractors, many of these subcontractors had no idea that the Debtors had even filed for bankruptcy even days and/or weeks after the bankruptcy filing.

22.     StoneMor has spent immeasurable amounts of time addressing these problems and has not only come out-of-pocket to pay these subcontractors directly, but has also arranged to

retain independent contractors to perform necessary services when these subcontractors have "walked off the job" due to the Debtors' failure to pay them.

23. Furthermore, in many instances, the services provided by these subcontractors (again, many of whom are upset at the way they were treated by the Debtors) have been substandard resulting in atrocious conditions at the StoneMor Properties including, unkept and overgrown cemeteries, improper grave sites, grass clippings on memorial markers, grave stones which were not properly installed, grave sites which were not properly leveled, and issues with certain of the mausoleums.

24. While StoneMor made repeated requests to the Debtors to try and get the condition of these properties alleviated, the Debtors, despite repeated promises to the contrary, have failed to do so and, as a result, StoneMor, in several instances, was forced to retain its own subcontractors to remedy these properties.

25. The Debtors' operational shortfalls were not just simple breaches of the Master Services Agreements which could be fixed simply by paying a sum certain to StoneMor; rather, they caused StoneMor significant harm, not only from a financial standpoint but also in terms of its reputation, and have (and will continue to) cause StoneMor to face possible regulatory issues[7].

26. As a result of these ongoing breaches, on January 7, 2022, in accordance with the terms of the MSA Assumption Order, StoneMor removed the remaining StoneMor Properties from the Debtors and took back control of the maintenance and service operations on those properties.

---

[7] As this Court is aware, StoneMor provides an "essential service" and, as such, needs to have its cemeteries to be ready for burial services. Many of the cemeteries are in horrible condition and, indeed, local media outlets have run stories on the shoddy conditions of these cemeteries. *See, e.g.,* Marcos Santander, *Jackson cemetery faces suspension following investigation*, WBBJ News, Jackson, Tenn., September 20, 2021, https://www.wbbjtv.com/2021/09/20/jackson-cemetery-faces-suspension-following-investigation/. In addition, one of the cemeteries was supposed to be sold to a third party but the sale fell through due to the poor condition of the property.

In connection therewith, StoneMor also informed the Debtors' employees who were providing services for these properties that they were eligible to transition back to their employment with StoneMor.

27. As part of this transition, the Debtors were responsible to remit payment to their employees for all hours worked through the final day of their employment (i.e., on or before January 7, 2022); however, the Debtors failed to fulfill their obligations and stopped payment on checks sent to nearly 200 of these employees.

28. Given the circumstances of the Debtors' failure to properly remit their payroll, and as a gesture of goodwill, StoneMor agreed to make these employees whole by issuing gift cards to the employees essentially equivalent (if not greater) than the employees' unpaid paychecks due and owing from the Debtors.

## JOINDER

29. StoneMor joins in the relief requested by the Committee and the United States Trustee in the Conversion Motions for the reasons stated in the Conversion Motions. StoneMor, however also submits that there are additional bases which support such requested relief, as detailed herein.

**A.    The Debtors' Chapter 11 Cases Should Be Converted.**

30. Bankruptcy Code Section 1112(b) states, in relevant part, that "on request of a party in interest and after notice and a hearing, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1) (emphasis added).

31. Section 1112(b)(4) contains a non-exhaustive list of examples of "cause," including, without limitation, the following:

    (A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

    (B)    gross mismanagement of the estate.

11 U.S.C. § 1112(b)(4)(A), (B).

32. The causes for conversion or dismissal enumerated in 11 U.S.C. § 1112(b) are not exhaustive, and a court has discretion to "consider other factors . . . and use its equitable powers to reach an appropriate result in individual cases." *In re Integrated Telecom Pres, Inc.*, 384 F.3d 108, 118, n. 3 (3d Cir. 2004); *see also In re Northeast Family Eyecare, P.C.*, No. 01-13983, 2002 Bankr. LEXIS 856, at *8-*9 (Bankr. E.D. Pa. July 22, 2002).

