IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MOON GROUP, INC., *et al.*, | ) | Case No. 21-11140 (JKS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Related D.I. 682, 697, 700, and 703** |
| | ) | |

## MEMORANDUM ORDER

Upon consideration of the *Emergency Motion of North Avenue Capital, LLC to Enforce the Court's Debtor-in-Possession Financing Orders and Order Granting Relief from the Automatic Stay and Abandonment*[1] (the "Emergency Motion"), filed by one of the Debtors' secured creditors North Avenue Capital, LLC ("North Avenue"), and joined by the Debtors' other secured creditor Newtek Small Business Finance, LLC[2] ("Newtek" and together with North Avenue, the "Term Lenders"); and the responsive letter filed by Legalist DIP GP, LLC, on behalf of Legalist DIP Fund I, LP and Legalist DIP SPV II, LP[3] (together, the "DIP Lender") challenging this Court's jurisdiction over abandoned property; and the Court having held a preliminary conference on September 6, 2022; and the Court having requested supplemental letter briefs solely on the issue of jurisdiction;[4] the Court having jurisdiction to determine whether it has subject matter jurisdiction;[5] and upon consideration of the parties' submissions;

---

[1] D.I. 682.

[2] D.I. 687.

[3] D.I. 685.

[4] *See* D.I. 697, 700 and 703.

[5] *Lyn v. Transamerica Small Business Cap., Inc. (In re Lyn)*, 483 B.R. 440, 449 (Bankr. D. Del. 2012).

**THE COURT HEREBY FINDS:**[6]

1.      On August 12, 2021 (the "<u>Petition Date</u>"), the above-captioned debtors (the "<u>Debtors</u>") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

2.      Moon Nurseries, Inc. ("<u>Nurseries</u>"), a corporation organized under the laws of the state of Maryland, was a wholesale grower and provider of nursery products (trees and shrubs) planted on approximately 546 acres that it owned, and an additional 226 acres that it leased.

3.      Moon Landscaping, Inc. ("<u>Landscaping</u>"), a corporation organized under the laws of the Commonwealth of Pennsylvania, operated a commercial landscape installation business.

4.      Moon Site Management, Inc. ("<u>Management</u>"), a corporation organized under the laws of the Commonwealth of Pennsylvania, operated a commercial landscape maintenance and snow removal business.

**A.      North Avenue Loan Facility**

5.      Prior to the Petition Date, North Avenue extended a term loan to the Debtors in the principal amount of $10 million (the "<u>NAC Loan</u>") pursuant to a Loan Agreement dated June 28, 2019 (the "<u>NAC Loan Agreement</u>") by and between the Debtors, John D. Pursell, Jr., John D. Pursell, III and North Avenue (collectively, the "<u>Guarantor</u>").

6.      The NAC Loan is evidenced by the Term Note, dated as of June 28, 2019 (the "<u>NAC Note</u>") made by the Debtors payable to North Avenue, and the Loan Agreement.  The NAC Loan is secured by a security interest in certain collateral of the Debtors pursuant to

---

[6] All facts herein are taken from the Emergency Motion, unless otherwise noted.

security documents ("NAC Security Documents") which include but are not limited to the:

(i) Security Agreement dated as of June 28, 2019 by and between the Debtors and North Avenue

(the "NAC Security Agreement"); (ii) various financing statements ("NAC Financing

Statements"); (iii) Deed of Trust dated June 28, 2019 made by Moon Nurseries, Inc. for the

benefit of North Avenue and recorded among the Land Records of Cecil County, Maryland at

Book 4429, Page 431 ("NAC Deed of Trust"); (iv) Assignment of Rents and Leases dated June

28, 2019 made by Moon Nurseries, Inc. in favor of North Avenue and recorded among the Land

Records of Cecil County, Maryland at Book 4429, Page 449 ("NAC Assignment of Leases and

Rents"); and (v) Intercreditor and Pari Passu Agreement dated as of June 28, 2019 ("Intercreditor

Agreement") by and between North Avenue and Newtek.  The NAC Note, NAC Loan

Agreement, NAC Security Documents, and all other documents evidencing, securing, perfecting,

guarantying, and relating to the NAC Loan are referred to as the "NAC Loan Documents."[7]

      7.     The NAC Loan is partially guaranteed by the United States Department of

Agriculture ("USDA").