33. The facts of this case overwhelmingly support conversion or dismissal, as there exist multiple circumstances constituting cause.

    **A.**    **Cause Exists Pursuant to 11 U.S.C. § 1112(b)(4)(A) Because There is a Substantial or Continuing Loss to or Diminution of the Estate and an Absence <u>of a Reasonable Likelihood of Rehabilitation</u>.**

34. The examples of "cause" for conversion or dismissal include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

35. "First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented[.]" *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007). In doing so, "the Court looks to both the financial prospects of the Debtor and the financial records filed with the Court." *Id*. at 564.

36. "The concept of rehabilitation necessarily hinges upon establishing a cash flow from which current obligations can be satisfied." *Grasso v. Madison Capital Co.*, No. 13-4308, 2014 U.S. Dist. LEXIS 44113, *22 (E.D. Pa. Mar. 31, 2014). To the contrary, a substantial

negative cash flow will support a conclusion that the estate is suffering continuing losses. *Id*. at *10.

37. Moreover, "[t]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376, 98 L. Ed. 2d 740, 108 S. Ct. 626 (1988)).

38. Unfortunately, in these cases, the Debtors' track record speaks for itself.

39. Simply stated, the Debtors have elected to forego payment of critical obligations owed to their own employees and to subcontractors performing essential work on their behalf. This wanton disregard has severely prejudiced StoneMor not only from a financial standpoint given the excessive amounts StoneMor needed to front in response to these shortcomings, but also on a reputational basis and have and may continue to subject StoneMor to regulatory issues.

40. Furthermore, the Debtors have consistently shown their intentions to improperly triage creditors for payment, electing to make payment on debts of certain estates while foregoing payment on others.

41. As the Bankruptcy Court for the Middle District of Pennsylvania succinctly provided, "robbing Peter to pay Paul is not a policy meriting judicial favor." *United States v. Lacrosse (In re Lacrosse)*, 244 B.R. 583, 588 (Bankr. M.D. Pa. 1999) (dismissing bankruptcy case of spouses for lack of good faith where one spouse utilized funds from creditors to pay down personal debts) (citing *Mickel-Hopkins, Inc. v. Frassinetti (In re Coble)*, 278 F.2d 301, 305 (4th Cir. 1960).

42. Courts will consider the actions of debtors and their intent to prefer creditors of certain estates over others in making determinations of conversion or dismissal. *See, e.g., In re*

*Coleman,* 288 B.R. 608, 609-10 (Bankr. S.D. Ga. 2002) (considering a "vast discrepancy in the proportion of monthly payments made to some creditors as opposed to others" in court's determination to dismiss an individual chapter 11 proceeding, noting as a factor the clarity of the debtor's intention to allocate payments on liabilities where debtor felt she had the most pressure from creditors, or believed she had the best equity position should she at some point have to surrender some of those properties); *see also*, *In re Croft*, 539 B.R. 122 (W.D. Tex. 2015) (evidence that debtors who declared chapter 13 bankruptcy and converted case to one under chapter 7 made exorbitant house and car purchases while they owed unpaid taxes, and failed to pay taxes while they were in chapter 13 bankruptcy, despite their six-figure income, supported decision to dismiss the debtors' case).

43. Similarly, here, the Debtors' actions in stripping assets of certain estates to benefit creditors of the other debtors should not be permitted to proceed.

44. The Debtors have further, by their own admission, exhibited a real and severe threat of administrative insolvency and have time and time again shown there is little to no true prospect of any successful reorganization. It is therefore patently clear that cause exists to convert or dismiss the Debtor's case because there is a substantial and continuing loss to the Debtor's estate as well as the absence of any reasonable likelihood of rehabilitation. In fact, the Debtors, themselves, have admitted that the pathway out of these cases is now, only, via a liquidation.