      8.     As of the Petition Date, the principal balance, accrued and unpaid interest, and

late charges due and owing under the NAC Loan were collectively $9,965,046.06.

**B.**     **The Newtek Loan Facility**

      9.     Prior to the Petition Date, Newtek extended a term loan to the Debtors in the

principal amount of $5 million (the "Newtek Loan").

---

[7] The DIP Lender asserts that North Avenue's liens are not perfected in Delaware and Pennsylvania. The Court is not ruling on the extent or priority of North Avenue's liens.

10.     The Newtek Loan is evidenced by the Loan Agreement dated June 28, 2019, by

and between the Debtors, the Guarantor and Newtek (the "NewTek Loan Agreement"). The

Newtek Loan is further evidenced by the Term Note dated as of June 28, 2019 (the "Newtek

Note") made by the Debtors payable to Newtek, and the Newtek Loan is secured by a security

interest in certain collateral of the Debtors pursuant to security documents ("Newtek Security

Documents") which include but are not limited to the: (i) certain Security Agreement dated as of

June 28, 2019 by and between the Debtors and Newtek (the "Newtek Security Agreement");

(ii) various financing statements ("Newtek Financing Statements"); (iii) Deed of Trust dated

June 28, 2019 made by Moon Nurseries, Inc. for the benefit of Newtek and recorded among the

Land Records of Cecil County, Maryland at Book 4429, Page 431 ("Newtek Deed of Trust");

(iv) Assignment of Rents and Leases dated June 28, 2019 made by Nurseries in favor of Newtek

and recorded among the Land Records of Cecil County, Maryland at Book 4429, Page 449

("Newtek Assignment of Leases and Rents"); and (v) Intercreditor Agreement.  The Newtek

Note, Newtek Loan Agreement, Newtek Security Documents and all other documents

evidencing, securing, perfecting, guarantying, and relating to the Newtek Loan are referred to as

the "Newtek Loan Documents," and the NAC Loan Documents and Newtek Loan Documents

are collectively referred to herein as the "Loan Documents."[8]

11.     The Newtek Loan is partially guaranteed by the United States Small Business

Administration.

---

[8] The DIP Lender asserts that Newtek's liens may not be properly perfected.  The Court is not ruling on the extent
or priority of Newtek's liens.

12.    As of the Petition Date, the principal balance, accrued and unpaid interest and late charges due and owing under the Newtek Loan were collectively $4,381,938.89.

## C.    The Cash Collateral Order and DIP Loan Facility

13.    Pursuant to the *Final Order Authorizing the Debtor to Use Cash Collateral of Primary Lenders and Granting Adequate Protection for its Use*[9] (the "Cash Collateral Order"), the Term Lenders were granted, as adequate protection for, among other things, the imposition of the automatic stay:

> (1) Replacement Liens on the Debtors' pre and postpetition property that is the type of property to which the Term Loan Lenders' security interests extended before the Petition Date, and proceeds of such property (collectively, the "Term Loan Collateral") in the same priority they had prior to the Petition Date, and (2) to the extent that the Replacement Liens on the Debtors' post-petition Term Loan Collateral are insufficient to protect the Term Lenders' interests, Replacement Liens on the Debtors pre and postpetition accounts receivable (and to the extent not a part of the Term Loan Collateral, the proceeds of such accounts receivable), *pari passu* as between the Term Loan Lenders; provided, however that any Replacement Liens in accounts receivable granted in this paragraph in favor of the Term Loan Lenders shall be subordinate in payment to the Replacement Liens in accounts receivable in favor of Kore and the Internal Revenue Service ("IRS") and the liens granted in to any DIP Lender in the event that the Court grants the Debtor authority to obtain Postpetition Financing.[10]

14.    Pursuant to the Cash Collateral Order and the Final DIP Order, the IRS, KORE Capital Corporation ("Kore") and the DIP Lender were granted liens and/or replacement liens on Term Loan Collateral in second, third and fourth priority, respectively.[11]

---

[9] D.I. 164.