45. In the case of *In re Midwest Props. of Shawano, LLC*, 442 B.R. 278, 285-86 (Bankr. D. Del. 2010), the court found that there was no likelihood of reorganization where the debtors were operating their businesses at a loss, less than half of the debtor's commercial properties were producing any income, and where the debtor failed to produce a draft plan, financial projections, any agreements or other details regarding alleged intended improvements to the properties. The

court specifically noted that despite the debtor's honest belief in achieving its aspirations, more than unsubstantiated hope was required in the form of evidence that a realistic plan can be proposed within a reasonable time frame. *Id*.

46.     As the debtors in *In re Midwest Props. of Shawano, LLC*, the Debtors here have no realistic plan.  Rather, it is their hope that they may pursue a liquidation of their assets, which while admirable, is entirely unsubstantiated and speculative, especially considering the multiple failed attempts so far[8].

47.     Simply put, at this point in time, more than five months after they commenced these cases, the Debtors have no definitive plans, projections or agreements that will stem the continuing loss to the estates or that indicate that the Debtors have any reasonable likelihood of rehabilitation.

48.     Even if a liquidation were imminent, that fact alone cannot itself establish a likelihood of rehabilitation.  Indeed, courts have specifically held that "[r]ehabilitation does not include liquidation.  Rehabilitation means to reestablish a business." *In re 15375 Memorial Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd on other grounds*, *In re 15375 Memorial Corp.*, 400 B.R. 420 (D. Del. 2009)), *aff'd*, *15375 Memorial Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605 (3d Cir. 2009); *see also In re Loop Corp.*, 379 F.3d at 516 ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business."); *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 714-15 (Bankr. D. Md. 2011) (determination is whether a debtor has "sufficient business prospects."); 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed).  In sum, the financial prospects of the Debtors are bleak.

---

[8] To the extent the Debtors are not considering substantive consolidation, it is extremely unlikely that Moon Group, Inc., Moon Wholesale, Inc., and Rickert Landscaping which, according to the Debtors' monthly operating reports, have no assets and no income, can or will be reorganized.

49. Accordingly, because the Debtors' estates are suffering substantial, continuous loss and there is no reasonable possibility of a successful reorganization within a reasonable period of time, cause exists to convert or dismiss these Chapter 11 Cases.

### B. Cause Exists Pursuant to 11 U.S.C. § 1112(b)(4)(B) Because the Debtors Are Grossly Mismanaging Their Estates.

50. The examples of "cause" for conversion or dismissal include "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B).

51. The Debtors are grossly mismanaging their estate by their consistent failures under the Master Services Agreements, refusals to compensate their employees and subcontractors for services performed and their inability to propose or consummate a viable plan or sale process, all of which is more than adequate cause for conversion. *See, e.g., In re Rsrvs. Resort, Spa & Country Club LLC,* Nos. 12-13316(KG), 12-13317(KG), 2013 Bankr. LEXIS 2808, at *6-7 (Bankr. D. Del. July 12, 2013) (converting a case from Chapter 11 to Chapter 7 after determining there was no possibility of rehabilitation, because the debtors were "plagued by mismanagement", administrative and litigation costs were piling up and appointing a trustee would be fruitless).

52. At this point in time, the Debtors have failed to pay all of their non-professional administrative creditors, nearly two hundred of their former employees, nor any of their professionals. Meanwhile, they continue to incur significant post-petition liabilities that are more likely than not to go unpaid, especially given the loss of their largest customer.

53. Because the Debtors are grossly mismanaging their estates, cause exists to convert instant proceedings to cases under Chapter 7 of the Bankruptcy Code.

WHEREFORE, for the foregoing reasons, StoneMor joins in the Conversion Motions and respectfully requests that the Court enter an order granting one or both of the Conversion Motions, substantially in the forms as submitted therewith.

Respectfully submitted,

Dated: January 25, 2022
Wilmington, Delaware

**DUANE MORRIS LLP**

/s/ Lawrence J. Kotler
Lawrence J. Kotler (DE 4181)
Drew S. McGehrin (DE 6508)
1201 N. Market Street, Suite 501
Wilmington, Delaware 19801
Tel: 302-657-4900
Fax: 302-657-4901
Email: ljkotler@duanemorris.com
      dsmcgehrin@duanemorris.com

*Counsel to StoneMor Operating LLC*