[10] Cash Collateral Order, ¶ 3(b) (North Avenue and Newtek are collectively referred to as the "Term Loan Lenders" in the Cash Collateral Order).

[11] *See* Cash Collateral Order at ¶ 3; Final DIP Order (defined below) at ¶¶ 7 and 10.

15.    Pursuant to the DIP Orders, the Debtors borrowed approximately $8 million from the DIP Lender (the "DIP Loan"),[12] and the DIP Lender was granted a first priority security interest in the Debtors' accounts, accounts receivable, and all assets not subject to the liens of the Term Lenders (other than avoidance actions and their proceeds) (collectively, the "DIP Collateral").

16.    Pursuant to the DIP Orders and the Cash Collateral Order, the DIP Lender, Kore, the IRS, and the Term Lenders hold first, second, third and fourth priority liens and/or replacement liens in the DIP Collateral, respectively.[13]

**D.    Conversion**

17.    On February 9, 2022, this Court entered an order converting Debtors' cases (with the exception of the case of Nurseries) to ones under chapter 7 of the Bankruptcy Code effective as of February 11, 2022.[14]

18.    The Court ordered the appointment of a chapter 11 Trustee for Nurseries on February 18, 2022.[15]

19.    The Trustee closed the operations of Nurseries on March 4, 2022.

---

[12] *See Interim Order Authorizing Debtor-in-Possession Financing* [D.I. 165] (the "Interim DIP Order"), *Final Order Authorizing Debtor-in-Possession Financing* [D.I. 241] ("Final DIP Order" and together with the Interim DIP Order, the "DIP Orders"), and the Cash Collateral Order.

[13] *See* Cash Collateral Order at ¶ 3; DIP Order ¶ 10.

[14] *See Order [Regarding Debtor's Motion Converting Chapter 11 Cases to Cases Under Chapter 7]* (the "Conversion Order"). D.I. 530. The Office of the United States Trustee appointed Don A. Beskrone as chapter 7 Trustee (the "Trustee"). D.I. 541.

[15] *See Notice of Acceptance of Don A. Beskrone of Appointment as Chapter 11 Trustee in the Case of Moon Nurseries, Inc.* D.I. 18 in Case No. 21-1142 (CSS). In his role as both chapter 7 Trustee and/or chapter 11 Trustee, the Court refers to Mr. Beskrone as the "Trustee."

20.     On March 9, 2022, the Trustee filed an emergency motion to convert Nurseries'

case to a case under chapter 7 and authorize the Trustee to abandon certain property of the

estate.[16]

21.     On March 22, 2022, the Court entered an order converting Nurseries' case from

chapter 11 to chapter 7 and authorized the Trustee to abandon certain property of the estates (the

"Initial Abandonment Order").[17]

22.     The Initial Abandonment Order also served to abandon the majority of the Term

Loan Collateral subject to the Term Lenders' first-priority lien.

23.     On July 21, 2022, upon the joint motion by the Term Lenders and the DIP

Lender,[18] the Court entered an order[19] which allowed abandonment of all remaining assets (with

certain exceptions) and granted relief from the automatic stay to the Term Lenders and the DIP

Lender to permit them, "without further notice or order to exercise all of their rights and

remedies consistent with applicable nonbankruptcy law," with respect to their collateral.[20]

---

[16]  *See Emergency Motion of Don A. Beskrone, Trustee, for Entry of an Order (I) Converting the Chapter 11 Case of Moon Nurseries, Inc. to a Case Under Chapter 7, (II) Authorizing the Trustee to Abandon Certain Property of the Debtors' Estates, and (III) Granting Related Relief.* D.I. 572.

[17]  *See Order Granting Emergency Motion of Don A. Beskrone, Trustee, for Entry of an Order (i) Converting the Chapter 11 Case of Moon Nurseries, Inc. to a Case Under Chapter 7, (ii) Authorizing the Trustee to Abandon Certain Property of the Estates, and (iii) Granting Related Relief.* D.I. 607.

[18]  *See Joint Consent Motion of Legalist DIP GP, LLC; North Avenue Capital, LLC; and Newtek Small Business Finance, LLC for Entry of Order (I) Granting Relief from the Automatic Stay and (II) for Abandonment of Property* (the "Joint Motion"). D.I. 655.

[19]  *See Order Granting Joint Consent Motion of Legalist DIP GP, LLC; North Avenue Capital, LLC; and Newtek Small Business Finance, LLC for Entry of an Order (I) Granting Relief from the Automatic Stay, and (II) for Abandonment of Property* (the "Abandonment Order"). D.I. 671.

[20]  Abandonment Order at ¶ 2 and Joint Motion at ¶ 50. The Joint Motion sought to sell the Term "Lenders' Collateral *outside of these bankruptcy proceedings.*" *See* D.I. 655 at ¶ 67 (emphasis added).

7

24.    By the Emergency Motion, the Term Lenders seek this Court's interpretation of the DIP Orders and the Abandonment Order to determine the extent and priority of the liens on the property subject to the Abandonment Order.[21]  In response, the DIP Lender raised the issue of whether the Court has jurisdiction over property that has been abandoned by the Trustee.[22]

**IT IS HEREBY ORDERED THAT:**

25.    The DIP Lender argues that the Court does not have jurisdiction to adjudicate the Emergency Motion because the Term Lenders, who requested abandonment, are now requesting the Court exercise jurisdiction over the abandoned assets.[23]  The DIP Lender contends that secured creditors who chose to liquidate their collateral outside of this Court should not be permitted to come back to this Court when they have a disagreement with another secured creditor regarding how to liquidate their "shared collateral."

26.    The Term Lenders respond that the Court has jurisdiction over "property of the debtor" following abandonment.  They maintain that property abandoned pursuant to 11 U.S.C. § 554 might cease to be a part of the bankruptcy estate but becomes property of the debtor.  The Term Lenders further argue that the Court has "arising under" and "related to" jurisdiction with respect to these abandoned assets.

---

[21]  At the conference, North Avenue argued "we're not asking Your Honor to decide today or to decide as part of the [E]mergency [M]otion . . . who has the senior liens and rights and priorities in the abandoned property" (D.I. 696 (Tr. of Hr'g Sept. 6, 2022; 10:24-11:2)), and "All the rights and claims that belong to the DIP lender as the DIP lender, whether it's senior or junior, they have and they will have . . . all of those issues are really for another day." (*Id.* at 11:7-13).

[22]  The Court is not summarizing the issues set forth in the Emergency Motion, which has not been fully briefed.

[23]  *See* D.I. 685 at p. 4.

27.      The Court disagrees with the Term Lenders.  Although the Term Lenders

maintain that the Court is only being asked to interpret its prior orders,[24] the Court finds that the

relief being sought by the Term Lenders is a determination of the extent and priority of the liens

asserted by the Term Lenders and the DIP Lender.[25]  The Court ordered and granted

"replacement liens" – there was no prior ruling regarding perfection and whether those liens

were indeed proper.  Ultimately, it must be decided if the Term Lenders are adequately

perfected, and, if not, it must be determined who has the first priority lien on the property with

authority to run a sale process.  At bottom, the relief sought by the Term Lenders is a

determination of the extent and priority of the liens, and which of the lenders is entitled to

control the assets.

28.      With the dispute framed, the Court will determine if it has jurisdiction over

abandoned property, whether the Court has "arising under" or "related to" jurisdiction, and, if the

Court does have jurisdiction, whether the Court should abstain from hearing the lenders'

dispute.[26]

**A.      Jurisdiction Over Abandoned Property**

29.      The Term Lenders argue that abandonment of property by the Trustee pursuant to

11 U.S.C. § 544(a) does "not divest this court of jurisdiction to enforce the rights of the debtors .

---

[24] The Court has authority to interpret its own orders.  *Spitfire Energy Group, LLC v. Presidio Petroleum LLC (In re TE Holdcorp, LLC)*, Civ. No. 21-779-CFC, 2022 WL 951553, at *10 (D. Del. Mar. 30, 2022); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195, 2205, 174 L. Ed. 2d 99 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders." (citation omitted)).  Here, however, the request exceeds interpretation of the Orders.

[25] *In re Lyn*, 483 B.R. at 449 ("The plaintiff has the burden of proving the Court's subject matter jurisdiction by a preponderance of the evidence.").

[26] The DIP Lender raised abstention in its initial response to the Emergency Motion; however, the parties did not brief this issue in their supplemental briefs on jurisdiction.

. . ."[27] The Term Lenders site to several cases which provide for retention of jurisdiction after abandonment for exemptions under § 522. For example:

> Generally, a bankruptcy court loses subject matter jurisdiction over property on its abandonment. Abandonment, however, does not divest a bankruptcy court of jurisdiction to enforce the rights of a debtor to claim **an exemption under § 522** of the Bankruptcy Code. A bankruptcy court still has jurisdiction to determine core matters affecting property of the debtor abandoned from the estate, such as enforcing the automatic stay, avoiding liens, or allowing claims of exemptions under provisions of the Bankruptcy Code.[28]

However, here, the Trustee is not claiming an exemption under § 522, and the cases cited are misplaced.

30.   The Court is persuaded by the Seventh Circuit's reasoning in *In re Xonics, Inc.*:

> Suppose A, B, and C claim interests in a pool of oil. If A is a bankrupt, the bankruptcy court could determine the interests of all three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1), because only after identifying the "property" of the estate may the court apportion that property among creditors. But if the estate should disclaim any interest in the pool, only the dispute between B and C would remain. The resolution of that dispute would not affect the creditors of the bankrupt, and there would be no source of jurisdiction. That B and C might also be creditors of the bankrupt would not enlarge the court's power; there is no

---

[27] *Bennett v. Commercial Credit Plan (In re Bennett)*, 13 B.R. 643, 645 (Bankr. W.D. Mich. 1981).

[28] *Maestas v. Old World Constr., Inc. (In re Maestas)*, 497 B.R. 167, 2013 WL 3786719, *1 (10th Cir. BAP (Colo.) 2013) (emphasis added and footnote excluded).

> Abandonment should not be considered a judicial sale of the property. Therefore, when property is subject to a security interest, abandonment does not take the place of a proper foreclosure sale. Even if the secured party is given possession, it will still have to comply with any nonbankruptcy law requirements for sale. Abandonment also should not be considered to divest the court of jurisdiction to enforce the rights of a debtor to claim an exemption under section 522.
>
> . . .
>
> Usually, abandonment of property will end the court's jurisdiction to determine disputes concerning that property, unless the result of the dispute could have some effect on the bankruptcy case.

5 Collier on Bankruptcy ¶ 554.02 (16th 2022) (footnotes excluded).

> jurisdiction to resolve all disputes among creditors of a bankrupt.
> There is jurisdiction under § 157(c)(1) only when the dispute is
> "related to" the bankruptcy -- meaning that it affects the amount of
> property available for distribution or the allocation of property
> among creditors. The bankruptcy jurisdiction is designed to
> provide a single forum for dealing with all claims to the bankrupt's
> assets. It extends no farther than its purpose. That two creditors
> have an internecine conflict is of no moment, once all disputes
> about their stakes in the bankrupt's property have been resolved.[29]

Abandonment is not considered a transfer of property but rather a reversion. Once the Trustee

abandoned the property, it reverted back to the appropriate Debtor as of the Petition Date, thus

all liens and rights in the property will be determined as against the appropriate Debtor and not

as to the estate being administered by the Trustee.[30]

31.    As a threshold issue, the Court must decide what impact, if any, a judgment in

favor of the Term Lenders has on the bankruptcy estate.[31] If the Court retains jurisdiction, the

Emergency Motion requires the Court to determine the amount and priority of the liens on the

abandoned property relative to other lenders. The property would still be outside the bankruptcy

estates. The Debtors' estates would derive no benefit from such determination. The only

beneficiary of such determination would be the Term Lenders or the DIP Lender, all non-debtor,

---

[29] *Elscint, Inc. v. First Wisconsin Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 131 (7th Cir. 1987) (citations omitted). *See also Samson Res. Co. v. Valero Mktg. & Supply Co.*, 449 B.R. 120, 125 (D.N.M. 2011) (holding that "the bankruptcy court lacks related jurisdiction to resolve controversies between third party creditors which do not involve the debtor or his property unless the court cannot complete administrative duties without resolving the controversy." (citations omitted)).

[30] *See Wells Fargo Bank, N.A. v. 1401 Condo. Ass'n*, No. CIV.A.CPU4-13-002536, 2015 WL 1730932, at *2 (Del. Com. Pl. Mar. 24, 2015). As held by Judge Gross in *In re Lyn*:

> By operation of law, abandoned property is no longer property of the estate.
> The debtor's interest in the property is restored *nunc pro tunc* as of the petition
> date. Abandoned property is removed from the bankruptcy estate, "divesting the
> trustee of control over that property and divesting the Court of jurisdiction over
> matters concerning the abandoned property." The debtor holds abandoned
> property as if no bankruptcy had been filed.

*In re Lyn*, 483 B.R. at 451 (citations omitted).

[31] *See In re Lyn*, 483 B.R. at 451.

third parties. As argued by the Term Lenders, the only possible impact on the Debtors' estates

would be a potential change in the amount of the lenders' deficiency claims, which will be

discussed below.[32]

32. Because abandonment has the "effect of removing property from the bankruptcy

estate, the Court's jurisdiction – or lack thereof – is a primary and necessary question."[33]

Therefore, the Court will determine whether it has "arising under" or "related to" jurisdiction

over this dispute.

**B.      Arising Under/Related To Jurisdiction**

33. The Term Lenders argue that this Court has jurisdiction as the dispute "arises

under" title 11 and is "related to" these cases.

34. The Court agrees with the DIP Lender that the relative lien priorities of the parties

is governed by the Uniform Commercial Code and not the Bankruptcy Code.[34] Consequently,

this dispute does not "arise under" title 11.

35. The Court next turns to "related to" jurisdiction. The Term Lenders assert that

there is "related to" jurisdiction because their deficiency claim will be determined by the sale

price of the abandoned assets.

---

[32] *In re Formica*, No. 20-23404-ABA, 2021 WL 1921842, at *10 (Bankr. D.N.J. May 12, 2021) (holding that that "bankruptcy court loses jurisdiction over a validity/priority/extent lien issue on property when that property has been abandoned.").

[33] *In re Wilton Armetale, Inc.*, 618 B.R. 424, 436 (Bankr. E.D. Pa. 2020).

[34] *Maxwell v. HSBC Mortgage Corp. (USA) (In re Maxwell)*, No. 10-79479-CRM, 2012 WL 3678609, at *2 (Bankr. N.D. Ga. Aug. 22, 2012) ("Plaintiff seeks declaratory relief to determine the validity or extent of Defendant's lien or interest in property. This is not a cause of action created by the Bankruptcy Code and does not arise only in bankruptcy proceedings. Indeed, actions to determine the validity or extent of liens can and do exist outside the bankruptcy context.").

36.    "An action is related to bankruptcy if the outcome could alter the debtor's rights,

liabilities, options, or freedom of action (either positively or negatively) and which in any way

impacts upon the handling and administration of the bankrupt estate."[35]  In this instance, the only

impact to the estate (and the only impact articulated by the Term Lenders) is the amount of the

Term Lenders' deficiency claim, which will tangentially affect the aggregate amount of general

unsecured claims, and any resulting distribution.

37.    The Court finds that the amount of the deficiency claim, if any, does not impact

the administration of the Debtors' estates.  The sale of the abandoned property simply liquidates

the amount of the Term Lenders' claim and is not determinative of liability, which was

established in prior orders of the Court.  Once the amount of any deficiency claim is determined,

the aggregate value of general unsecured claims will be fixed, and distributions made, if

appropriate.  The amount of the deficiency claim does not impact estate administration, but the

amount of distributions.  Consequently, the Debtors' rights, options, liabilities, and freedom of

action will not be affected by liquidating the amount of the Term Lenders' deficiency claim.

38.    "Because abandoned property is no longer property of the estate, once a property

is abandoned by the Trustee, the court lacks 'related to' subject matter jurisdiction over claims

concerning such property."[36]  Furthermore, "[t]he Court also notes that its conclusion regarding

lack of subject-matter jurisdiction is consistent with the decisions of other courts which have

---

[35] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

[36] *Rothman v. Wells Fargo Bank N.A.*, No. CV 20-436 (RBK), 2020 WL 5626992, at *4 (D.N.J. Aug. 18, 2020) (citations, modifications, and internal quotation marks omitted).

declined to exercise jurisdiction to hear challenges to *in rem* claims when the underlying

collateral had been abandoned from the bankruptcy estate."[37]

## C.    Abstention

39.    Even if, the Court has "related to" jurisdiction over this dispute, the Court must

then consider whether abstention is appropriate under § 1334(c)(1):

> The Third Circuit has identified twelve factors when considering
> whether permissive abstention is appropriate. These factors include
> the: (1) effect or lack thereof on the efficient administration of the
> estate, (2) extent to which state law issues predominate over
> bankruptcy issues, (3) difficulty or unsettled nature of the
> applicable state law, (4) presence of a related proceeding
> commenced in state court or other non-bankruptcy court,
> (5) jurisdictional basis, if any, other than 28 U.S.C. § 1334(c)(1),
> (6) degree of relatedness or remoteness of the proceeding to the
> main bankruptcy case, (7) substance rather than form of an
> asserted "core" proceeding, (8) feasibility of severing state law
> claims from core bankruptcy matters to allow judgments to be
> entered in state court with enforcement left to the bankruptcy
> court, (9) burden of the court's docket, (10) likelihood that the
> commencement of the proceeding in a bankruptcy court involves
> forum shopping by one of the parties, (11) existence of a right to a
> jury trial, and (12) presence in, the proceeding of non-debtor
> parties.  The Court's analysis of the relevant factors "'is not a
> mathematical formula.'"[38]

Here, the Court is instructed by the following facts: (i) state law issues predominate, (ii) there is

remoteness from the main case, (iii) the parties are non-debtors, and (iv) there is a lack of

bankruptcy issues in determining the amount and priority of each of the lenders' liens.  So that

*even if* the Court has "related to" jurisdiction, the Court will permissively abstain from hearing

this dispute.

---

[37] *Scott v. U.S. Bank, N.A. (In re Scott)*, 607 B.R. 211, 224 (Bankr. W.D. Pa. 2019).

[38] *Wallen v. Tauren Exploration, Inc. (In re Cubic Energy, Inc.)*, 603 B.R. 743, 755 (Bankr. D. Del. 2019) (footnotes and citations omitted).

## CONCLUSION

As set forth above, the Court does not have jurisdiction over the abandoned property, the dispute does not "arise under" the Bankruptcy Code, and the dispute is not "related to" these cases. Furthermore, *even if*, the Court has "related to" jurisdiction, the Court will permissively abstain from hearing this dispute.

BY THE COURT:

J. Kate Stickles
United States Bankruptcy Court

Dated: September 19, 2022